**Exhibit A**

# In The Matter Of:

*Janice Scott v.*

*The Charter Oak Fire Insurance Company*

---

*Janice Scott*

*July 28, 2021*

*Part 1 (7-28-21) Part 2 (8-10-21)*

---

# WSG Reporting, LLC

## Certified Court Reporting & Video

wsgreporting.com
3430 Heartwood Lane  •  Atlanta, GA 30340
office@WSGreporting.com  •  (770) 367-7822

*Original File 0728-0810Scott-MLowe.txt*

*Min-U-Script® with Word Index*

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4

5    JANICE SCOTT,

6         Plaintiff,                      Civil Action
                                          File No.
7    vs.                                  1:20-cv-4420-TWT

8    THE CHARTER OAK FIRE
     INSURANCE COMPANY,
9
          Defendant.
10   _____

11

12

13

14          REMOTE DEPOSITION OF JANICE SCOTT

15          July 28, 2021, and August 10, 2021

16                    10:00 a.m.

17                  Atlanta, Georgia

18

19

20         Michelle R. Lowe, RPR, CCR-2748

21    *****************************************

22               WSG REPORTING, LLC
                3430 Heartwood Lane
23            Atlanta, Georgia 30340
                 (770) 367-7822
24            office@WSGreporting.com

25

```
1   REMOTE APPEARANCE OF COUNSEL:

2   On behalf of the Plaintiff:

3           RALPH VILLANI

4           Attorney at Law

5           VILLANI LAW FIRM

6           821 Dawsonville Hwy

7           Suite 250-333

8           Gainesville, Georgia  30501

9           770-985-6773

10          ralphjvillani@gmail.com

11

12  On behalf of the Defendant:

13          KAREN K. KARABINOS

14          Attorney at Law

15          DREW, ECKL & FARNHAM, LLP

16          303 Peachtree Street, NE

17          Suite 3500

18          Atlanta, Georgia  30303

19          404-885-6313

20          karabinosk@deflaw.com

21

22  Also Present:

23          Sari Marmur

24

25
```

```
 1                 INDEX OF EXHIBITS
 2    For the Defendant:
 3    EXHIBIT      DESCRIPTION                    PAGE
 4    Exhibit 1    Plaintiff's documents            33
 5    Exhibit 2    October 12, 2018, letter         72
 6    Exhibit 4    Office of Insurance and Safety  187
 7                 Fire Commissioner Complaint
 8    Exhibit 5    Check notification letter        79
 9    Exhibit 6    November 9, 2018, letter         89
10    Exhibit 7    December 13, 2018, letter       142
11    Exhibit 10   Diagram                          65
12    Exhibit 11   Complaint for Damages and Demand 174
13                 for Jury of Twelve
14    Exhibit 12   Plaintiff's Initial Disclosures 181
15    Exhibit 13   Plumbing invoices               120
16
17                      *  *  *
18
19
20
21
22
23
24
25
```

1                    I N D E X

2                                                      PAGE

3   July 28, 2021                                         1

4   August 10, 2021                                     117

5

6

7   Examination by Ms. Karabinos:                         7

8   Examination by Mr. Villani:                         192

9   Further Examination by Ms. Karabinos:               228

10  Further Examination by Mr. Villani:                 234

11

12                       *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              DEPOSITION OF JANICE SCOTT

 2                   JANICE SCOTT,

 3   being first duly sworn or affirmed to testify to the

 4   truth, the whole truth, and nothing but the truth,

 5   was examined and testified as follows:

 6              MS. KARABINOS:  Let the record reflect

 7   that this is the deposition of the plaintiff, Janice

 8   Scott, taken for the purposes of discovery and for

 9   all purposes permitted under the Federal Rules of

10   Civil Procedure.  This deposition is being taken at

11   the date, time, and place pursuant to notice and

12   agreement of counsel.

13              Ralph, I propose that we enter into the

14   usual stipulations that all objections be reserved

15   until the time of the use of the transcript, except

16   for the form of the question and the responsiveness

17   of the answers.  Is that okay with you?

18              MR. VILLANI:  It is.  And I forgive --

19   forgive me every once in a while I'll get a senior

20   moment or passion will flow up and I'll violate

21   that.  But for the most part -- and I try to when I

22   do an objection -- I would ask counsel to do that --

23   Karen, ask you to do that -- if there's an objection

24   to the form of a question, I will state what the

25   objection is, the form, you know, evidence -- facts
```

1   not in evidence or confidential information,

2   attorney-client privilege.  And then this way it

3   will give you time to cure it during the deposition

4   instead of going to a long, drawn-out federal

5   hearing -- and you know how long and drawn-out they

6   can be -- explaining what your -- why that part of

7   the testimony should be stricken.  This way we'll

8   have a -- go in there with a clean deposition.

9           MS. KARABINOS:  I agree with that as to

10  objections regarding form.

11          May we will also stipulate as to the

12  qualifications of the court reporter and waive all

13  formalities, such as taking, transcribing, and

14  signing of the -- and filing of the deposition.

15          MR. VILLANI:  Sure.  I mean, I'm sure

16  Miss Lowe is a certified court reporter and able to

17  do this, otherwise you wouldn't have hired her.

18          MS. KARABINOS:  That is true.

19          MR. VILLANI:  And the other thing is my

20  client would like to read and sign.  She wants to

21  reserve the right.

22          And, Miss Scott, what that means is that

23  you're allowed to get a copy of -- I guess because

24  of COVID they will e-mail you a electronic copy of

25  your deposition with an errata sheet, which means

1  errors, and you go through it.  If on a line, you

2  say, what color was that light when you went through

3  it -- oh, it was red.  And you say, oh, no, I meant

4  green.  And so you change the light was green and

5  you put a reason under there, I didn't understand

6  the question, or one of the kids ran in the room at

7  the time and I shushed them out and I didn't hear

8  the question.

9           Okay?

10          THE WITNESS:  Okay.

11          MS. KARABINOS:  Okay.  Great.  Thank you

12  very much.

13      EXAMINATION BY COUNSEL FOR THE DEFENDANT

14  BY MS. KARABINOS:

15      Q   Miss Scott, as I indicated before we got

16  started, I am counsel of record for Charter Oak.

17  That is the defendant in the lawsuit that you have

18  filed.  And I'm here today to ask you some questions

19  regarding the nature of your lawsuit against Charter

20  Oak, the facts upon which that lawsuit is based.

21          So we're going to be here for a little

22  while today.  Anytime that you want to take a break,

23  just let me know.  All I ask is that if there is a

24  question that's pending that you do answer the

25  question before we take a break.  Is that okay?

1        A    Okay.

2        Q    All right.  And I know we're doing this

3    virtually.  So if at any time you don't understand

4    my question because maybe your Internet has gone

5    out -- because I've had that happen several times

6    over the last 18 months -- or I speak too fast or

7    for whatever other reason you don't understand my

8    question, please just say, hey, Karen, I didn't

9    understand your question.  I'll be glad to rephrase

10   my question until you feel comfortable enough in

11   responding.  Okay?

12       A    Okay.

13       Q    Okay.  Great.  One of the things that

14   we're going to be doing is the court reporter is

15   going to take down everything that you and I say

16   today; so it's very important that you give verbal

17   responses.  So if you shake your head up or down,

18   I'm going to ask you if that's a yes or no.  I'm not

19   trying be rude, but I want to make sure that the

20   court reporter accurately reflects your response and

21   I too understand what your response is.  Okay?

22       A    Okay.

23       Q    And if you say, uh-huh or uh-uh, I'm going

24   to do the exactly same thing.  Okay?

25       A    Okay.

```
 1        Q    It's kind of hard sometimes when you're

 2   being deposed on a matter that you know a lot about.

 3   And you will probably know the answer to my

 4   question, before I get the question all the way out.

 5   But Michelle, our court reporter, doesn't know what

 6   that question is.  So if you'd be so kind to wait to

 7   answer my question until I finish it and then you

 8   can answer.  And I, in turn, will try to wait until

 9   you finish your answer, before I ask my next

10   question.  Okay?

11        A    All right.

12        Q    Great.

13             Now, at any time during the deposition, if

14   you hear something, you see something, or maybe you

15   just remembered something after I'd already asked

16   that question, let me know and I'll be glad to allow

17   you to put that information on the record.  Okay?

18        A    Okay.

19        Q    Okay.  Great.

20             All right.  Let's go ahead and get started

21   with your deposition then after getting all of those

22   instructions out of the way.

23             Could you give us your full name for the

24   record.

25        A    Janice C. Scott.
```

1     Q    And what does the C. stand for?

2     A    Cassandra.

3     Q    Can you spell that for us.

4     A    C-A-S-S-A-N-D-R-A.

5     Q    Okay.  And in preparation for your

6 deposition today, did you review any documents?

7     A    Yes.

8     Q    What documents did you review?

9     A    I reviewed the documents that the lawyer

10 had put together.

11     Q    And can you identify what those documents

12 were?

13     A    I don't have them right in front of me.

14     Q    Generally what were the documents?

15     A    It was everything pertaining to this case.

16     Q    Was it a copy of the complaint?

17     A    Yes.

18     Q    Was there a copy of any other pleadings

19 that had been filed with the court?

20     A    No.

21     Q    During this case your attorney,

22 Mr. Villani, has produced certain documents to us.

23 Did you produce the stack of documents that y'all

24 have produced to us?

25     A    Yes.

1     Q    Okay.  Other than the complaint and those

2   stack of documents, were there any other documents

3   that you have reviewed?

4     A    No.

5     Q    Okay.  Besides your attorney, have you

6   discussed this case with anybody else in preparation

7   for your deposition?

8     A    No.

9     Q    What about Mr. Bruce Fredrics?

10    A    I've not discussed with him lately while

11  I'm trying to get ready for the deposition.  It's

12  been a while since I talked to Bruce.

13    Q    When was the last time that you spoke with

14  Mr. Fredrics?

15    A    I'm not sure.

16    Q    Is there anybody currently in your home

17  with you today while we're taking this deposition?

18    A    Not at this moment, no.

19    Q    Do you expect anybody to arrive today?

20    A    My daughter may come back early.  I don't

21  know what time she'll be back.

22    Q    Okay.  And for the record, what's your

23  daughter's name?

24    A    Sandra Scott.

25    Q    And is it S-A-N-D-R-A?

1        A     Yes.

2        Q     Okay.  And does she reside with you?

3        A     Yes.

4        Q     How long has she lived with you at the

5    Foote Street address?

6        A     This time -- the last time she moved out.

7    She's here -- she moved back about four years ago.

8        Q     Four years ago?

9        A     Yes.

10       Q     We're here about a lawsuit that you filed

11   against Charter Oak regarding some water and mold

12   damage; is that correct?

13       A     Correct.

14       Q     And what is the date of loss that you

15   believe that the water and mold damage occurred?

16       A     September the 29th of 2018.

17       Q     Around that date was your daughter, Sandra

18   Scott, residing with you?

19       A     Yes.

20       Q     Was anybody else besides you and your

21   daughter living there?

22       A     Her children:  Nehemiah Johnson and

23   Christian Johnson.

24       Q     Okay.  Neal Minor Johnson?  Is that what

25   you said?

```
 1        A     Nehemiah.

 2        Q     Can you spell that for me.

 3        A     N-E-H-E-M-I-A-H.

 4              MR. VILLANI:  Like in the Bible.

 5              MS. KARABINOS:  Okay.  Gotcha.

 6   BY MS. KARABINOS:

 7        Q     And Chris Johnson, are those your

 8   grandchildren?

 9        A     Christian Johnson, yes.

10        Q     How old are they?

11        A     12 and 14 now.  Nehemiah is 14; Christian

12   is 12.

13        Q     Thank you.  I was just going to ask that.

14              So they were 9 and 11 at the time of the

15   loss; is that correct, give or take?

16        A     Yes.

17        Q     All right.  What, if anything, does your

18   grandchildren have knowledge of regarding the leaks

19   and the mold that we're here about?

20        A     Nothing.  Nothing that I know of.

21        Q     Okay.  What about your daughter?

22        A     She -- I'm not sure if she know anything

23   about the leak.

24        Q     Okay.  So was she -- did she observe where

25   water was leaking?
```

1       A    I'm not sure.

2       Q    Okay.  Did she observe any of the mold?

3       A    No.

4       Q    All right.  So you currently are still

5  living at the Foote Street address in Atlanta,

6  Georgia; is that correct?

7       A    Yes, ma'am.

8       Q    How long have you lived there?

9       A    We built this house in 1988; so about 33

10 years.

11      Q    Okay.  And prior to 1988, where did you

12 live?

13      A    I lived then in the Edgewood Court

14 Apartments.

15      Q    Edgewood Court?

16      A    Yes.

17      Q    And how long did you live there?

18      A    I don't remember.  It's been a while.

19      Q    Yeah.  Well, if you've been 33 years at

20 the current place, yeah, it has been a while.

21           Have you ever been married?

22      A    Yes.

23      Q    Are you still married?

24      A    No.

25      Q    How did that marriage end?

1        A     Divorce.

2        Q     And what was the name -- who was your

3   spouse?

4        A     James Scott.

5        Q     And when did you and Mr. Scott divorce?

6        A     In 1975.

7        Q     In what county?

8        A     I'm sorry.  '95.

9        Q     And in what county did y'all divorce?

10        A     DeKalb County.

11        Q     Have you ever remarried?

12        A     No.

13        Q     Other than Sandra Scott, do you have any

14   other children?

15        A     I do.

16        Q     And what are their names and ages?

17        A     Yolanda -- what's her new last name?  Oh,

18   God, I forgot her name.  She recently got married;

19   so I don't remember her last name.

20        Q     Okay.

21        A     Yolanda is -- she was born in '75; so she

22   was -- she's 46.

23        Q     Okay.  And where does she live?  Just give

24   me the county.

25        A     DeKalb County.

1    Q    Okay.  And do you have any other children?

2    A    Samuel Scott.

3    Q    And how old is Samuel?

4    A    42.

5    Q    And what county does he live in?

6    A    I'm not sure.

7    Q    Okay.  And then any others?

8    A    Michael Scott.

9    Q    And where -- how old is Michael?

10    A    He's 40.

11    Q    And where does -- what county does he live

12  in?

13    A    I don't know.

14    Q    Does both Michael and Samuel reside in

15  Georgia?

16    A    As far as I know, they do.

17    Q    If you would, tell me a little bit about

18  your educational background, starting with high

19  school.  Did you graduate from high school?

20    A    Yes.

21    Q    Which high school was that?

22    A    Frederick Douglas.

23    Q    And what year was that?

24    A    1975.

25    Q    Did you go on to attend college or any

1    trade or technical schools?

2        A    I went to -- I went and trained for

3    nursing assistant at the Jewish Home.  Then I

4    went -- then I went to be a mom for a while, then I

5    went back to work.  I went to school at Georgia

6    Medical Institute, became a medical assistant.  I

7    went to Clayton State.

8                MR. VILLANI:  Say that one more time,

9    Janice.

10               THE WITNESS:  Excuse me?

11               MR. VILLANI:  That last thing you just

12   said.  I didn't hear that.

13               THE WITNESS:  I went to Clayton State.

14               MR. VILLANI:  What state?

15               MS. KARABINOS:  Clayton State University.

16               MR. VILLANI:  Thank you.  My audio is

17   going in and out again.

18   BY MS. KARABINOS:

19       Q    Did you obtain a degree from Clayton

20   State?

21       A    No.  I didn't finish.  I went -- no.  I

22   didn't finish.

23               (Off-the-record discussion.)

24   BY MS. KARABINOS:

25       Q    And what is your current occupation,

1    Miss Scott?

2        A    I'm not working now.

3        Q    Okay.  How long have you not been working?

4        A    Since 2017.

5        Q    Okay.  And what prompted you to stop

6    working in 2017?

7        A    In 2016 I had surgery on my left foot.  I

8    had screws in it -- I have screws in it right now.

9    They had to redo the surgery and I -- they had to

10   redo it in '17.  I was in a car accident in '17 and

11   got a bad back injury.  And since then I've been on

12   disability.

13       Q    Is the disability that you are

14   receiving -- is that with the Social Security

15   Administration or --

16       A    Yes.  And long-term.

17       Q    Okay.  And long-term disability from your

18   employer?

19       A    Yes.

20       Q    Who's your long-term disability with?

21       A    Sun Life.

22       Q    Okay.  And how much do you receive per

23   month from that?

24       A    $506.

25       Q    And from the Social Security

```
1    Administration for your disability?  How much do you
2    receive on that?
3             MR. VILLANI:  Janice, your previous
4    response was Sun Life?
5             THE WITNESS:  Yes, sir.
6             MR. VILLANI:  How much was that?
7             THE WITNESS:  $506.
8             MR. VILLANI:  506.  Okay.  Did you say how
9    much you received from the SSDI?
10            MS. KARABINOS:  No.  She was a about to
11   answer that question.
12            MR. VILLANI:  Go ahead.
13      A    $1,312.
14   BY MS. KARABINOS:
15      Q    How long have you been receiving the
16   Social Security Administration benefits?
17      A    It was approved in December of '17.
18      Q    And is that for a permanent disability?
19      A    Yes, ma'am.
20      Q    Other than those two sources of income, do
21   you have any other income coming into your home?
22      A    No.
23      Q    Who were you employed with in 2017 when
24   you quit working?
25      A    North Fulton Neurology.
```

```
1        Q    Was there a particular office that you
2   went to?
3        A    That was the office.
4        Q    Okay.  And where was that located?
5        A    Roswell, Georgia.
6        Q    And was that connected to North Fulton
7   Hospital?
8        A    No.
9        Q    Okay.  It was separate?
10       A    Separate.
11       Q    How long had you worked there?
12       A    12 years.
13       Q    Okay.  Do you have any education or
14  training in plumbing?
15       A    No.
16       Q    How about water mitigation or mold
17  mitigation?
18       A    No.
19       Q    Besides the case that we're here about
20  that you filed against Charter Oak, have you ever
21  filed another lawsuit against anyone or any company?
22       A    Yes.
23       Q    And what -- what lawsuits were those?
24       A    Car accident.
25       Q    Okay.  And who did you sue?
```

1      A    I don't recall the name or the company.

2      Q    Okay.  And was it the employer of the

3  person that hit you?

4      A    Yes.  I believe it was their insurance.

5      Q    Okay.  You sued the insurance company.

6           Do you remember what court that was filed

7  in?

8      A    No.  It didn't go to court.  Mediation.

9      Q    Did you ever file suit?  You actually

10 filed lawsuit against the -- for the car accident?

11     A    I had an attorney that took care of that.

12     Q    You don't recall in which county or what

13 court that lawsuit was filed?

14     A    I'm not sure which county that lawsuit was

15 filed in.

16     Q    Okay.  And did the case settle in the

17 mediation?

18     A    Yes.

19     Q    And when did it settle?

20     A    Last year.

21     Q    Okay.  And how much was the settlement?

22          MR. VILLANI:  I object to requesting that.

23 That has nothing to do with the case and it's beyond

24 the scope of discovery, I believe.

25          MS. KARABINOS:  Are you directing her not

1    to answer that?

2            MR. VILLANI:  I'm putting my objection on

3    the record.

4    BY MS. KARABINOS:

5        Q    Okay.  Subject to that objection,

6    Miss Scott, you can answer that.

7        A    Excuse me.  What was your question again?

8        Q    How much did you settle for?

9        A    37,000.

10       Q    Any other lawsuits that you've previously

11   filed?

12       A    No.

13       Q    Okay.  Prior to your employment with North

14   Fulton Neurology, where did you work?

15       A    That's been so long.  I don't remember.

16       Q    What was your position at North Fulton

17   Neurology?  Were you a medical assistant?

18       A    Yes.

19       Q    All right.  So we talked about that you

20   had purchased the property back in 1988; is that

21   correct?

22       A    Yes.

23           MR. VILLANI:  I object to the form of the

24   question, because she said -- she didn't say that

25   she purchased the property.

```
 1              MS. KARABINOS:  That's true.

 2              You said you lived there.

 3              That's right.  You're right.

 4   BY MS. KARABINOS:

 5       Q    Did you purchase the property in 1988?

 6       A    Yes.

 7       Q    Okay.  And from whom did you purchase the

 8   property?

 9       A    Habitat for Humanity.

10       Q    And if I understand correctly, in the

11   Habitat for Humanity home you would have paid a

12   monthly mortgage to that organization until you paid

13   that off; is that correct?

14       A    Right.

15       Q    How much were your monthly payments?

16       A    318.

17              MR. VILLANI:  Can you please repeat that,

18   Miss Scott.

19              THE WITNESS:  318.

20              MR. VILLANI:  $318.  Sorry.  My audio is

21   going in and out.  I do apologize, Counsel and Madam

22   Court Reporter.

23              THE WITNESS:  It's okay.

24   BY MS. KARABINOS:

25       Q    Have you since paid off that mortgage?
```

1      A      Yes.

2      Q      When did you pay it off?

3      A      2017.

4      Q      Do you have -- currently have any other

5    mortgages on the property?

6      A      No.

7      Q      Now, since you purchased the property in

8    1988, did you have any what I would call home

9    warranty companies that would come and make repairs

10   to your home, if need be?

11     A      Yes.

12     Q      And what was the name of the company that

13   you have obtained a home warranty from?

14     A      Total Protection.

15     Q      Say that again?

16     A      Total Protect.

17     Q      Okay.  Any others?

18     A      No.

19     Q      Have you ever had a home warranty with

20   HomeServe?

21     A      HomeServe is the water line -- the water

22   line service.

23            MR. VILLANI:  Can you repeat that,

24   Miss Scott.

25            THE WITNESS:  HomeServe is the water line

1   service that covers my water lines.

2   BY MS. KARABINOS:

3        Q    And when did you first get a home warranty

4   with HomeServe?

5        A    I'm not sure the date, ma'am.

6        Q    Do you currently have a home warranty with

7   them?

8        A    Yes.

9        Q    And when's the last time you've used or

10  called HomeServe to your home?

11       A    The last time I used them was when the

12  pipe burst back in 2018.

13       Q    You called them and they came out to your

14  home?

15       A    They did.

16       Q    Okay.  What did they observe?

17            MR. VILLANI:  I would object to the form

18  of the question.  She doesn't know what people see.

19  And many times people -- when they see something,

20  they don't even know what they're seeing.  So I

21  would object to the form.

22  BY MS. KARABINOS:

23       Q    Did you have any conversations with them

24  about what they observed?

25       A    No.

1        Q     Did they tell you what was wrong?

2        A     Yes.

3        Q     What did they tell you?

4        A     They told me they seen a leaky pipe.

5        Q     Where?

6        A     One was in the wall between the kitchen

7    and the bathroom.

8        Q     And the other?

9        A     One behind the bathtub.

10       Q     Do you have any records regarding their

11   visits after the pipe burst in 2018?

12       A     I do, but I don't have it in front of me.

13       Q     Okay.  Do you have that there at your

14   home?

15       A     Yes.

16       Q     Okay.  Can we go off the record for you to

17   get that document, please.

18       A     Okay.

19             (Off-the-record discussion.)

20             THE WITNESS:  I'm sorry.  When -- when

21   HomeServe come out, they just come out.

22   BY MS. KARABINOS:

23       Q     Miss Scott, do you have any contact

24   information for HomeServe?

25             MR. VILLANI:  I think she's on her laptop.

1   That's why you're looking at the ceiling.  She

2   probably opened her laptop to look.

3            THE WITNESS:  Hold on.

4            MS. KARABINOS:  Take your time.

5            MR. VILLANI:  Miss Scott, did you hear her

6   question?  She wanted to know if you had any contact

7   information for HomeServe?

8            THE WITNESS:  I'm looking for it now.  I'm

9   trying to find it right now.

10           MS. KARABINOS:  Okay.  Take your time.

11           MR. VILLANI:  Counsel, I think we gave you

12  contact information during discovery.

13           MS. KARABINOS:  No.  I did not have

14  anything for HomeServe.  And we've tried to send a

15  nonparty RPD to HomeServe based on the information

16  from the Secretary of State's Office and Secretary

17  of State registered agent says that they no longer

18  are registered agents for HomeServe.  So we have not

19  been able to procure any information from HomeServe.

20           MR. VILLANI:  I'm sorry about that.

21           I got the same thing with a trucking

22  company.  The registration is out in Savannah.  And

23  we had the sheriff go there about three or four

24  times and knock on the door.  He says, I don't --

25  I'm no longer a registered agent.

1          But the secretary said, you're the

2     registered agent.

3          A     The phone number I have for HomeServe is

4     1-877-444-7750.

5     BY MS. KARABINOS:

6          Q     And what are you looking at there,

7     Miss Scott, to provide us with that information?

8          A     This is a letter for a renewal service.  I

9     don't have the current one with me, but this one is

10    dated March 4th of '20.

11         Q     All right.  Did individuals with HomeServe

12    come out to your property in 2018 when the pipe

13    burst?

14         A     Yes.

15         Q     Okay.  What month did they come out?

16             MR. VILLANI:  I'm sorry, Counsel.

17             Miss Scott, can you get all of the

18    paperwork you have from HomeServe -- I don't care if

19    it's a letter, a little scrap of piece of paper

20    where you had a note about it -- put that together.

21    Give it to me; so I can make sure that Karen has it,

22    please, Miss Scott.

23             THE WITNESS:  Okay.  I'll get it out to

24    you.  I'll fax it to you.

25             MR. VILLANI:  Don't get it today while

1   you're on deposition.  That's okay.

2          MS. KARABINOS:  That's okay.  I was making

3   a list, Ralph.  You knew exactly what I was going to

4   be asking for; so thank you.

5   BY MS. KARABINOS:

6      Q    And the last time they came out was in

7   2018; is that right, Miss Scott?

8      A    Yes.

9      Q    And what month was it?

10     A    They came out October 1st.

11     Q    Okay.  All right.  And did they tell you

12  what was causing the leak that was between the

13  kitchen and the bathroom and the one behind the

14  bathtub?

15     A    What was causing it?

16     Q    Yes.

17     A    What do you mean?

18     Q    Was it a burst where the pipe actually

19  burst?  Was it just a screw that was unloose?  What

20  was it?

21     A    The pipe burst.  I have the polybutylene

22  pipes.

23     Q    Okay.  What did they recommend?

24     A    They be -- that they be fixed.  They fixed

25  the pipe.

1    Q    Did they suggest that you have all the

2    polybutylene pipe in your home replaced?

3    A    No.  They just fixed it.  They didn't say

4    anything about replacing them.

5    Q    Has anybody, an individual or a company,

6    ever told you that you need to have all the

7    polybutylene pipe in your home replaced?

8    A    No.

9    Q    How much did you pay for the repair for

10   that pipe?  Let me ask:  Was it one pipe or two

11   pipes that burst?

12   A    It was --

13        MR. VILLANI:  Counsel, I object to the

14   form of the question, because we have two different

15   claim dates.  I think one is 9/29; the other one is

16   around 9/5.

17        MS. KARABINOS:  I'm going to object.  She

18   testified earlier that the only date of loss upon

19   which this lawsuit was based is September 29th of

20   2018.  That's what she testified to.

21        MR. VILLANI:  I'm sorry?

22        THE WITNESS:  Excuse me?

23        MS. KARABINOS:  You testified when I asked

24   you earlier about the date upon which you have filed

25   this lawsuit against Charter Oak for the damages was

1   September 29th, 2018.  That's what you testified

2   earlier this morning.

3          MR. VILLANI:  Yeah.  But you didn't ask

4   her if that was the only thing.  I'm going to

5   object, because in the complaint it mentions two

6   dates.

7          MS. KARABINOS:  Okay.  I'm going to object

8   too.  You know, do not instruct your witness about

9   what she should be testifying to.  If you need to

10  clarify, you can do that in redirect.

11         MR. VILLANI:  You're right.  I do

12  apologize.

13  BY MS. KARABINOS:

14     Q    Okay.  So, Miss Scott, earlier today you

15  testified that the date that the water leak occurred

16  was on September 29th, 2018; is that correct?

17     A    I had one before that, but I don't

18  remember -- I'm not sure how to answer this

19  question.

20     Q    Okay.  So let's go back.

21         What was the first date that you had a

22  water leak in your home?

23         MR. VILLANI:  I object to the form of the

24  question.  Are you talking about the first date

25  that's in the lawsuit or the first date that she

1    ever had a leak?  So please clarify, Karen.

2    BY MS. KARABINOS:

3        Q    I'm going to go back and see if I can

4    refresh your memory.  And we're going to go back to

5    the very first time that you had any water leak at

6    your home.  Okay?  Regarding the pipes at your

7    house.  Do you recall the very first time that you

8    had a water leak?

9        A    I had a pipe burst -- I'm not exactly sure

10   what year it was.  That was behind my refrigerator

11   that bust.  It was, like, 5:00 in the morning.  It

12   bust and the fire department came and helped me

13   squeegee out the water.  Once that happened, I --

14   once -- because it was 5:00 in the morning, I did

15   not call HomeServe until after daylight.  Maybe 8:00

16   I called them, but at 5:00 in the morning the best

17   thing I thought to do was to call the fire

18   department to help me to get the water shut off.

19   And they came and helped.  They shut the water off.

20   They squeegeed it out.  I think it was, like -- I'm

21   not sure about the year it was, but that's when the

22   first one behind the refrigerator bust early in the

23   morning.

24       Q    Did you call HomeServe after it became

25   light and --

1      A     Yeah.

2      Q     -- you were able to get somebody?

3      A     Yes.

4      Q     Okay.  Did HomeServe come out or did they

5  send somebody out on their behalf?

6      A     They sent somebody out on their behalf.

7      Q     Okay.  I'm going to share my screen with

8  you.  So if you need to, you know, enlarge it or you

9  need me to enlarge the document.

10          (Scott Deposition Exhibit 1 was marked for

11  identification and attached to the transcript.)

12  BY MS. KARABINOS:

13      Q     The first thing we're going to look at is

14  Exhibit Number 1.  I'll represent to you that these

15  are 437 pages of documents that your attorney

16  produced in the lawsuit.  And don't get worried.

17  We're not going to go through every single page.

18  We're just going to talk about some of them.  Okay?

19      A     Okay.

20      Q     So let me see if I can share my screen.

21          Miss Scott, do you see that it says

22  Exhibit Number 1 right up there?

23      A     Yes.

24      Q     Okay.  I'm going to direct your attention

25  to -- hold on -- Page 63.  And what you'll see is

1    that at the bottom here where I've got my cursor,

2    I've Bates stamped J Scott 0063.  So that's what

3    we're looking at.  This appears to be a invoice

4    service order from Delmar Construction.  Do you

5    remember Delmar Construction coming out to your

6    house?

7         A    Delmar Construction was not a part of

8    HomeServe.

9         Q    Why would Delmar Construction come out to

10   your house on August the 9th, 2016?

11        A    Okay.  They came out because the pipe

12   behind the bathtub had popped; it burst.

13        Q    Say that one more time.

14        A    The pipe behind the bathtub had bust.  But

15   that was not from HomeServe.

16        Q    So the first loss that you can recall that

17   happened behind the fridge at 5:00 a.m., HomeServe

18   came out, but it was not Delmar Construction?

19        A    No.

20        Q    Okay.  So looking here on Page 63, we've

21   got August 9th, 2016.  So was the water leak behind

22   the fridge that you just spoke about -- was that

23   before or after Delmar came?

24        A    After.

25        Q    Okay.  So HomeServe came after Delmar?

```
 1       A     Right.
 2       Q     Now, looking here at the invoice that was
 3  produced by your attorney -- if you need me to --
 4  let me see if I can make it a little bit bigger.  It
 5  says:  Pipe leak behind freezer.
 6             Was that different than the refrigerator,
 7  or did you have a separate freezer?  You see right
 8  here:  Pipe leak behind freezer.
 9             MR. VILLANI:  Object.  Because I can't
10  read that either.
11             Can you make it a little larger.
12  BY MS. KARABINOS:
13       Q     Pipe leak behind freezer.
14             MR. VILLANI:  That also looks like it
15  could be refrigerator, Counsel.
16             MS. KARABINOS:  If your witness can't
17  understand what it is, let her tell us.  Not that
18  you can't read it.
19  BY MS. KARABINOS:
20       Q     Miss Scott?
21       A     I'm trying to remember, ma'am.  I'm not
22  sure.  This happened over some time.  I'm not
23  exactly sure when these pipes burst.  I just keep
24  all the records that I have when they give me.  But
25  he came from Total Protect.
```

1        Q    Delmar came out there by Total Protect?

2        A    Right.  Not HomeServe.

3        Q    Okay.  When did you start getting Total

4   Protect?

5        A    I just got them maybe a couple years ago,

6   but I been had Total Protect for a long time.

7        Q    Who did you first get a couple of years

8   ago?

9        A    HomeServe.

10       Q    Okay.  What year did you get HomeServe?

11       A    I'm not exactly sure what year I got

12  HomeServe.

13       Q    So if you just said that you got HomeServe

14  just, you know, a couple of years ago, was HomeServe

15  the company that you called out after you saw water

16  leaking behind your refrigerator at 5:00 a.m. that

17  morning, or was that Total Protect?

18       A    Total Protect.

19       Q    Okay.  Was Delmar Construction the company

20  that came out as requested by Total Protect?

21       A    Correct.

22       Q    Okay.  So is this invoice that we're

23  looking at on Page 63 of Exhibit Number 1 from

24  Delmar Construction -- is that the invoice regarding

25  the service for that leak behind the refrigerator at

1    5:00 a.m.?

2         A    It would be.

3         Q    Okay.  And that was also -- they looked at

4    your bathtub as well; correct?

5         A    Correct.

6         Q    Okay.  That was in 2016.  How long did you

7    have Total Protect?  Do you know?

8         A    I had them for years.  I don't remember

9    exactly when I got them.

10        Q    Okay.  And what made you change from Total

11   Protect to HomeServe?

12        A    I still have both.

13        Q    You still have both?

14        A    I do.

15        Q    And why --

16        A    With Total Protect there's a large

17   deductible.  You have to pay ahead.  With HomeServe,

18   I don't have to pay a deductible.

19        Q    Okay.  Is HomeServe just for your water

20   line?

21        A    It is.

22        Q    And what does Total Protect do?

23        A    Total Protect protects everything:

24   Washer, dryer, stove, refrigerator,

25   air-conditioning, fans.

1      Q    And how much is the deductible with Total

2    Protect?

3      A    $125.

4      Q    And is that per month or year?

5      A    You're saying my deductible?  Every time

6    that they come I have to pay $125.

7      Q    Okay.  Do you have any contact information

8    for Total Protect?

9      A    Let's see the phone number.  I just had

10    them.

11         Their phone number is -- their phone

12    number is 1-800-47 -- 474 --

13         MR. VILLANI:  Can you repeat that.

14         THE WITNESS:  Huh?

15         MR. VILLANI:  Can you repeat that.  I

16    heard 1-800.  I didn't hear the rest of that.

17      A    474-4047.

18    BY MS. KARABINOS:

19      Q    And do you have an address for them?

20      A    It says Total Protect Home Warranty, PO

21    Box 550247, Fort Lauderdale, Florida 33355.

22      Q    Thank you.

23         When would you file a claim or a request

24    for service from Total Protect versus HomeServe?

25      A    I'm not understanding what you're saying.

1        Q    Okay.  You talked about that you had two.

2   You got Total Protect and you have HomeServe; right?

3        A    Right.

4        Q    Okay.  When would you ask Total Protect to

5   come out versus when would you ask HomeServe to come

6   out?

7        A    Now that I have HomeServe, I don't use

8   Total Protect for my water lines.

9        Q    Okay.  And you don't recall, sitting here

10  today, when you started with HomeServe; is that

11  correct?

12       A    HomeServe is recently.  I don't --

13       Q    Do you have any type of contract with them

14  that you have a copy of?

15       A    I do.

16       Q    Okay.  And --

17       A    I think April 2017 was the first one.

18       Q    Is it HomeServe, H-O-M-E -- same --

19  S-E-R-V-E?  Is it one word or two words?

20       A    It's one word.

21       Q    Okay.  And is there an E on the end.

22       A    Yes.

23       Q    Okay.  And do you have an address for

24  them?  I know you gave us the cell -- the office

25  number.

1        A     It's 1232 Perimeter [sic] Drive, Suite

2    1 -- Perimeter -- if I'm saying it right,

3    P-R-E-M-I-E-R -- Drive, Suite 100, Chattanooga,

4    Tennessee 37421.

5        Q     Thank you.

6             MR. VILLANI:  Read it again, please.  The

7    street name, spell that.  P what?

8             THE WITNESS:  P-R-E-M-I-E-R Drive.

9             MR. VILLANI:  Premier.  Okay.  Thank you.

10            MS. KARABINOS:  Thank you.

11            THE WITNESS:  Suite 100 if you didn't get

12   that.

13            MR. VILLANI:  What was the number again?

14   I'm sorry.

15            THE WITNESS:  Suite 100.

16            MR. VILLANI:  Thank you.

17   BY MS. KARABINOS:

18       Q     All right.  So was the 2016 loss that

19   Delmar came out to your home -- was that the first

20   water leak that you had at your home?

21       A     No.

22       Q     What was the first water leak?

23       A     The first water leak was behind the

24   bathtub.

25       Q     And what year was that?

1      A     I don't remember, ma'am.

2      Q     Do you remember who came out?

3      A     No.

4      Q     Do you remember what the issue was?

5      A     A bursted pipe.

6      Q     And did -- I guess, was your house built

7   with polybutylene piping?

8      A     Yes.

9      Q     Okay.  Have you ever had it fully

10  replaced -- removed and replaced with different

11  piping since you've been there?

12     A     No.

13     Q     How many times, as you sit here today, do

14  you recall that you've had your polybutylene pipe

15  burst?

16     A     I'm not sure.

17     Q     More than five?

18     A     No.

19     Q     So five or less?

20     A     Yes.

21     Q     Okay.  All right.  We're going to still be

22  looking at Exhibit Number 1.  I'm going to go back

23  to Page 58 of the document.  I'm going to change my

24  view so we're looking at Page 58.  Do you see that

25  right here on the right-hand side?  This is, again,

1   part of the documentation that your attorney

2   produced to us.  It says Head's Plumbing Sales &

3   Service.  Have they ever been out at your house

4   before?

5        A    They replaced my water heater.

6        Q    And this was in -- November 16th, 2018;

7   right?

8        A    Right.

9        Q    Why did your water heater need to be

10  replaced?

11       A    The hot water heater -- it stopped

12  working.

13       Q    Okay.  So this particular invoice from

14  Head's Plumbing Services for November the 16th,

15  2018, is to relight your water heater.  Do you see

16  that?

17       A    Yeah.  But it's not -- I mean, it's not

18  working.  I don't know how to light it.

19       Q    Did you physically have your water heater

20  replaced?

21       A    It's been replaced, yes.

22       Q    When was it replaced?

23       A    I don't remember the year that it was

24  replaced.

25       Q    Okay.  Was -- do you know why you had to

1  have it replaced?

2      A    It wasn't -- the water -- some reason the

3  water was not heating up in there.  It stopped

4  heating up.

5      Q    Did you have any leak from the water

6  heater?

7      A    No.

8      Q    Okay.  All right.  Next one we're going to

9  look at is on the next page, which is 59 of Exhibit

10 1.  This is Hers & His Plumbing.  Have they ever

11 come out to your house?

12     A    Yes.

13     Q    Okay.  This is for an invoice of October

14 18th, 2018.  And it says:  High water bill and high

15 water pressure.  Whole house piped in polybutylene

16 pipe.  Has been repaired numerous times.  Recommend

17 total replacement of all water pipes in home and

18 install pressure reducing valve to protect pipes,

19 valves, and faucets.

20          Do you see that?

21     A    Yes.

22     Q    Did I read that correctly?

23     A    What it says, yes.

24     Q    Why did Hers & His Plumbing come out in

25 October of 2018?

1        A    After the pipe had burst, they came out

2   and fixed the pipe.  And I needed -- they told me I

3   needed a -- what do you call that -- a pressure

4   valve.  And they fixed the pressure valve.  And

5   since fixing the pressure valve, I haven't had any

6   pipes burst.

7        Q    So this is a company that had recommended

8   that you replace all of the polybutylene throughout

9   your home; is that correct?

10       A    According to this, yes, that's what it

11  says.

12       Q    Did you speak with the individual -- I

13  believe Jerry is the name of the technician -- from

14  Hers & His Plumbing when he came out?

15       A    I did.

16       Q    Okay.  And he came out -- and the

17  information about that the whole house piped in

18  polybutylene pipe had been repaired numerous times.

19  Where would he have gotten that information from?

20  You?

21       A    No, he wouldn't have got it from me.  He

22  would have got it from when he was under the house

23  looking.  I don't know what's under the house.

24       Q    So he went up underneath the house?

25       A    Yes.

1      Q    Did he tell you what he observed

2   underneath the house?

3      A    That I did not have a pressure valve.  He

4   said that's what's causing the pipes to burst.  The

5   pressure was too high.  And he said I needed a

6   pressure valve, which I got a new pressure valve put

7   in when there was never one in the house.

8      Q    When did you get a new -- not a new one,

9   but when did you install your very first pressure

10  valve?

11     A    Shortly after this.

12     Q    Did Hers & His Plumbing do that for you?

13     A    Yes.

14     Q    Okay.  Since that date, you've not had any

15  water leak at your home; is that correct?

16     A    Correct.

17     Q    Okay.  Let me see here.  This is a invoice

18  that is Bates stamped J Scott 0060.  And I cannot

19  read it.  This is the condition it came in from your

20  attorney.  Do you believe they replaced -- not

21  replaced -- they installed the pressure valve on the

22  same day that they were out there on October 18th,

23  2018?

24     A    I believe so.  It was $350 to get it done.

25     Q    Okay.  And did you pay that?

1        A     I did.

2        Q     And was that -- did you get any of that

3   covered by HomeServe?

4        A     No.  It wasn't covered by anybody.  I had

5   to pay for it.

6        Q     And do you have a copy of the check that

7   you paid?

8        A     I didn't pay by check; I paid by my debit

9   card.  And it's been a while and I don't have that

10  record.  That check -- I mean, the copy of anything

11  from that.  It's been a while.  I don't have a

12  statement on that.

13       Q     And where do you bank -- where did you

14  bank in 2018?

15       A     Excuse me?

16       Q     Where did you bank in 2018?

17       A     Bank of America.

18       Q     Okay.  And you believe it may have come

19  from a debit card transaction through your account

20  at Bank of America?

21       A     Yes.

22       Q     Okay.  So we've established that since

23  October the 18th of 2018 you have not had any other

24  water leaks; is that right?

25       A     Correct.

1    Q    Do you recall Hers & His Plumbing coming

2    out at any other time to your home prior to October

3    2018?

4    A    They came -- the last -- they came on

5    October 1st.  And the guy came -- he said, I can't

6    go under there.

7              And I'm like, huh?

8              He said, there's mold under there.

9              I'm like, what?  What's that?  Because I

10   didn't know what it was.

11             MR. VILLANI:  I object to the response as

12   not responsive.  And she's going to be -- and I

13   object to the answer.  It's hearsay.

14   BY MS. KARABINOS:

15   Q    Go ahead, Miss Scott.

16             So was Hers & His -- they came out before

17   October 18th, 2018, to address another matter; is

18   that right?

19   A    They came out to address the matter that

20   we are talking about.

21   Q    Okay.  And what date did they come out?

22   A    October 1st.

23   Q    Okay.  And you called them or did

24   HomeServe call them?

25   A    HomeServe.

1    Q    And what was -- and you called HomeServe
2    to tell them what?
3    A    The pipe burst.  I don't know when the
4    pipe burst under there.  Whatever happened, I called
5    them on September 29th of 2018.
6    Q    Okay.
7    A    Which was a Saturday.
8    Q    And that -- that's when you first noticed
9    that there was water leaking; right?  September the
10   29th, 2018?
11   A    I didn't know the water was leaking.
12   Q    What --
13   A    I just -- ma'am, I'm trying to explain.
14   Q    Okay.  Go ahead.
15   A    What I noticed was my towel rack that sits
16   over my toilet kept leaning over.  I never saw the
17   water.  I never heard water.  When it leaned toward
18   me, I'm trying to figure out what was going on.  And
19   then when I sat down on the toilet, that's when I
20   heard it.  I never saw it.
21        So I called them to tell them that I
22   thought it might be a pipe burst under there or in
23   the wall, because you couldn't see water anywhere.
24   Q    What did you hear?
25   A    It sounded like it was raining outside.

1      Q    So that was on Saturday, September the

2  29th?

3      A    Correct.

4      Q    And you didn't see any water leaking, but

5  you heard water running?

6      A    I heard water running, but I didn't know

7  where it was coming from.  Since I had a warranty

8  company, I'm going to always call the warranty

9  company first and let them know what's going on so

10  they can come out and fix it, because I'm paying

11  them for that service.

12      Q    So did you call them on the 29th of

13  September 2018?

14      A    Yes.

15      Q    Okay.  And they came out on what date?

16      A    They said they couldn't get anybody out

17  until Monday, which was October 1st.

18      Q    Okay.  And HomeServe sent out Hers & His

19  Plumbing?

20      A    Yes.

21      Q    Okay.  And who came out with Hers & His

22  Plumbing?

23      A    I don't remember the guy's name.

24      Q    It was a man, though?

25      A    Yes.

1      Q    Okay.  And do you have a copy of that

2    worksheet or --

3      A    Ma'am, I've given you everything that I

4    have.  I gave it to the attorney.

5      Q    Okay.  I'm going to show you what we've

6    got so far.  We've got Page 58, which we've looked

7    at, which is the Head's Plumbing Sales & Service for

8    relighting the water heater.  We've got Page 59 of

9    Exhibit 1, which is Hers & His, which we've already

10   looked at about them coming out on October the 18th,

11   2018.  Then we've got another Hers & His, which is

12   on -- I can't -- I can't see what the date is.  Do

13   you have a better copy of this particular invoice

14   with you, Miss Scott?  It looks like --

15     A    I don't have it.

16     Q    Okay.  Then we've got a Head's Plumbing

17   for 9/6/2018.  And then I've got a Hers & His

18   Plumbing for January 30th, 2018.

19     A    That's in the yard.  Ain't got nothing to

20   do with in the house.

21     Q    Okay.  I'm just telling you what we got.

22          Okay.  Then we've got the Delmar

23   Construction one on Page 63 that we talked about.

24          Then we've got Hers & His Plumbing for

25   March 7th, 2012, water main under house leaking.

1   Polybutylene water line.  Repair water line.

2            That's all of the repair documents that I

3   have regarding water in your home.  Are you aware of

4   any others that you might have?

5        A    No.

6        Q    Okay.

7        A    Can I say this?  Since I have a warranty

8   company that fixes my water pipes and I've had one

9   for a while, I've never known that I needed to call

10  the insurance because the water line burst.  Nobody

11  ever said anything about when you have a pipe that

12  burst in your house, you need to call them.  So I

13  always use my warranty company and get all the water

14  dried up.  And that's it as far as I know until this

15  happened with the -- in the walls.

16       Q    Okay.  And what prompted you to call and

17  report the loss to Charter Oak at this time in

18  October of 2018?

19            MR. VILLANI:  I object to the form of the

20  question.  There's nothing in the evidence to show

21  that she called Charter Oak.  Please ask her who she

22  called.  That's my objection.

23  BY MS. KARABINOS:

24       Q    What prompted you to decide that you

25  needed to file an insurance claim?

1        A    I called Travelers because when they saw
2    mold, I didn't know what mold was.  And my warranty
3    did not cover mold; so they said --
4             I asked, who do I need to talk to?
5             They said, you need to talk to your
6    insurance.
7             That's what prompted me to call y'all,
8    because I didn't know about mold.
9        Q    All right.  And who observed the mold?
10       A    One of the plumbers.
11       Q    And was that the plumbers from Hers & His
12   Plumbing?
13       A    Yes.
14       Q    And he observed mold underneath your home?
15       A    Yes.
16       Q    In the crawlspace?
17       A    Yes.
18       Q    Did he see water leaked into your home?
19       A    I'm not sure.
20       Q    Into the -- okay.  Did he tell you about
21   what he found that might have prompted you to hear
22   the sound of water running?
23       A    He didn't tell me anything.  The only
24   thing he said was, oh, there's mold under there.
25   I'm not going under there.

1           And then when he said that, I'm like,
2    okay.  So what are we supposed to do about the water
3    that I hear?
4        Q    Okay.  What did he tell you?
5        A    He said, I don't see any under here, but
6    there's mold from what I can see from the
7    crawlspace.
8           I don't -- I don't see anything, but I
9    hear it when I sit on the toilet.
10          He said, maybe it's your toilet leaking.
11          I said, no, it's not.
12          He said, there's mold under the house; so
13   I'm not going under your house.  And he said, you
14   need to get that fixed and then call us back.
15          I said, okay.  Who do I call for that?
16          He said, your insurance.
17          So that's why I called the insurance.
18   I've never used my insurance, because I don't want
19   them to cancel every time something happened.
20       Q    So you called --
21          MR. VILLANI:  Can we take a ten-minute
22   break.  I have to really take a ten-minute break.
23   I'm sorry.
24          MS. KARABINOS:  Okay.  I guess we'll take
25   a ten-minute break then.

```
 1              (Recess taken from 11:06 a.m. to 11:16
 2    a.m.)
 3    BY MS. KARABINOS:
 4        Q    Miss Scott, while we were off the record
 5    you asked me to clarify about who -- what company I
 6    represent.  And I told you earlier that I represent
 7    Charter Oak.
 8              And so I'm going to show you part of
 9    Exhibit Number 1, which, again, is the documents
10    that your attorney produced to us in discovery.
11    We're going to go to Page 397 of that document.
12    This is a copy of your policy.  And we're looking at
13    here at what's called the dec page.  Do you see
14    that?
15        A    I don't see that.
16        Q    I probably haven't -- have I not shown it
17    to you yet?  Hold on.  Sorry about that.
18              How about that?  Can you see that --
19        A    Okay.
20        Q    -- Miss Scott?
21        A    Yes.
22        Q    All right.  If you go down to the second
23    page, it says your insurer is The Charter Oak Fire
24    Insurance Company.
25              So that is one of the underwriting
```

1    companies underneath the Travelers umbrella, if you

2    will.  So the actual defendant in this case, which

3    has been corrected by your attorney, is The Charter

4    Oak Fire Insurance Company.  That's who would be

5    liable should you recover for any of the damages.

6    Okay?

7         A    Okay.

8         Q    Does that clear up that for you?

9         A    Yeah.  Because I'm like, wait a minute.  I

10   thought I was with Travelers.  At least that's who I

11   thought I was paying for the Travelers.

12        Q    That's the actual underwriting company.

13   Then let's go back here.  Let me rotate the view

14   again.  Remember we were not able to see what this

15   particular invoice from Hers & His Plumbing.  I

16   believe I found another copy that shows what this

17   is.  This is another one, Hers & His Plumbing, the

18   date is 10/1/2018, from a technician, John D.  And

19   it says:  Water supply line to tub was leaking

20   causing high water bill.  Repaired line to correct

21   problem.

22             Is that when the company that came out

23   when you reported to HomeServe about the rushing

24   water?

25        A    Yes.

1        Q     Okay.  And --

2        A     I think --

3        Q     Go ahead.  I'm sorry.

4        A     So when he came out, he found the leak.

5    After he left, I still heard water.  So the one that

6    I was complaining about was not fixed.

7        Q     Okay.  Let me make sure I completely

8    understand you.

9              So Hers & His Plumbing came out on October

10   1st when you called HomeServe on Saturday, September

11   29th, 2018?

12       A     Correct.

13       Q     They found this leak to the supply line to

14   the tub.  And then it was somebody else that came

15   out and went underneath your crawlspace of your

16   home?

17       A     Yeah.  His name was John too.  He didn't

18   go in the crawl -- he just opened the door.

19       Q     All right.  Was he from the same company,

20   Hers & His Plumbing?

21       A     Yes.

22       Q     Did he come out on a different date than

23   October 1st, 2018?

24       A     Yes.

25       Q     When did that guy come out?

1       A    This guy came out -- the first John came

2    out on Monday --

3       Q    Okay.

4       A    -- the 1st.  On the 3rd, the next John

5    came out and said when he opened the door he smelled

6    mold and he was not going under the house.

7       Q    Okay.  And, again, that individual who you

8    think was probably named John as well -- he was with

9    Hers & His Plumbing too?

10      A    Right.

11      Q    Why did he come out two days after John D.

12   fixed the water supply line?

13      A    Because I still heard water.

14      Q    Did you call back HomeServe and tell them

15   that you still were hearing water?

16      A    I did.

17      Q    Okay.  So that was the same water that

18   prompted you to call them on September the 29th;

19   correct?

20      A    Correct.

21      Q    Okay.  Do you have any records of

22   Hers & His Plumbing coming out in response to your

23   complaint that you still heard water running and

24   that -- do you have anything to document them coming

25   out?

1      A    He didn't give me anything, because he
2   didn't do anything.
3      Q    Okay.  So he opened up the door, he told
4   you he smells mold, I'm not going underneath;
5   correct?
6      A    Correct.
7      Q    And you -- I believe you testified
8   earlier -- and if I misconstrue your testimony,
9   please correct me.  You said, well, what about the
10  water leaking?
11          And he says, I don't see any water
12  leaking.
13          Is that what he said?
14     A    He said he didn't see any water.
15     Q    Okay.
16     A    But I could hear water.  And I told him --
17  I said, well, what are we going to do about cutting
18  off the water?  I don't know where it is.  I don't
19  see it running anywhere, but what am I going to do?
20  I hear it.
21     Q    What did he tell you?
22     A    He didn't tell me anything.  He said, you
23  need to get the mold fixed first and then we can
24  talk about whatever else.  We can figure it out
25  later, but the mold got to be fixed.

 1          When he said that, I asked him, who do I
 2   call about the mold?
 3          I called HomeServe back.  They said, we
 4   don't do mold.
 5          I called Total Protect:  We don't do mold.
 6   Call your insurance.
 7          So since y'all are my insurance, I called
 8   y'all.
 9      Q    Okay.  And you called your insurance
10   company, my client, on October the 3rd, the --
11      A    Yes.
12      Q    -- same day the guy observed the mold --
13   or smelled the mold?
14          MR. VILLANI:  I'll just object to the form
15   of the question, because you indicated to her your
16   client is Charter and she's been indicating that she
17   called, quote/unquote, Travelers.  I really would
18   like you to clarify that, because I'm sure the
19   record is going to reflect.
20          MS. KARABINOS:  That's a legal argument,
21   Ralph.  We've already determined and you've agreed
22   that Charter Oak is the company that's liable.  So
23   Charter Oak and Travelers -- she can just say she
24   called her insurance company.
25   BY MS. KARABINOS:

1      Q    Miss Scott, you called your insurance

2    company; correct?

3      A    Correct.

4      Q    And what did you tell them?

5      A    I told them that I was told that I had

6    mold under my house and I wanted to know what do I

7    need to do to get it fixed.

8      Q    And what did they say?

9      A    They said they would schedule somebody to

10   come out and look.

11     Q    When did that person come out?

12     A    They came out the next day.

13     Q    So that would have been October 4th?

14     A    Yes.

15     Q    And do you remember who came out?

16     A    Hold on.

17          Jeffrey Teitelbaum.

18          MS. KARABINOS:  For the court reporter,

19   you spell his name T-E-I-T-E-L-B-A-U-M.

20          MR. VILLANI:  Can you spell that again,

21   Counsel.

22          MS. KARABINOS:  T-E-I-T-E-L-B-A-U-M.

23   BY MS. KARABINOS:

24     Q    And did he come by himself?

25     A    Yes.

1       Q     Okay.  And who was present besides you and

2  Mr. Teitelbaum?

3       A     Just me and him.

4       Q     Okay.  All right.  Now, between October

5  3rd when you called your insurance company and when

6  Mr. Teitelbaum came out, did you have anybody else

7  take a look at your home?

8       A     No.

9       Q     Were you still hearing the water running

10 with your toilet?

11      A     Yes.

12      Q     Okay.  And did you show Mr. Teitelbaum

13 your toilet?

14      A     I showed him where I thought it might have

15 been, because I kind of snooped around trying to

16 figure it out myself.

17            And when I showed it to him, he was like,

18 that's the toilet.

19            I'm like, no.  That's right here

20 underneath the water thing.  So I'm not sure where

21 it's coming from, but it's sounding like it's right

22 here between the wall and -- between the wall in the

23 kitchen and the wall in the bathroom.

24      Q     What did he say?

25      A     He didn't say nothing after that.

1      Q    Did he open up any walls?

2      A    He didn't say anything.  I just showed him

3   what I thought it might have been.

4           He just said, that's the toilet.

5           And that's all he said.  But he didn't say

6   anything else after that.

7      Q    Okay.  Let me go back to one thing here.

8   Between 2016 and when Delmar Construction came out

9   and found the pipe leak behind the freezer and the

10  tub valve leak that we talked about and when you

11  heard the water running on September 29th, 2018, did

12  you have any other water leaks in your home, that

13  you were aware of?

14     A    Not that I was aware of.

15     Q    Let's go back to Exhibit Number 1.

16     A    I don't remember what happened between '16

17  and now.

18     Q    Okay.  Looking at Exhibit Number 1, Page

19  61 of those documents, there is a repair water

20  service line, Head's Plumbing, on January the 6th,

21  2018.  Do you see that?

22     A    That's in the front yard.  That is not in

23  the house.

24     Q    Right.  And there's a note here that they

25  recommend replacement of the service line.  Did you

1  replace the service line?

2       A     They replaced the line.

3       Q     Or did they repair it?  Do you recall?

4       A     They repaired the line.

5       Q     Okay.  But no replacement.  All right.

6       A     That's too much to replace all the pipes,

7  ma'am.  I couldn't afford that.

8       Q     Then we've got Hers & His Plumbing came

9  out to your house on January 30th of 2018.  Why did

10 they come out at that point?

11      A     That's in the yard too.

12      Q     Okay.  What was leaking at that point?

13      A     A pipe had burst in the yard.

14      Q     Okay.  How close to the house was it?

15      A     It was closer to the street.

16      Q     All right.  So when you called on

17 September 29th to HomeServe, that was because you

18 heard water from the -- like it was raining near the

19 toilet; correct?

20      A     I don't know where it was.  It just sound

21 like -- when you were in the bathroom, if you sit on

22 the toilet, it sound like it was raining.  I don't

23 know where it was.

24      Q     All right.  And then they came out --

25 HomeServe sent Hers & His Plumbing.  They came out

1    on October 1st, that Monday.  They repaired a water

2    supply line to the tub; right?  And that did not

3    stop the water sound that you heard?

4         A    No, it did not.

5         Q    And then we talked about on October 3rd

6    another guy came out.  He's the one that opened the

7    door to the crawlspace, smelled mold, said he didn't

8    observe any water leaking.

9              You said, what are we going to do.

10              And he said, call your insurance company.

11              Right?

12         A    Correct.

13         Q    Okay.  So that same water sound -- how

14    long did that last?

15         A    No more than ten days.

16         Q    Okay.  Who fixed it?

17         A    John D. from Hers & His Plumbing.

18         Q    When did he fix it?

19         A    On October 5th.

20         Q    Okay.  And what did he tell you or what

21    did John D. tell you about why you were hearing that

22    sound of water running?

23         A    He said that it had been a water line that

24    had busted inside the wall.

25         Q    Which wall?

1        A     Between the bathroom and the kitchen.

2   They're right there together.

3        Q     Okay.  I'm going to show you a sketch

4   here.  Do you see Exhibit Number 10 that's on the

5   screen?

6        A     Yes.

7              (Scott Deposition Exhibit 10 was marked

8   for identification and attached to the transcript.)

9   BY MS. KARABINOS:

10       Q     This is kind of a floor plan layout of

11  your home.  Does that look -- on your home where the

12  master bedroom, back bedroom, hall, living room

13  dining room, kitchen, and bathroom are laid out?

14  Does that look about right to you?

15       A     Uh-huh.

16       Q     That's a yes?

17       A     Yes.

18       Q     Okay.  And you've only got one bathroom;

19  is that correct?

20       A     Correct.

21       Q     Okay.  So right here I'm highlighting

22  bathroom.  Do you see that?

23       A     Yes.

24       Q     Okay.  So the wall in which John D. from

25  Hers & His Plumbing found the water leak -- was it

1    this particular wall?  Let's see if I can highlight

2    it.  No, I can't highlight it here.

3            Was it this particular wall right here?

4    No, that didn't do it.  Hold on.

5            Was it behind the toilet right here?  Is

6    that what he's talking about?

7        A    Yes, behind the toilet.

8        Q    Okay.  And how many pipes burst?

9        A    I don't know.

10       Q    Okay.  But that water was leaking right

11   behind the toilet; is that correct?

12       A    He fixed it behind the toilet, but I don't

13   know how many.

14       Q    Okay.  Did he say anything about whether

15   that particular pipe was polybutylene?

16       A    He didn't say.

17       Q    But you had polybutylene throughout your

18   home; is that correct?

19       A    Correct.

20       Q    Now, when you called your insurance

21   company, did you tell them that you had had numerous

22   leaks over the years?

23       A    No.  I didn't tell them anything about

24   leaks over the years.

25       Q    What did you tell them?

1        A      I called them for the specific thing that

2    was going on at the time.

3        Q      Which was what?

4        A      Which was that -- I had mold was the main

5    thing that I called about, because that's what the

6    issue was.  The reason why we couldn't get the pipe

7    fixed was because of the mold.

8        Q      And did you tell them about the rushing

9    water that you heard?

10       A      No, I didn't say anything about water,

11   because my main concern at the time was the mold.

12       Q      And when Mr. Teitelbaum came out to your

13   home on October the 4th, did you tell him about any

14   previous water leaks that you had?

15       A      No.

16       Q      Did you see him open up the floor space or

17   the wall space behind or near the toilet?

18       A      Did I see him do what behind the toilet?

19       Q      Open up any of the wall space or any of

20   the areas on the left or right side or back or front

21   of the toilet.

22       A      There's nothing there for him to open up.

23       Q      What did you see Mr. Teitelbaum do while

24   he was there?

25       A      I let Mr. Teitelbaum do what

1   Mr. Teitelbaum do.  He did not say anything to me.

2   So I just let him do what he do.

3        Q    Okay.  How long was he there?

4        A    Maybe 10, 15 minutes.  I don't know

5   exactly.

6        Q    Did you have a timer on him?

7        A    No, I didn't.

8        Q    So you don't know really how long he was

9   there?

10       A    I'm not sure how long he was there.  I

11  just let him do his thing.  And he came back and

12  said, I'm done and I'm gone.

13       Q    Did he tell you anything about what he

14  found or what was going to be the next steps?

15       A    No, ma'am.

16       Q    Did he give you any paperwork?

17       A    No, ma'am.

18       Q    Okay.  What was the next thing that

19  happened?

20       A    What do you mean, what was the next thing

21  that happened?

22       Q    So somebody with your insurance comes out,

23  does an inspection; correct?

24       A    Yes.

25       Q    He leaves.  So what was the next -- so

1   what was the next thing that happened with regard to

2   your report of the mold?

3        A    Okay.  I get a letter.  I called him to

4   find out what was -- and because I didn't hear

5   anything for a while.  I called him and asked him

6   what was the status of it.

7             He said, well, I'm just -- I'm still

8   waiting; so when I know, you'll know.

9        Q    When did you call him?

10       A    I don't remember the dates.  Hold on.  Let

11  me look at my notes of when I called him.

12       Q    You have some notes regarding the events

13  of the loss?

14       A    I just write -- jot down when I talk to

15  somebody.  That's all.

16       Q    Okay.

17       A    Not a thing on detailed stuff, just when I

18  talk to somebody.

19       Q    Is that kept on like an old calendar or

20  just a running notepad or what?

21       A    Just a notepad.

22            I spoke to him on the 11th.

23            MR. VILLANI:  I'm sorry.  Say that one

24  more time.

25            THE WITNESS:  I actually spoke to someone

1    named Angel on the 11th, because I couldn't get in

2    touch with Jeff.

3                MR. VILLANI:  What date?  You say the

4    11th?

5                THE WITNESS:  October 11.

6                MR. VILLANI:  2018?

7                THE WITNESS:  Yes, sir.

8                MR. VILLANI:  You've got to be specific,

9    please.

10               THE WITNESS:  I'm sorry.

11   BY MS. KARABINOS:

12       Q    What did you and Angel talk about?

13       A    Just explained to him, you know, about the

14   water thing.  And I was just trying to check to see

15   what was my status from when he came -- when Jeff

16   came out and looked.

17               He said, I will have to talk to his

18   supervisor.

19               And it was kind of like I was getting the

20   runaround from one person to another one to another

21   one to another one.  Like, nobody was -- from my

22   perspective -- concerned.  Just give me -- you know,

23   like, was passing the buck.  So I don't know.

24               Then finally I got a -- the denial letter.

25       Q    Okay.  So prior to you talking with Mr. --

1   or Angel, you had not been advised what coverage

2   decision had been made; is that right?

3        A    Correct.

4        Q    Did you --

5        A    As far as I can remember.

6        Q    I'm sorry.  Say that again.

7        A    As far as I can remember, that is correct.

8        Q    Did Mr. -- Angel call you back?

9        A    I don't have a note that he did.

10       Q    You don't recall it independently of

11  looking at a note?

12       A    No, I don't.

13       Q    When did you receive the denial letter?

14       A    I'm not sure.  You all have a copy of it.

15  It was in the stuff that I sent to the attorney.

16       Q    Was it in the same month of October?

17       A    I don't know if it was October or

18  November.

19       Q    Did you file an insurance claim -- I mean

20  an insurance complaint with the Department of

21  Insurance?

22       A    No.

23       Q    You did not?

24       A    No.

25       Q    Do you know if -- do you know if

1   anybody had --
2           I'm sorry.
3      A    I'm not sure what that is.
4      Q    Okay.  We'll go over that in just a
5   second.
6           All right.  Let me show you -- I'm going
7   to share my screen again.  Here's Exhibit Number 2.
8           (Scott Deposition Exhibit 2 was marked for
9   identification and attached to the transcript.)
10  BY MS. KARABINOS:
11     Q    Do you recognize that as a letter from The
12  Charter Oak Fire Insurance Company, dated October
13  12th, 2018 --
14     A    Okay.
15     Q    -- regarding your claim?
16     A    Okay.
17     Q    Did you receive that?
18          Tell me when you want me to go to the next
19  page.  I'll be glad to move it.
20     A    Okay.
21     Q    All right.  Here's the second page.
22          MR. VILLANI:  Can you go back to the first
23  page.  I was trying to copy some things.
24          MS. KARABINOS:  I'm going to wait for the
25  witness to finish reading before I move it.

```
 1        A      Okay.
 2   BY MS. KARABINOS:
 3        Q      Did you receive a copy of this letter?
 4        A      Yeah.  I sent it to y'all.
 5        Q      Okay.
 6        A      I gave it to the attorney.
 7        Q      Okay.  So -- there's a lot of things that
 8   you probably have done, but I have to put them on
 9   the record.
10             So you received it; correct?
11        A      Yes.
12        Q      Okay.  And when you received it, what did
13   you do?  Did you call your insurance company?
14        A      I called, trying to find out what was
15   going on.
16        Q      Okay.  Who did you speak with?  Did you
17   speak to Angel again?
18        A      I'm not sure if I spoke to Angel again.
19        Q      Do you recall speaking to anybody else at
20   your insurance company?
21        A      I spoke with a Justin Barber.
22        Q      Okay.  When you --
23        A      I left a -- I left a message for him
24   asking him to call me on October -- October 25th of
25   2018.
```

1       Q     Did he call you back?

2       A     No.

3       Q     He didn't call you back on the 26th of

4    October?

5       A     I'm trying to see.  I don't see -- wait a

6    minute.

7             I spoke with him -- I don't have a note

8    that I see that I spoke to him on that day.  If he

9    did, I don't remember.

10      Q     But you have a note that you did speak

11   with him; right?

12      A     I have a note on December 13th, 2018.

13            MR. VILLANI:  Miss Scott, you just broke

14   up.  Can you repeat that, please.

15      A     I spoke with Justin Barber on December

16   13th of 2018.

17   BY MS. KARABINOS:

18      Q     What did y'all talk about then?

19      A     On that day -- the house insurance denied

20   fixing it -- or fixing it.  I was told that I waited

21   until my house was caving in before I called him --

22   called them.

23            He said, you can't wait until you have a

24   whole lot of accident -- he was trying to explain to

25   me about between the -- the difference between a car

1    accident and the house accident.

2              You can't wait until you have a whole lot

3    of --

4              MR. VILLANI:  Miss Scott.  Miss Scott, can

5    you hear me?  That whole answer you broke up and

6    your thing froze.  Can you speak slowly into the

7    microphone and repeat that answer.  I'm sorry to --

8              THE WITNESS:  It's okay.

9        A    I wrote my notes as to what was said.  The

10   house insurance denied fixing my house.  I was told

11   I waited until my house is caving in before I called

12   them.

13             He said, you can't wait until you have a

14   whole lot of car accidents before you call your

15   insurance.

16             And I asked him -- you know, don't talk to

17   me like that.  And no wonder why they only gave me

18   $5,178 to fix something knowing that it was not

19   going to do anything to fix the house.

20             I'm not sure what you're looking for,

21   ma'am.

22       Q    Well, did you keep notes of every time

23   that you spoke with somebody at your insurance

24   company?

25       A    I don't have all the notes here.  I don't

1    know where they are.

2        Q    Okay.  But did you write down notes

3    contemporaneously during your conversation with

4    anyone at your insurance company?

5        A    Those are the notes that I wrote done.

6        Q    And you're writing them down as you're

7    speaking with them or shortly thereafter?

8        A    Shortly thereafter.

9        Q    Okay.  And did you write down every time

10   that you spoke with somebody at your insurance

11   company?

12       A    I try my best to, but I -- I moved some

13   things and stuff is missing right now; so I don't

14   know.  I've been looking, trying to get everything

15   together, but I can't find it.

16       Q    Okay.  Do you remember speaking with

17   anybody else at your insurance company about this

18   particular damage other than Jeff Teitelbaum, Angel,

19   Justin Barber?

20       A    Craig Hite.

21       Q    When did you speak with Craig?

22       A    I spoke to him on October 15th.

23       Q    What did y'all talk about?

24       A    Just explained to him what was going on

25   regarding, you know, my claim, because it had been

1    denied.  And then he sent somebody from -- he sent

2    Eric -- I don't know how to pronounce the last name.

3    It's L-R-E-G-A.  They came out and they did another

4    inspection.  And then they said, everything is going

5    to be okay.

6              And that's when the check came for the

7    $5,000.

8        Q    So let me stop you right there.  So you

9    spoke with Craig Hite on October 15th.  And y'all

10   talked about the denial letter; is that right?

11       A    I spoke to him about the denial letter,

12   yes.

13       Q    Okay.  And he -- he offered to have

14   somebody come out and reinspect your home and

15   provide an independent opinion; is that correct?

16       A    Correct.

17       Q    And that's when Eric --

18            MR. VILLANI:  I object to the form of the

19   question.  She said nothing about independent.

20   That's not been in evidence.

21            MS. KARABINOS:  I am asking her a question

22   and if I want to stay with that question, I'm going

23   to.

24   BY MS. KARABINOS:

25       Q    He offered to send somebody out to provide

1    an opinion; correct?

2         A    Someone came out to inspect it, yes.

3         Q    And that guy Eric -- what company was he

4    with?

5         A    Emergency Water & Fire.

6         Q    And do you know what relationship that

7    they had with Travelers or Charter Oak?

8         A    No.

9         Q    Okay.  What did Eric with that company

10   tell you about why they were out there?

11        A    He just said they came -- they're just

12   coming out to inspect.  That's all I know.

13        Q    So there was another opinion that they

14   were going to provide; is that correct?

15        A    I'm not really sure.

16        Q    Okay.  What was your understanding about

17   why Emergency Water & Fire showed up at your house?

18        A    My understanding was to come out and do

19   another inspection.

20        Q    To do what?  For what reason?

21        A    For the water damage and mold.

22        Q    Okay.  And what did they tell you after

23   their inspection?

24        A    They just said, don't worry.  Everything's

25   going to be all right.

1       Q    Did they tell you -- did they tell you
2    what caused the water damage or the mold damage?
3       A    No.
4       Q    Did they tell you how much it was going to
5    cost to repair it?
6       A    No.
7       Q    Okay.  Did they tell you how long the leak
8    had been occurring?
9       A    No.
10      Q    Did you ever get a report from them?
11      A    No.
12      Q    All right.  So after they come out --
13   after Craig Hite tells you he's going to send out
14   somebody else, what's the next thing that happened?
15      A    Next thing that happened was I got the
16   check for 5,000.  I got the check from them.
17      Q    How much did you get?
18      A    It was 5,000 -- hang on a second.
19      Q    Let me show you Exhibit Number 5 that's on
20   the screen, Miss Scott.
21           (Scott Deposition Exhibit 5 was marked for
22   identification and attached to the transcript.)
23   BY MS. KARABINOS:
24      Q    Was the check for $5,178.61?
25      A    That's it.

1        Q    Okay.  On Page 2 of Exhibit Number 5 -- if
2    I can rotate it and make it a little bit smaller --
3    that's a copy of that check; correct?
4        A    Correct.
5        Q    Okay.  And it looks like you did not cash
6    it until January the 3rd of 2019; is that correct?
7        A    Correct.
8        Q    Okay.  What did you do with that
9    $5,178.61?
10        A    Okay.  Once they sent -- when I got the
11    check, Travelers had sent me a list of people that I
12    could work with to get things done at my house.
13    They came in and put in a big machine to dry out the
14    water.
15        Q    Who's they?
16        A    ServPro.
17             Once --
18        Q    Okay.  Can I interrupt you just for a
19    minute.  Out of that list you selected ServPro to
20    come?
21        A    I did.
22        Q    So you called them to come out to your
23    home?
24        A    I did.
25        Q    Okay.  All right.  Go ahead.

1        A     Once they came out, they came out and put

2     the dehumidifiers in the house.

3              And then the reason I cashed the check was

4     because I was told that y'all was not -- the

5     insurance was not going to cover anything; so I had

6     to go ahead and use it.  Once I got with an

7     attorney, I was told that it was okay to go ahead

8     and cash the check, because I didn't know what to

9     do.  I was scared to do that, because I didn't want

10    it to come back on me and say that I owe this money

11    back to them.

12             And --

13       Q     Okay.  So let me ask you -- I'm sorry.  Go

14    ahead.

15       A     With -- ServPro said that everything was

16    denied.  Then I --

17       Q     Hold on.

18       A     And I did not have money in my pocket to

19    pay.

20             MR. VILLANI:  Miss Scott, you broke up.

21    You've got to repeat that, please.

22    BY MS. KARABINOS:

23       Q     Can you just repeat that question --

24    repeat your answer to my question.  You went out.

25    You were kind of like -- it was very elongated; your

1    words were.  You were talking about Serv -- you

2    didn't cash your check.  ServPro told you that the

3    insurance company was denying everything.  Is that

4    what it was?

5         A    Yes, they denied everything.  They said

6    they was not going to fix anything because they said

7    that it was more -- it costed more than $5,178 to

8    fix stuff; so that was not going to even touch the

9    mold.

10             So I was, like, stuck -- I was at a

11   standstill and I was stuck.  I didn't know what to

12   do at this point.  So I still had -- now that I'm

13   owing these people money, this is the only money

14   that I have.  So I had to cash the check to give

15   them that money.

16        Q    Okay.  So let me back up.  When did you

17   contact ServPro?

18        A    It was in November around Thanksgiving

19   time, because that's when they came in to put -- the

20   dehumidifiers was here during Thanksgiving.

21        Q    Do you recall the person you spoke with at

22   ServPro?

23        A    Her name was Mary.

24        Q    Okay.

25        A    I can't remember the first name.  I don't

1   remember anything else about it.

2        Q    So between the time that you got the check

3   on November 9th, 2018, until you cashed it in

4   January to pay ServPro, did you have anybody else

5   come look at your home?

6        A    Bruce Fredrics came in January.

7        Q    All right.  We'll get to Bruce in just a

8   second.

9             I'm going to put something else up here.

10  Hold on.  I'm going to stop share.

11            Did you call anybody else -- any other

12  mitigation companies or repair companies -- before

13  contacting ServPro?

14       A    I called -- I don't remember the name, but

15  they said they couldn't do it.

16       Q    Do you recall why they said they couldn't

17  do it?

18       A    It was closer to holidays; so weren't

19  going to do anything until the first of the year.

20       Q    Let me show you -- you called ServPro of

21  North Atlanta Buckhead; correct?

22       A    That's them.

23       Q    This is their statement.  Let me back it

24  out a little bit.  The date entered is November the

25  23rd, 2018.  Is that the date that they came out?

1      A     Yeah.  They came out that -- yeah, because

2   they came out the week of Thanksgiving.

3      Q     And the estimator's name is Ben Peck,

4   P-E-C-K.  Do you recall speaking with him?

5      A     Yes.

6      Q     Is he the one that said that the

7   statements provided by your insurance carrier was

8   not going to be enough to cover the remediation?  Is

9   that who told you that or was that somebody else?

10     A     He said it wasn't enough money.  Yeah,

11  he's the one.

12     Q     And you gave all of the $5,178.61 to

13  ServPro; is that correct?

14     A     Not all of it, no.

15     Q     Not all of it?

16     A     No.

17     Q     How much did you give to ServPro?

18     A     I don't have their invoice in front of me,

19  but it was over $1,000.

20     Q     And what was -- what work was that for?

21     A     For the time that they had those

22  dehumidifiers in here.

23     Q     Where were the dehumidifiers and the fans

24  located?

25     A     One was in the kitchen, one was in the

1   hallway, and the other was in the hall by the

2   bathroom.

3        Q    Were any of them in the bathroom itself?

4        A    No.

5        Q    Since ServPro -- let me back up.

6             How many days did the dehumidifiers and

7   equipment stay at your home that was provided by

8   ServPro?

9        A    Five.

10       Q    Five days.

11       A    They came on Monday and they picked them

12  up on Friday after Thanksgiving.

13       Q    Did they do any moisture readings when

14  they left?

15       A    I don't know.

16       Q    Do you know whether your house was dry at

17  that point?

18       A    I don't know.  They didn't say anything

19  about it.  They just came in and got them and left.

20       Q    Did they remove any flooring or Sheetrock

21  or any studs or tile or anything?

22       A    I'm not understanding what you're talking

23  about.

24       Q    Okay.

25       A    Say that again, please.

1          Q      You bet.

2                 Did ServPro remove any Sheetrock from any

3     of your walls?

4          A      No.

5          Q      How about any flooring?

6          A      No.  They cut my linoleum, looked at it,

7     and taped it down.

8          Q      Okay.  And that would have been the

9     linoleum in the bathroom?

10         A      In the bathroom and in my hallway.

11         Q      Do you know why they did that?

12         A      I'm not exactly sure unless they were

13    checking to see if it was wet.  That's the only

14    thing they could have been checking for.

15         Q      When they removed the equipment, did they

16    tell you anything about what your condition -- what

17    the condition of the mold was or the moisture or if

18    your house was still wet?  Anything?

19         A      No.

20         Q      Since ServPro left with the equipment five

21    days after putting it in, has any other water

22    mitigation company or mold mitigation company come

23    to your home?

24         A      No.

25         Q      Is the mold still present?

```
1        A    I'm not sure.  It's in the basement --
2    it's in the crawlspace; so I don't know.
3        Q    So you've not had anybody go in and take a
4    look?
5        A    No.
6        Q    Since September 29th of 2018 have you --
7    have you consistently lived there?
8        A    Yes.
9        Q    Do you recall at any other time that
10   someone else with your insurance carrier came out to
11   inspect your property?
12       A    Any other time?  What do you mean?
13       Q    We talked about Mr. Teitelbaum coming out
14   to your house on October 4th; right?
15       A    Right.
16       Q    Okay.  At any other time, did somebody
17   else from your insurance company come out and
18   inspect your home?
19       A    They sent someone else out, but I don't
20   remember what date it was he came out.
21       Q    Okay.  We talked about Eric with Emergency
22   Water & Fire coming out.  Was this somebody else?
23       A    Somebody else came after him -- after Eric
24   did, but I don't remember his name and I don't
25   remember what date that was.
```

1      Q    Was it somebody by him or herself?

2      A    He was by himself.

3      Q    Okay.  Was it Justin Barber?

4      A    Justin came out once.  Someone else came

5  after him.  I think he was the -- what you call -- I

6  don't know how you -- what's the name?

7      Q    An investigator?

8      A    It might have been what he said he was.

9      Q    It was a he?

10      A    It was a he.

11      Q    What about an engineer?

12      A    That might have been -- yeah, that's what

13  it was.  I was trying to think of the name.  I

14  couldn't remember what he said.

15      Q    What I'm trying to figure out, Miss Scott,

16  is how many people came out to your home either as

17  employees of your insurance company or at your

18  insurance company's request.  So we have Jeff

19  Teitelbaum, we have Eric with Emergency

20  Water & Fire, Justin Barber came out; is that right?

21      A    Correct.

22      Q    Did he come by himself or with somebody

23  else?

24      A    Somebody else was with him at the time

25  that he came.

1     Q    Okay.  And then we have the engineer with

2   Forcon that came out.  Anybody else?

3     A    No.

4     Q    Okay.  All right.  So let's see here.  I'm

5   going to show you another document here.  This is

6   Exhibit Number 6.

7          (Scott Deposition Exhibit 6 was marked for

8   identification and attached to the transcript.)

9   BY MS. KARABINOS:

10     Q    It's a letter from The Charter Oak Fire

11   Insurance Company, November 9th, 2018, regarding

12   your claim.  Do you recall receiving that letter,

13   Miss Scott?

14     A    Yes.

15     Q    Okay.  Prior to November 9th, 2018, was

16   that when -- before that date, was that when Eric

17   with Emergency Water & Fire came out?

18     A    Yes.

19     Q    Okay.  So originally your insurance

20   company said there was no coverage, and we saw that

21   on October 12th, 2018, letter; right?

22     A    Yes.

23     Q    And then you asked and talked to Craig

24   Hite, who sent out somebody else to inspect your

25   home; correct?

1      A    Correct.

2      Q    And then you received this letter,

3   November 9th, 2018, which is Exhibit Number 6.  And

4   that's when your insurance carrier said there is

5   coverage and in the amount of $5,178.61 --

6      A    Yes.

7      Q    -- is that correct?

8      A    Yes.

9      Q    Okay.  And you talked about how you used

10  $1,000 to pay ServPro.  What have you done with the

11  remaining $4,178.61?

12     A    I have $4,100-some -- $4,000.  I have

13  that.

14     Q    Okay.  It's in your bank account?

15     A    Yes.

16     Q    And, sitting here today, you previously

17  testified that nobody has come out to do anything

18  more with regard to the mold; is that correct?

19     A    I'm sorry.

20     Q    Sure.  I'll repeat it.

21          So nobody else has come out to do anything

22  about the mold except for what ServPro did; correct?

23     A    Correct.

24     Q    And has anybody made any of the physical

25  repairs to like your flooring, Sheetrock, studs,

1   anything along that line?

2       A    In the bathroom.  We did it ourselves.  Me

3   and my friend fixed the floor right up under the

4   toilet, because that part had rotted out because of

5   water in the wall.

6       Q    Who was that friend?

7       A    Willie Tiller.

8            MR. VILLANI:  Say that one more time.

9   BY MS. KARABINOS:

10      Q    Willie Tiller, T-I-L-L-E-R?

11      A    Yes, Tiller.

12           MR. VILLANI:  What's the first name

13  please, again.

14           THE WITNESS:  Excuse me?  I'm sorry.

15           MR. VILLANI:  What was his first name

16  again, please.

17           THE WITNESS:  Willie, W-I-L-L-E-R -- I'm

18  sorry.  His first name is W-I-L-L-I-E.

19  BY MS. KARABINOS:

20      Q    Do you have any contact information for

21  Mr. Tiller?

22      A    404-272-5995.  That's my boyfriend; so he

23  did it for me.

24      Q    Okay.  How much did y'all spend in making

25  those repairs to the floor under the toilet?

1      A     Very little.  We just -- I don't remember.

2   I didn't even keep receipts because it was not -- I

3   mean it wasn't a big thing of what we did.  We just

4   got a piece of wood and put it over -- took the

5   other wood out and put it over where that came out

6   of.  I don't remember.  It wasn't that much.

7      Q     When did this happen?  When did y'all fix

8   the floor?

9      A     When all of this happened.  I don't

10  remember the date that we did it, but it was back in

11  2018.

12     Q     Was it before or after ServPro came to

13  your home?

14     A     It was -- I'm not sure, ma'am.  I don't

15  remember.

16     Q     Did you take any photographs?

17     A     No.

18     Q     Any other repairs to your home since you

19  called in the loss on October the 3rd, 2018?

20     A     No.

21     Q     Have we gone over everybody that has come

22  out to your home either that -- who are employed by

23  your insurance company or were asked to come out

24  there on your insurance company's behalf?

25     A     As far as I know, we have.

1          Q     We have?

2          A     Yes.  I believe so.

3          Q     Okay.  Okay.  Now, I want to switch gears

4    to those people or companies who have come to your

5    home at either your request or your attorney's

6    request or Mr. Fredrics's request.  So let's go

7    first to who have you had come out and inspect your

8    damage at your request?

9          A     Mr. Fredrics.

10         Q     Okay.  And that's Bruce Fredrics; correct?

11         A     Uh-huh.

12         Q     And when did you first contact

13   Mr. Fredrics?

14         A     January of 2019.

15         Q     And how did you get referred to

16   Mr. Fredrics?

17         A     By the Internet.

18         Q     Okay.  All right.  And I'm going to go

19   back to Exhibit Number 1 and we're going to go all

20   the way back to Page 1.  This looks like a e-mail

21   that you sent to Mr. Fredrics on January 2nd, 2019.

22   And this says:  I need an estimate for my homeowners

23   insurance to compare their estimate to.  I have

24   water damage and mold.  The amount of money given by

25   insurance is not enough to get the work done and

1    they demand an estimate.

2              Did I read that correctly?

3    A    Yes.

4    Q    Okay.  So this is your first contact that

5    you made to Mr. Fredrics?

6    A    Yes.

7    Q    And the very last sentence says that they

8    demand an estimate.  You're talking about your

9    insurance company?

10    A    Correct.  What I was told when I talked to

11    the insurance -- and I don't remember the names.

12    The person that I spoke with said that if there's

13    not -- if there's not, you need to let us know,

14    because we think you can get it done for the amount

15    of money that we gave you.

16              But everybody that I talked to says you

17    can't get it done for that.  It don't even cover the

18    mold.  It's not enough.  So I don't know what to do.

19    I was at a loss.

20    Q    All right.  So other than ServPro, who

21    were all the other people you spoke with who said

22    that was not enough money to get your work done that

23    had been provided by your insurance company?

24    A    No one -- I don't -- it just like you pick

25    up the phone and you just call people, ask them do

1    this or that, and you tell them about what you got.

2    It was not a person that came out and checked it.

3    Just calling around trying to get some help.

4         Q     And who did you call?

5         A     I don't remember the name, ma'am.  I don't

6    even have the numbers in front of me.  Just going

7    down the Internet.  I didn't write names down,

8    because I was just on there looking at it on the

9    Internet and just calling from the Internet, just

10   doing cold calls.

11        Q     So the only company that came out to your

12   house and said that the money that was given to you

13   by your insurance company was not enough was

14   ServPro; is that right?

15        A     No, ServPro didn't say that.  They said --

16   no, ServPro didn't say that, because we thought that

17   once they came out and looked and everything would

18   be covered.

19              So when -- I don't know what estimate that

20   ServPro sent in to look at the insurance, because I

21   didn't get a copy of it.  So I don't know what they

22   sent to the insurance.

23        Q     Okay.  Then I am sorry that I

24   misunderstood you, Miss Scott.  And, you know,

25   that's all on me.

1            I thought you previously testified that

2    ServPro told you that the amount of money that your

3    insurance carrier had given you would not be enough

4    money to pay for the damages?

5        A    What they said to me after -- after they

6    had -- they was going to do what they was going to.

7    They said, your insurance is denying coverage.

8            And that's when they told me that I've

9    been denied, that the 5,000 would not be enough to

10   cover what needs to be done at my home.  That's what

11   I was saying to you.

12       Q    Okay.  Let me see if I can understand

13   that.

14           So was the amount of money that your

15   insurance carrier had given you -- I'm just going to

16   talk $5100 and change -- that paid for their ServPro

17   services, but not other services that you might

18   need?

19           I'm trying to understand what were they

20   talking about.

21       A    I don't know what ServPro gave to them as

22   their estimate of coverage for everything that they

23   needed to be done here.  I don't know what ServPro

24   and those talked about.

25           So after they said that they -- that the

1    insurance pay is denied them, then that's what I was

2    told that the 5,000 would not be enough to cover the

3    mold part.  From the -- you know, just trying to get

4    somebody to help.  I was being told 5,000 is not

5    enough.  It's not going to cover that.

6        Q    It's not going to cover the mold or not

7    going to cover the repair to the water damage for

8    the water damage?

9        A    It wasn't going to cover the mold.  It

10   wasn't -- it wasn't enough to cover what needed to

11   be fixed.

12       Q    Okay.

13       A    Then most of them was mainly the mold.

14   The thing they was saying was the mold was not going

15   to be covered if the water damage was covered.  Then

16   it wasn't -- it wasn't going to be enough to fix one

17   or the other.

18       Q    All right.  So in the November 9th, 2018,

19   letter that you got from your insurance company that

20   talked to you about the $5,178.61, was it your

21   understanding that that was a denial of coverage?

22       A    My understanding that that was all I was

23   going to get for coverage.  They weren't going to

24   give me no more.  That was it.  I wasn't getting

25   anything else.  That was the understanding that I

1  had.  So I was either going to sink or swim on my

2  own trying to figure out how to get the rest of --

3  how to get it fixed.

4         I don't -- I'm just at a loss for all of

5  this right now.  I don't know -- I don't know what

6  to do or how to get from Point A to Point B through

7  the insurance.  I'm not a plumber.  I don't know

8  anything about mold.  I'm just at a loss right now.

9         Q    Okay.  So at one point earlier in your

10 testimony today -- and, again, correct me if I'm

11 wrong -- I believe I heard you say that your

12 insurance carrier told you that if you give us

13 another estimate that shows that maybe we -- that

14 there's additional damage that is covered or the

15 costs are not enough, we'll consider that, and

16 that's one of the reasons why you went out and got

17 ServPro; is that right?

18        A    I got ServPro because -- I thought I was

19 getting my home fixed is the reason I got ServPro.

20 It wasn't that I was trying to get more money.  I

21 thought they was going to fix it for the money that

22 I was already given.  So I came out and let them

23 know what's going on.

24        And they said, well, we think you could

25 get done for that.

1      Q    And then you called -- or reached out to

2   Mr. Fredrics.  And that was because you wanted to

3   get another estimate to compare the one that had

4   been provided to you by your insurance carrier; is

5   that right?

6      A    Yes.  Trying to figure out what to do

7   next.  I was looking for some help.

8      Q    Okay.  And so did Mr. Fredrics reach back

9   out to you?

10      A    Yes.

11      Q    Okay.  Again, we are looking at Exhibit

12   Number 1, Page 1.  We're going to go to Page 3.  And

13   this is an e-mail from Mr. Fredrics to you, dated

14   January the 2nd, saying:  I need more information.

15   We need to discuss by phone.

16          Is that correct?

17      A    Correct.

18      Q    And did you have a discussion with

19   Mr. Fredrics via phone?

20      A    Yes.

21      Q    And what did y'all speak about?

22      A    We spoke about -- we spoke about the

23   amount of money that was given by insurance and what

24   I need to have done and I was told by different ones

25   that it wasn't enough.

1        Q    Okay.

2        A    And he said okay; so he took on my case.

3        Q    And did you execute any documents with

4    him?

5        A    I signed paperwork with him, yes.

6        Q    All right.  Let's take a look at the

7    paperwork.  I'll get to it here in a second.  Hold

8    on.  Let me get it.

9             All right.  We're looking at Page 275 of

10   Exhibit Number 1.  Is this your signature on the

11   limited power of attorney?

12       A    It is.

13       Q    What is your understanding regarding this

14   limited power of attorney to Mr. Fredrics's company

15   called PACS Limited -- PACS Limited?

16       A    He's the appraisal [sic] to help me try to

17   get things done.

18       Q    Okay.  It says that the limited power of

19   attorney as my compensable neutral, impartial, and

20   disinterested proxy, to act for me in place of me,

21   but not in any agent capacity for all insurance

22   claims-related -- claims-related matters specified

23   below.

24             Right?

25             And it has the claim number of -- that was

1  assigned by your insurance company; correct?

2      A    Correct.

3      Q    Okay.  Whose -- whose handwriting is this

4  handwriting up at the top?  Client through policy

5  number?  Is that yours?

6      A    No.

7      Q    Whose is that?

8      A    Bruce did that.

9      Q    Okay.

10     A    Or I think he -- wait a minute.  I

11  can't -- I'm not sure.  This was -- this was

12  e-mailed to me and I printed it off and signed it

13  and sent it back to him.

14     Q    Who's Renata Santos?

15     A    Ma'am, I don't know.  Someone in his

16  office, I assume.

17     Q    What about Tahresa -- T-A-H-R-E-S-A --

18  Woods?

19     A    I would say the same.  I have no idea who

20  they are.

21     Q    Did you sign it in front of a notary?

22     A    Haven't been to a notary.

23     Q    Well, there's a notary signature by

24  Stephanie Rodriguez.  Did you sign this in front of

25  her?

1      A     No.

2      Q     Okay.  You received it via e-mail from

3  Mr. Fredrics, you printed it, signed it, and

4  e-mailed it back to him?

5      A     Correct.

6      Q     So you didn't go out and have any of your

7  signatures witnessed by any of these ladies that are

8  identified in here or in front of a notary public;

9  correct?

10      A     I'm sorry.  Hold on just a minute.  I'm

11  trying to think now.  I'm trying to think.

12            I know who this -- I'm sorry.  It's been

13  so long ago.  Today is long too.

14            Stephanie is the lady at the bank -- at

15  the bank.

16      Q     Which bank?

17      A     I remember taking this to the --

18      Q     Okay.  Which bank?

19      A     -- Bank of America.

20      Q     Which location?

21      A     The one that's on Ponce de Leon.

22      Q     Okay.  And who are Renata and Tahresa?

23      A     Renata was the teller -- the person that I

24  spoke with.  The other one was a witness for her.

25  And Stephanie was the notary.

1      Q    And they were all employed by Bank of
2   America on Ponce de Leon?
3      A    Yes, ma'am.
4           I'm sorry.  I'm sorry.  I'm not thinking
5   clear.  That's a lot.  I'm getting old.  I've been
6   sick this week; so I'm just trying to get my head
7   together.
8           MS. KARABINOS:  Okay.  My earphones are
9   about to go off; so I'm going -- let's take a
10  five-minute break until I can change my earphones,
11  please.
12          MR. VILLANI:  Can we take a ten-minute
13  break to 12:30, please.
14          MS. KARABINOS:  Sure.
15          (Recess taken from 12:23 p.m. to 12:32
16  p.m.)
17  BY MS. KARABINOS:
18     Q    Miss Scott, let me share my screen with
19  you again.  We're still on Exhibit Number 1.  And
20  we're looking at Page 259.  Do you see that on your
21  screen?
22     A    Yes.  It's little, though.
23     Q    Do you want me to make it larger for you?
24     A    Yes, please.
25     Q    How about that?

1      A     Yes.

2      Q     Okay.  So this is a retainer notice letter

3   between yourself and Professional Adjustment &

4   Consulting Service, known as PACS, P-A-C-S.  And

5   that's your signature on the bottom there?

6      A     Yes.

7      Q     That's a signature of Mr. Fredrics as

8   well?

9      A     Yes.

10     Q     Okay.  What is your understanding about

11  what this document was that you signed?

12     A     Excuse me?  I don't understand what you

13  mean.

14     Q     What is your understanding about what is

15  this document that you signed?

16     A     My understanding is that I gave him

17  authority to take over and do what is needed for me.

18     Q     Okay.  And in what capacity?

19     A     In full capacity to do what needed to be

20  done.

21     Q     Okay.  Was it your understanding that he

22  was your public adjustor?

23     A     Yes.

24     Q     Okay.  Did you have any other -- any other

25  understanding about what other roles that he was

1  going to act on your behalf?

2       A    No.  He was just the adjustor.  The

3  appraisal or the adjustor.  That's all I thought.

4       Q    Okay.  Was it an adjustor or was he going

5  to be your appraiser?

6       A    Adjustor.  I don't know why I said

7  appraiser.  I think it's adjustor.

8       Q    Okay.  And so you contacted your insurance

9  company to advise them that you had gotten an

10  adjustor; right?

11      A    No, I did not.

12      Q    You did not contact the insurance company

13  to tell them that you had gotten an adjustor?

14      A    No.

15      Q    So --

16      A    I didn't know I had to tell them anything

17  further.

18      Q    Okay.  Did you ever have any conversation

19  with anybody with your insurance company regarding

20  Mr. Fredrics?

21      A    No, I did not.

22      Q    You did not?

23      A    No.

24      Q    You never told anybody at your insurance

25  carrier that you had hired a public adjustor who had

1    written an estimate for you?

2        A    I don't remember if I did or not.

3        Q    You want to check your notes?

4        A    I don't have that written down.

5        Q    Okay.  So there's a possibility that you

6    did.  You don't know one way or the other?

7        A    No.

8        Q    Do you remember receiving a phone call

9    from Jeff Teitelbaum regarding the status of you

10   getting estimates?

11       A    I don't remember.

12       Q    You don't remember sometime at the end of

13   December 2018 he called you about the status and you

14   said you were working on getting some companies to

15   come out and would hope to have something to him at

16   the first of the year?

17            MR. VILLANI:  Objection.  It was asked and

18   answered.  She doesn't remember.

19   BY MS. KARABINOS:

20       Q    Do you remember?

21       A    I don't remember.

22       Q    Possibility that that happened?

23       A    I don't know.

24       Q    Did you ever contact your insurance

25   carrier to tell them that you had obtained an

1   estimate from an adjustor?

2       A    I don't remember.

3       Q    Do you recall signing any other documents

4   other than the one that was previously looked at

5   where you had the witnesses' signatures and the

6   retainer notice that we've got up in front of you?

7       A    I can't understand you, ma'am.

8       Q    Do you recall signing with Mr. Fredrics

9   any other documents other than the two that I've

10  just showed you?

11      A    I can't remember right off if I did.

12      Q    How much have you paid Mr. Fredrics for

13  his services to date?

14      A    Zero.

15      Q    Zero?

16      A    Nothing.

17      Q    Has he asked you to pay anything?

18      A    No.

19      Q    What is your understanding about what

20  you're to pay him, if any, at the end of this case?

21      A    My understanding is if I get nothing, he

22  get nothing.

23      Q    Have you reimbursed him for any expenses

24  associated with -- that he paid on your behalf?

25      A    Ma'am, you're breaking up really bad on

1    this end.

2        Q    Has he paid you for anything else -- have

3    you paid him for anything else that he may have paid

4    on your behalf, like reimbursed him any money?

5        A    No.

6        Q    When did Mr. Fredrics come out to your

7    home, if at all?

8            MR. VILLANI:  Counsel, you just broke up.

9    You want to repeat that.

10   BY MS. KARABINOS:

11       Q    When did Mr. Fredrics come out to your

12   home, if at all?

13       A    The first of January of 2019.

14       Q    Do you remember the date?

15       A    I think it was around the 2nd or 3rd.

16       Q    Was that before or after you signed the

17   retainer notice that we've been looking at on Page

18   259 of Exhibit 1?

19       A    Ma'am, I'm not -- you're breaking up.  I'm

20   sorry.

21           MS. KARABINOS:  All right.  Let's take a

22   break.  Let me see if I can get the sound better

23   here.  Hold on.  We'll go off the record.

24           (Off-the-record discussion.)

25           MS. KARABINOS:  All right.  Let's go back

1   on the record.

2              Miss Scott, thank you so much.  Anytime

3   you can't hear me, you need to let me know.

4              THE WITNESS:  Okay.

5   BY MS. KARABINOS:

6      Q    So you believe that Mr. Fredrics came out

7   on what day?

8      A    I think it was the 2nd or the 3rd.  I'm

9   not exactly sure which date, but I know it was the

10  first week of January.

11     Q    Of 2019?

12     A    '19, yes.

13     Q    Okay.  Was anybody with him?

14     A    No.

15     Q    Was anybody with you?

16     A    My family was here.

17     Q    Okay.  Did Mr. Fredrics speak to anybody

18  other than yourself about the loss?

19     A    No.

20     Q    How many times has Mr. Fredrics come to

21  your home?

22     A    I think it was, like, two, maybe three.

23  I'm not exactly sure the number.

24     Q    Okay.  So what did he do on this first one

25  which occurred either on January 2nd or January 3rd?

 1      A    We discussed --

 2           THE COURT REPORTER:  Hold on.

 3           Is that an objection?

 4           MR. VILLANI:  Yes.

 5           As I'm saying an objection, Miss Scott,

 6  you need to stop talking.  Okay?

 7           I object because it's facts that aren't in

 8  evidence.  You keep saying 2nd or 3rd.  She said, I

 9  don't know.

10           So can you please rephrase that question.

11           MS. KARABINOS:  Her testimony was it

12  happened either January 2nd or 3rd; so that's why I

13  phrased my question that way.

14           MR. VILLANI:  It was the first week of

15  January.  She clarified that.

16  BY MS. KARABINOS:

17      Q    Miss Scott, was it either January 2nd or

18  January 3rd?

19      A    I'm not exactly sure, but I know it was

20  the first week of January of 2019.

21      Q    All right.  Well, let's go ahead and

22  clarify here.

23           Miss Scott, I'm showing you Page 235 of

24  Exhibit Number 1.  And this is the estimate that we

25  received from Mr. Fredrics.  It says:  Date

1   inspected, January the 2nd, 2019.

2          Does that refresh your memory that that's

3   when he came out and inspected that first time?

4       A    That's when he came out.

5       Q    Okay.  All right.  So --

6          MR. VILLANI:  Thank you, Counsel.

7   BY MS. KARABINOS:

8       Q    Did he speak with your family members

9   while he was out there about the loss?

10      A    No.

11      Q    Did he speak to you about the loss?

12      A    We went over what I had called about, him

13  helping me to get some help.

14      Q    Did y'all talk about when you first

15  observed the water running on September the 29th of

16  2018?

17      A    I don't remember if we did.

18      Q    So what did you tell him about how you --

19  let me back up.

20          What did you tell him about why you called

21  the insurance company?

22      A    Rephrase that.

23      Q    What did you tell Mr. Fredrics or did you

24  tell Mr. Fredrics --

25      A    Uh-oh.

1        Q    We just lost your video.  That's okay.

2   There you go.

3            Did you tell Mr. Fredrics anything about

4   what you told your insurance company?

5        A    I don't remember the details of the

6   conversation.  It's been a while.

7        Q    Do you have notes regarding your

8   conversation with Mr. Fredrics at any time?

9        A    No, ma'am.  I didn't take any notes with

10  him.

11       Q    During any of the conversations you had

12  with him either in person or on the phone?

13       A    I didn't take any notes with him.

14       Q    So the only notes that you took were with

15  regard to your conversations with people from your

16  insurance company or people who came out there on

17  their behalf?

18       A    People who came out -- I took notes on

19  people I actually spoke to at Travelers.

20       Q    Okay.  Do you have any notes regarding

21  your conversation with Eric with Emergency

22  Water & Fire?

23       A    No.

24       Q    Do you have any notes regarding your

25  conversation with ServPro?

1       A     No.

2       Q     So did Mr. -- well, let me back up.  Did

3    Mr. Fredrics ask you about what caused the mold?

4       A     No.

5       Q     Did he ask you about what caused the water

6    damage?

7       A     No, not that I remember.

8       Q     Okay.  Did he tell you about what he

9    believed to be the cause of the mold?

10      A     I'm not sure if he did.  I don't remember.

11      Q     Did he tell you what he believed to be the

12   cause of the water damage?

13      A     I don't remember if he did.

14      Q     Do you remember anything that you and

15   Mr. Fredrics talked about on January 2nd of 2019?

16      A     We talked about the reason I called the

17   insurance and I was trying to get help, trying to

18   find somebody that would do the -- fix the mold and

19   water damage.  And he did an inspection.

20            And then he said, I'll get back with you.

21            I don't remember all that happened.  Right

22   now I'm drawing a blank, because I was sick over the

23   weekend and I don't even remember from Friday to

24   late Monday.

25      Q     Are you talking about currently?

1        A    Yes, this week.  I was sick over the

2   weekend and I missed -- I'm drawing a blank because

3   I missed a whole weekend; so according to my memory

4   right now it's not here.  I don't even know what

5   happened.  My daughter said I slept the whole

6   weekend.

7        Q    So do you believe because of what happened

8   this weekend, you are not able to answer my

9   questions today?

10       A    I'm drawing a blank on some of the

11  answers -- on some of the stuff that you're asking

12  right now.  I'm drawing a blank, because I can't

13  remember.  I've lost some time somewhere and I can't

14  remember what happened.  I can't even tell you what

15  went on over the weekend, because I don't remember

16  it from Friday until Monday.

17       Q    Okay.  So, Miss Scott, I understand.  And

18  I'm so sorry, you know, that you had that over the

19  weekend.  But what I'm trying to figure out is what

20  happened this weekend preventing you from being able

21  to answer my questions about what happened in 2018

22  and 2019?

23       A    Right now, yes, because I'm starting to

24  get a really bad headache.  I'm trying to answer the

25  best I can.

1      Q    Okay.  Well, do you want to stop and get

2  you some Tylenol or some Advil for a headache?

3      A    Yeah.

4           MS. KARABINOS:  Okay.  Let's take a minute

5  for you to do that.

6           MR. VILLANI:  Counsel, if you need to

7  reset this, we're not going to have any objection.

8  This is the first time I'm hearing about

9  Miss Scott's problem.

10          THE WITNESS:  I was trying to -- I thought

11 I could push through it and that's what I was trying

12 to do.

13          MS. KARABINOS:  Go get you something and

14 give me some time to think about this.

15          MR. VILLANI:  Miss Scott, do you think you

16 can continue with this deposition today as -- you

17 said your mind is foggy or whatever, or would you

18 rather ask counsel if she would be kind enough to

19 reset it again?

20          THE WITNESS:  Yes, can we do that, please.

21 Reset it.

22          MR. VILLANI:  You look like you're crying.

23 I'm sorry.  Are you in a lot of pain?

24          Counsel, I don't think she's in any shape

25 to continue.  I'm sorry.

1            THE WITNESS:  I'm getting really confused.

2    It's like stuff is running together and I can't

3    figure out what's going on.

4            MS. KARABINOS:  Okay.  Give me just a

5    minute.

6            (Recess taken from 12:51 p.m. to 12:54

7    p.m.)

8            MS. KARABINOS:  Let's just go back on the

9    record.

10           This is Karen Karabinos, counsel for

11   Charter Oak.  We are going to adjourn Miss Scott's

12   deposition.  And we have it tentatively rescheduled

13   for 10:00 a.m. on August the 10th, due to her

14   medical condition that has come on since we started

15   the deposition this morning.

16           Is that agreeable, Ralph?

17           MR. VILLANI:  Yes, it is.

18           MS. KARABINOS:  Okay.  All right.

19   Miss Scott, I hope you feel better soon.

20           (Deposition adjourned 12:57 p.m.)

21

22

23

24

25

```
1              AUGUST 10, 2021, 10:05 a.m.
2              MS. KARABINOS:  Let the record reflect
3    that this is the reconvened deposition of Miss Scott
4    taken in reference to the Janet Scott versus The
5    Charter Oak Fire Insurance Company case that is now
6    pending before Judge Thrash at the Northern District
7    of Georgia, United States District Court, Atlanta
8    Division.
9    BY MS. KARABINOS:
10       Q     Miss Scott, I just want to advise you that
11   you are still under oath.  Do you understand that?
12       A     Yes.
13       Q     All right.  As you know, we adjourned your
14   deposition a couple of weeks ago because you were
15   not feeling well.  You said you had a headache and
16   had some difficulty answering my questions; is that
17   correct?
18       A     Yes, ma'am.
19       Q     How are you feeling today?
20       A     I feel a lot better.
21       Q     Okay.  Great.
22             Did you go see a doctor?
23       A     I did.
24       Q     And when did you go see a doctor?
25       A     Excuse me?
```

1      Q     When did you go see a doctor?

2      A     I went -- I ended up in the ER the same

3   day that -- on the 28th.  And then I saw my -- I saw

4   another doctor on the 29th.

5      Q     What did the doctor say?

6      A     Dehydration and urinary tract infection.

7      Q     That will make you have a headache along

8   with host of other things; right?

9      A     Yes.

10      Q     So you're feeling good right now?

11      A     Yes.

12      Q     Again, anytime that you don't feel well

13   during the deposition today, please let me know.

14   Okay?

15      A     Okay.

16      Q     Are you on any medications that would

17   prevent you from understanding my questions and

18   answering them truthfully?

19      A     No.

20      Q     Okay.  And, now, is there any issue today

21   with your ability to remember what happened after

22   you reported the damage to your insurance company?

23      A     No.

24      Q     Because of what happened when we initially

25   took your deposition a couple of weeks ago, I'm

1  going to go over a couple of the same things that we

2  talked about, just to make sure that you accurately

3  answered my questions.  Okay?

4      A   Okay.

5      Q   Okay.  Great.

6          First of all, if I misinterpret or

7  missummarize your deposition testimony from two

8  weeks ago, please tell me that it's incorrect and

9  give me the correct information.  Okay?

10     A   Okay.

11     Q   From what I understand from your testimony

12 two weeks ago is that on September 29th, 2018, you

13 sat on the -- you sat on the toilet and heard water

14 running; is that correct?

15     A   Correct.

16     Q   Okay.  And you called Hers & His Plumber

17 that day?

18     A   No.  I called HomeServe who my warranty

19 company that sent Hers & His Plumbing out.

20     Q   So you called HomeServe on September 29th,

21 2018?

22     A   Yes.

23     Q   And Hers & His Plumbing did not come out

24 until the following Monday, October the 1st, 2018;

25 right?

1      A    Correct.

2      Q    And on that date the company found that

3   there was a leak to the water supply line to your

4   tub in your bathroom; is that correct?

5      A    Correct.

6      Q    Okay.  And your attorney yesterday sent me

7   some better copies of the plumbing invoices; so I'm

8   going to show you those now.

9          MS. KARABINOS:  Ralph, I appreciate you

10   sending those.

11          MR. VILLANI:  Yeah.  My client spent some

12   time digging those up and I do appreciate her -- I

13   know she wasn't feeling well the last couple of

14   weeks, but I appreciate --

15          Janice, I appreciate you going through the

16   trouble of getting this.  It makes the deposition a

17   lot easier if you can read the documents.

18          MS. KARABINOS:  Absolutely.

19          (Scott Deposition Exhibit 13 was marked

20   for identification and attached to the transcript.)

21   BY MS. KARABINOS:

22      Q    I'm going to show you what we've now

23   marked as Exhibit Number 13.  Do you see that?

24      A    Yes.

25      Q    Okay.  And, again, this is -- these are

1    the invoices that your attorney sent us yesterday.

2    And the first page is a copy of the service order

3    for the very first time that they say they saw --

4    one second.  Wrong one.  Let me change the view here

5    so you can rotate it.

6            Here we've got October the 1st, 2018, and

7    we've got a water supply line to the tub was

8    leaking, causing a high water bill, repaired line to

9    correct problem.

10           That's what happened on the 1st; right?

11       A    Right.

12           MR. VILLANI:  Counsel, just for the record

13   this is Page Number 4 of Exhibit 13?

14           MS. KARABINOS:  That is correct.

15   BY MS. KARABINOS:

16       Q    Do you also see Exhibit Number 10 in front

17   of you?

18       A    Yes.

19       Q    So Exhibit Number 10 is just a sketch of

20   your home.  We looked at it briefly last time.  So

21   where the water leak was that the company found on

22   October the 1st, was it -- let me draw it with a

23   pencil.  Was it right here?

24       A    No.

25       Q    Where was it?

1       A     You see where the little circle is?

2             Okay.  That wall in between those walls

3    right there.

4       Q     Right here?

5       A     Yeah, behind -- yeah, behind the wall

6    right there.  Yeah, right in there.

7       Q     So I'm going to put that out there.  And

8    that was what was found on October 1st; right?

9       A     Right.  But that was not the one that I

10   called about, because I didn't know about that one.

11      Q     You didn't know about that one until when?

12      A     When the plumber came out, he found it.

13   That's not the one that I called about, because I

14   didn't know that one was there.

15      Q     Okay.  When you -- who did -- who are you

16   referencing to when you said when I called about?

17      A     HomeServe.

18      Q     Okay.  What was -- what you heard was

19   water leaking from your toilet?

20      A     No, it wasn't leaking from the toilet.

21      Q     You heard the water running?

22      A     I heard the water running behind me when I

23   was sitting on the toilet, which led me to believe

24   it had to be in the wall between the kitchen and the

25   bathroom.

1      Q    So is this right where you're talking

2    about?  Behind your toilet?

3      A    Yeah, behind the toilet.

4      Q    And so your toilet is right here where I'm

5    drawing a line to; is that correct?

6      A    Yes.

7      Q    Is this your freezer?

8      A    No.  That's the refrigerator.  Actually

9    that's a cabinet sitting right there.  The

10   refrigerator is in between the two cabinets.

11     Q    Is the freezer right here where I'm making

12   an X?

13     A    That's a refrigerator, not a freezer.

14     Q    Do you have a separate freezer?

15     A    I do.  It's not sitting on that side at

16   all.

17     Q    Where is the freezer in that home?

18     A    The freezer is on the other side of the

19   wall by the cabinets over here, behind the back

20   door.

21     Q    So right here?

22     A    Yeah, behind the back -- this is the door

23   right here.  Where it says kitchen, that's the door.

24   And to the -- if I'm standing there, it would be to

25   the right of the door.  It would be sitting right --

1  right there.

2      Q    Hold on.  Let me make a couple of

3  corrections here.

4      A    And it's not connected to any water line.

5      Q    Okay.  So is the freezer right here?

6      A    That's a refrigerator on the wall right

7  there between the two cabinets.  That's a cabinet.

8      Q    Okay.  So the refrigerator is right there?

9      A    Yes.

10     Q    So I'm going to put refrigerator.

11     A    Refrigerator, not a freezer.

12         MR. VILLANI:  You could put icebox.  That

13  will date us all.

14  BY MS. KARABINOS:

15     Q    And what is next to the cabinet right here

16  that's got the number there on it?  What is in the

17  area between the wall cabinet?

18     A    That's a wall.  There's a cabinet on

19  the -- the refrigerator sits between two cabinets.

20     Q    Okay.  And is the freezer -- where's the

21  freezer?  Right here?

22     A    No.  It's on the other side of the wall

23  behind the refrigerator door over by where the stove

24  is on the other side -- it's the back door -- no --

25  on the other side of the whole kitchen.  It's on the

1  other side of the kitchen right there.  Right where

2  the thing for the door is.  It's behind the door --

3  beside the door.  Right there.

4        Q    Right here?

5        A    Yes.

6        Q    Okay.  All right.  That helps me a lot,

7  because I've never been out to your house; so this

8  is very helpful.

9             So we have the refrigerator that's sharing

10 the wall between your bathroom and your kitchen and

11 then your freezer is on the wall between your

12 kitchen and your dining room; is that correct?

13       A    Correct.

14       Q    Okay.  So going back; so you heard water

15 running behind the wall in your toilet, that's what

16 prompted you to call HomeServe on September the

17 29th; is that correct?

18       A    Correct.

19       Q    Okay.  Now we're on the same page.  Thank

20 you for clarifying.

21            And then Hers & His Plumbing came out and

22 they found a water leak on October 1st between the

23 wall between your tub and, it looks like, the HVAC

24 closet right there; is that correct?

25       A    Yeah, where the hot water tank is.

1    Q    Okay.  And you said, I believe from your

2    previous testimony, that you still heard water

3    running even after they left that day; is that

4    correct?

5    A    Right.  And I called them back to let them

6    know they did not fix what I called them about,

7    because I didn't know about the one that he found.

8    Q    Okay.  When did that company come back

9    out?

10   A    They came out on a Wednesday, same week;

11   so they came out on the 3rd.

12   Q    Okay.  So was it the same technician who

13   had been there on the 3rd?

14   A    No, it was a different one.

15   Q    All right.  And was this a technician who

16   went into your crawlspace and smelled the mold?

17   A    He didn't go into the crawlspace.  He

18   opened the door and said there was mold down there

19   and he wasn't going in, that I had to call to get it

20   cleaned out before he would go in there.  That was

21   the first time I had ever heard about mold.

22   Q    Right.  And he didn't do anything else?

23   Did he go into the home to see if there were any --

24   listen for the water running or anything?

25   A    He didn't do anything at all.

1      Q    Okay.  So was it after he came that you

2   then called your insurance company to report the

3   loss?

4      A    That's when -- yeah.  When I called the

5   insurance company was because I didn't know anything

6   about the mold.  If I have a problem -- if something

7   happened I would call the HomeServe because that's

8   who my warranty company is.  The warranty company is

9   HomeServe; so I would call them before I would call

10  anybody.  And then once the guy came and said it was

11  mold, then I was told to call the insurance company.

12     Q    And he was the one who got it from

13  Hers & His Plumbing on October 3rd who suggested you

14  call the insurance company; is that right?

15     A    No.  He didn't suggest anything.  He just

16  said, you got mold.  You got to get it fixed.  Once

17  you get it cleaned out, then I'll come back.

18          I called HomeServe back to ask them what

19  to do about that, if they did that or who I need to

20  talk to about it.  They're the one who said call the

21  insurance company.

22     Q    Okay.  Thank you for clarifying.

23          And so then you called your insurance

24  company on October 3rd; is that correct?

25     A    Correct.

1       Q    And the first adjustor we talked about

2    last time that was a Mr. Jeffrey Teitelbaum; right?

3       A    Yes.  He came out on October 4th.

4       Q    At the time of his inspection did you

5    still hear the water running?

6       A    I did.

7       Q    Okay.  Did Mr. Teitelbaum still hear the

8    water running?

9       A    He did.

10      Q    Okay.  And what did he say about the water

11   running?

12      A    He was saying it was from the toilet.  And

13   I told him that it wasn't from the toilet, because

14   once you put your hand down there, up against the

15   wall, you didn't get any water on your hands; so it

16   couldn't have been on the toilet.

17      Q    Okay.  Did he see any -- did he go

18   underneath the crawlspace?

19      A    I don't know if he did or not.  I don't

20   remember what he did.  I know he came in the house

21   and -- he didn't say anything to me about any

22   findings; so I don't know what he did.

23      Q    So when he left, did he tell you what, if

24   any, coverage was going to be afforded at that time?

25      A    He didn't -- when he left, he sent me a

1    letter, said I was denied.

2         Q    But when he was present, did y'all discuss

3    about what he observed, what coverages he might be

4    able to afford, or anything like that?

5         A    No.

6         Q    Okay.

7         A    He talked to me about -- he talked to me

8    about it being denied because he said that I had a

9    ongoing thing and I didn't do anything about it.

10             But I told him, I have a warranty company

11   that takes care of the water if I have a water pipe

12   burst like I had one burst before behind the

13   refrigerator.  That one happened early in the

14   morning.  I called the fire department to help me

15   get that off, because it was -- HomeServe was

16   closed.  So no warranty company was open at that

17   time of night -- or that time of morning to get

18   somebody out here to cut the water off.

19             So the fire department came.  They helped

20   get the water out of the house.  And we dried up as

21   much as we can.  We put fans out and we dried out

22   everything that -- I know it was dry.

23             So I didn't know I needed to call the

24   insurance company to report it.  That's why I had a

25   warranty company.

1    Q    When was the date of when the fire

2    department came out to help you get the water up?

3    Do you remember that?

4    A    I don't remember the date.  It happened

5    maybe a year or so before that.

6    Q    Let me show you Exhibit Number 13 again.

7    This is a new document -- or better -- clearer

8    documents that your attorney produced to us

9    yesterday.  And here's a service order on Page 1 of

10   Exhibit 13 for Delmar Construction.  It is dated

11   right here, October 9th, 2016.  Is this what you

12   were talking about when there was a leak behind the

13   refrigerator and the fire department came out?

14   A    Yes.

15   Q    Okay.  And then going back to the sketch

16   that was 10, where was that water leak in 2016 that

17   the fire department assisted with?

18   A    Behind the refrigerator.

19   Q    So still in that wall between the bathroom

20   and kitchen?

21   A    Yes.

22   Q    Okay.  After Mr. Teitelbaum came to your

23   house on October the 4th of 2018, who was the next

24   company to come out to your home in response to any

25   type of water or mold damage?

1       A       HomeServe came back on October the 5th and

2    John D. fixed that leak behind -- he fixed the leak,

3    because he went through the cabinet and fixed that

4    leak that was between the wall between the

5    bathtub -- I mean, the toilet and the cabinet.  He

6    went through the cabinet and fixed it.  Cut a hole

7    in there, went through the wall right there, which

8    was easier than trying to go through the wall behind

9    the toilet.

10      Q       Okay.  Let's go back to that same sketch.

11              And so John D. with Hers & His Plumbing

12   came out on October 5th and he when through the

13   cabinets?

14      A       Yeah, he went through the cabinet.

15      Q       And went to this same area that I'm

16   highlighting here, which we highlighted earlier, and

17   fixed the water leak?

18      A       He went through the cabinet between the

19   wall -- between the wall behind the cabinet and

20   between the wall behind the toilet, and that's when

21   he fixed the water leak.

22      Q       That stopped the hearing of the water

23   going on that you heard?

24      A       Excuse me?  I can't hear you.

25      Q       That stopped the water running sound that

1    you had previously heard?

2         A    It did.

3         Q    Okay.  That was the same area that you had

4    previously heard.

5              Why didn't the folks at Hers & His

6    Plumbing check that area behind the toilet when they

7    first came out October 1st?  Do you know why?

8         A    I don't know why -- I don't know why he

9    didn't.  I don't know if he didn't hear it, because

10   he went in the house and he said he didn't see any

11   water leaking, not where I heard water.  He didn't

12   see any water leaking on that side or by the

13   bathtub.  That's when he found when he came out on

14   the 1st.

15        Q    So I'm going to -- I wrote October --

16   October 5th inspection was that same wall behind the

17   refrigerator and behind the toilet and sink; is that

18   right?

19        A    No.  It was between the -- it was between

20   the cabinet.  The wall between the cabinet and the

21   toilet.  It wasn't behind the refrigerator.

22        Q    So where I put a C, that's the cabinet

23   that they went through; correct?

24              Do you see that C?

25        A    The cabinet is closer to the wall than it

1   is in the middle.

2        Q    The second C?  That's what you're talking

3   about?

4        A    Yeah.  Right here close to the wall.

5        Q    All right.  Let me just correct.

6        A    Where the toilet is there's -- right

7   behind where the toilet on the other side of that

8   wall is a cabinet.  And he went through that cabinet

9   right behind the toilet.

10        Q    Okay.  Right here.

11        A    Yeah.  Right there on the other side of

12   that wall.

13        Q    So we've got the October 1st, 2018, over

14   here by the tub.  We have the October 5th inspection

15   right behind the cabinet in the kitchen and the

16   toilet in that shared wall there?

17        A    Right.

18        Q    And did Mr. Teitelbaum tell you where he

19   observed any leak?

20        A    He said that he saw one under the sink and

21   showed me that one.  I didn't know that was leaking

22   under there.  We got that fixed right away.

23        Q    Was that the sink in your bathroom?

24        A    Kitchen.  It just started to drip.  It

25   just started to drip, because the cabinet wasn't wet

1    under the sink.

2         Q    That's what Mr. Teitelbaum saw?

3         A    Yeah, that's what he said.  It had just

4    started, because he felt down on the cabinet and it

5    wasn't wet.  So it wasn't like it was going on and

6    we let it go on.  When he saw it, he showed it to

7    me.  And when they came out to fix the pipe, I

8    showed them that and they fixed that one the same

9    day that they fixed the one behind the bathtub.

10        Q    Did Mr. Teitelbaum see any other leak

11   besides that one that just started underneath your

12   kitchen sink?

13        A    Not that I know of.  That's the only one

14   that he told me about.  Other than that, I didn't

15   know.

16        Q    All right.  We previously looked at

17   Exhibit Number 2.  Can you see that on your screen?

18        A    It's very small.

19        Q    Is that better?

20        A    A lot better.

21        Q    We looked at this one last time.  It's

22   dated October 12th, 2018.  It's a letter from

23   Mr. Teitelbaum to you.  This is where Travelers

24   originally denied your claim that we talked about;

25   correct?

1        A    Correct.

2        Q    And after you got that letter, you

3    testified last time that you spoke with Craig Hite

4    and he agreed to have a vendor come out and

5    reinspect; is that correct?

6        A    Correct.

7        Q    And that company was Emergency

8    Water & Fire Restoration.  Do you recall that?

9        A    Yes.

10       Q    And what did Emergency Water & Fire

11   Restoration determine?  Do you recall?

12       A    Only thing he said to me, everything is

13   going to work out.  So he said, don't worry.  It

14   will be taken care of.

15            That's what he told me.  Now, what he

16   meant by that?  I don't know.  But later they sent a

17   check.  The check came from Travelers for

18   $5,000-something.  And I tried to go along with

19   the --

20       Q    You will see Exhibit 6, which we also

21   looked at last time.  It's a letter from Travelers

22   dated November the 9th, 2018, in which they --

23       A    Right.

24       Q    -- afforded coverage for a repair cost of

25   $6,004.18.  And after taking out your deductible and

1  any kind of recoverable depreciation, they issued

2  you a check in the amount of $5,178.61; is that

3  correct?

4        A    Yes.

5             MR. VILLANI:  Ma'am, all of our pictures

6  are blocking the right-hand side of that document.

7  If you can just maybe squeeze it down.

8             MS. KARABINOS:  Is that better?

9             MR. VILLANI:  Yes.

10            MS. KARABINOS:  Is that better for you,

11 Ralph?

12            MR. VILLANI:  Yes, it is.  Thank you very

13 much.

14            MS. KARABINOS:  You're welcome.

15 BY MS. KARABINOS:

16       Q    We also looked at the check notification,

17 which was Exhibit Number 5, showing that the check

18 in the amount of $5178.61 is on its way; right?

19       A    Yes.

20       Q    Okay.  And Mr. Teitelbaum -- he went over

21 the estimate of damages over the phone with you?

22       A    Mr. Teitelbaum -- he didn't tell me

23 anything about they was doing the check.  I didn't

24 talk to Mr. Teitelbaum again after that.

25       Q    Mr. Teitelbaum didn't go over with you the

1    estimate for damages prior to you receiving the

2    check?

3        A    Not that I recall.  Not on the phone.

4        Q    You don't recall any conversation you had

5    with him regarding what damages were going to be

6    afforded?

7        A    I'm trying to think hard.

8        Q    Do you need to review your notes?

9        A    I'm looking through the paperwork I got.

10       I remember talking to him, but I don't

11   remember exactly what he said it was covering.

12       Q    Do you recall telling him that you had a

13   company that would be providing an estimate of the

14   damages?

15       A    He gave me a list of companies that could

16   do it for me.

17       Q    And did you choose one of those companies?

18       A    I did.  I choose ServPro.  And -- from the

19   list of people he gave me -- I used ServPro from the

20   list that he gave me.

21       Q    ServPro came out; right?  We talked about

22   that last time?

23       A    Right.

24       Q    And they prepared an estimate; correct?

25       A    They -- I didn't get a copy of it.  They

1    sent it to -- they sent it to Travelers.

2        Q    Do you recall what happened after ServPro

3    came out to your home?  What was the next thing that

4    happened?

5        A    ServPro came to the house.  They put those

6    big machines up to dry up the water.  And they

7    stayed out -- they was here the whole week of

8    Thanksgiving that year.

9            And after that I was told that my claim

10   had been denied with -- with Travelers, because

11   Travelers was not providing any more money to cover

12   what needed to be done is what I was told.

13       Q    Who told you that?

14       A    I think his name was Ben.  The people from

15   ServPro said that.

16       Q    Ben, B-E-N?

17       A    B-E-N.

18       Q    Okay.  Do you recall whether Travelers

19   came back out again after ServPro had been there?

20       A    They sent an engineer out.  I'm not sure

21   if it was after or before they came, but they sent

22   an engineer out.

23       Q    Do you remember Mr. Teitelbaum coming back

24   out at one point?

25       A    Mr. Teitelbaum?

1        Q     Yes.

2        A     I don't remember him coming out.  I

3    remember somebody named Jeff Barber coming.

4        Q     Justin Barber.

5        A     Justin Barber, yeah.

6        Q     Do you remember him coming out?

7        A     Yeah.  He came out.  Him and another guy

8    came out.

9        Q     And you don't recall the name of that

10   other guy?

11       A     I don't -- I was not introduced to the

12   other guy that came with him.

13       Q     That other guy with Mr. Barber was not

14   Mr. Teitelbaum?

15       A     It was not.

16       Q     All right.  And what happened while

17   Mr. Barber was at your home?

18       A     He walked in and looked.  And his comment

19   to me was -- y'all -- your house caved in and you

20   want somebody to do something about it after you let

21   it cave in.

22             I'm like, what?  I'm like, what?

23             I didn't understand his comment.

24       Q     Did you ask him to explain it further?

25       A     He wouldn't say a thing to me after that.

1      Q     Did you try to engage him in conversation?

2      A     I tried, but he wouldn't say anything.  He

3   said something on the phone about trying to compare

4   homeowner's insurance with the car insurance.  Like

5   if you have a lot of wrecks, you can't go to your

6   car insurance and say I had a wreck when you've

7   already had a wreck.

8            I wasn't sure what he was talking about.

9      Q     So let me ask you this:  Let's go back to

10  Exhibit Number 10 for a second.  When you had the

11  leak in 2016, where was the water running?

12     A     Behind the refrigerator.

13     Q     Okay.  And in same area here?

14     A     Yes.

15     Q     Okay.  And at that time did anybody come

16  out and put up dehumidifiers or fans like they did

17  with ServPro?

18     A     No, no.  I didn't use ServPro.

19     Q     I understand you did not use ServPro.  But

20  did any other company come out and place

21  dehumidifiers or fans in 2016?

22     A     No.

23     Q     Was it ever recommended that you do that?

24     A     No.

25     Q     Did you discuss whether the area needed to

1   be dried out with the folks from Delmar

2   Construction?

3       A    He didn't tell me anything about what

4   needed to be done.  I dried up all the water that I

5   could dry up when the firemen was here.  We

6   squeezed -- what's that squeegee thing?  We did all

7   of that with the prior people who were here and

8   tried to -- got all the water that I could see up.

9   And I set fans out.  He didn't tell me to do

10  anything.  I set fans out and dried up.

11          And the company that Delmar came from was

12  Total Protect, which was my home warranty.

13      Q    Did Total Protect advise you to put any

14  dehumidifiers or fans out?

15      A    No.

16      Q    Who else was out at your home when

17  Mr. Barber came?  Besides the other man that you

18  don't know the name of, was there anybody else out

19  there for any other company?

20      A    No.

21      Q    Was ServPro there?

22      A    No.

23      Q    Did you have anybody out there with you,

24  such as your daughter or your grandchild or

25  anything?

1        A    No.  They came out there.  Everybody was

2    at school and work.

3        Q    Okay.  I'm going to show you Exhibit

4    Number 7.

5            (Scott Deposition Exhibit 7 was marked for

6    identification and attached to the transcript.)

7    BY MS. KARABINOS:

8        Q    Do you see that?

9        A    Yeah, I see it.

10       Q    Okay.  This is another letter from --

11       A    Travelers.

12       Q    -- Charter Oak --

13       A    Travelers.

14       Q    Well, it says The Charter Oak Fire

15   Insurance Company, but we'll just call it your

16   insurance company.

17           They did --

18       A    Explain to me what is -- exactly what is

19   Charter Oak Fire Insurance.  Is that fire insurance,

20   because I signed up for Travelers.  I didn't sign up

21   for Charter Oak.

22       Q    Charter Oak Fire Insurance is your

23   insurance company that provides the policy that is

24   in dispute.  I've already spoken to your attorney

25   about that and that's why the defendant in this case

1    has been changed from Travelers to The Charter Oak

2    Fire Insurance Company.

3         A    Well, why is it that everything that I got

4    came from Travelers?  Most everything that I got

5    came from Travelers.  My home insurance policy says

6    Travelers.  Charter Oak is like in the middle or the

7    second page.  Even a check that came to me from

8    Travelers.  Nothing I have saying that it's from

9    Charter Oak Fire.  And I thought -- looking at that,

10   I'm thinking that's a fire insurance, not a

11   homeowners insurance.

12        Q    We talked about this last time.  Your

13   policy actually shows that The Charter Oak Fire

14   Insurance Company is the company that underwrote or

15   wrote the policy.  It is a company that's an

16   underwriting company under the Travelers umbrella.

17   So if you have any more questions about that, I'll

18   let you talk to your attorney about that.

19             Did you receive this letter dated December

20   the 13th, 2018?

21        A    I did.

22        Q    Okay.  And this was a letter that you

23   received after Mr. Barber had been to your home?

24        A    Yes, I believe.

25        Q    Okay.  So we have the same building damage

1    calculation that was in the previous letter;

2    correct?

3         A    Excuse me?  Say that again.

4         Q    In this letter, December 13th, 2018, there

5    is the same payment calculation as was in the

6    previous letter we just looked at; right?

7         A    Right.

8         Q    Okay.  And then if you go on Page 2 of

9    this letter, I'm going to point -- address your

10   attention to the third full paragraph.  It said:

11   You presented a claim for water damage.  We

12   inspected the damages with Janice Scott on November

13   30th, 2018.

14            Is that the date that Mr. Barber was

15   there?

16        A    I'm not sure which one was here.  I don't

17   keep a running log of who came and what day they

18   came.

19        Q    You did keep some notes; right?

20        A    Of who I talked to on the phone.  When

21   they came in the house, I did not.

22        Q    Okay.  Thank you.

23            You see that your insurance carrier says

24   that the research found there to be several areas of

25   the home with long-term water damage.  This was

1   determined by the amount of rotted wood and

2   water-damaged portions of your home.  Per ServPro,

3   water was located throughout the home's subfloor,

4   which indicates the water has been leaking over a

5   period of time and has traveled through the home.

6   Since the water leaked over a period of time --

7   weeks, months, or years -- your policy does not

8   provide coverage.

9           Did I read that correctly?

10      A    You read what it says, yeah.

11      Q    Okay.  When you received this letter dated

12  December 13th, 2018, did you contact anybody at your

13  insurance carrier to discuss what their research

14  found, as I just read?

15      A    I was told that -- I could get my home

16  fixed for the 5,000 that they sent was what I was

17  told.  I could get it --

18      Q    Who told you that?

19           Who told you that?

20      A    What was his name?

21      Q    Was that Justin Barber?

22      A    I believe it was Mr. Barber.  I'm not --

23  I'm not exactly sure which one --

24      Q    Do you remember when you spoke with

25  Mr. Barber.

1      A      I remember speaking to Mr. Barber.

2      Q      Okay.  Can you --

3      A      I asked him on December 13th, at 8:15, the

insurance denied fixing.  I was told that I waited

until my house is caving in before I call them.

6              He said, you can't wait until your home --

until you have a lot of car accidents before calling

your insurance.

9              And then I told him that I wasn't -- don't

talk to me like I'm stupid, because the way he was

trying to talk to me was like I didn't understand

what was going on.

13             I asked him, what did a car accident have

to do with my homeowner's insurance?  I didn't know

when a pipe burst I would have to call them every

time it burst before they -- you know, if I did --

that's why I thought the warranty company was

covering all the damages.

19     Q      Miss Scott, did the comment about

comparing your claim to an automobile claim -- was

that made over the phone, or was that made in

person, or both?

23     A      That was on the phone.

24     Q      All right.  During the conversation with

Mr. Barber on December 13th, did y'all discuss the

1    prior leaks that you had at your home?

2        A    We didn't talk about prior leaks.

3            What he said was I waited until my house

4    started to cave in to call the insurance company for

5    help.  He also -- I asked him -- because they was

6    denying me, I asked him, why would y'all give me

7    $5,178.17 when they know that was not going to do

8    anything?

9            Then he said, your insurance don't cover

10   mold or water damage or pipe bursting.

11       Q    He told you --

12       A    I didn't know what I was supposed to do

13   after that.

14       Q    I'm sorry.  Could you repeat that last

15   statement.

16       A    He told me -- I asked him, why did they

17   give me $5,178.17 when they know it wasn't going to

18   cover anything?

19           Then he said, your insurance don't cover

20   mold or water damage or pipe burst.

21           So I didn't know what I was supposed to do

22   with that.

23       Q    So when you had that conversation with

24   him, had you already received this letter dated

25   December the 18th -- excuse me -- December 13th?

1    A    I spoke to him on December 13th.

2    Q    Okay.  Did you --

3    A    And then -- and then a letter came later.

4    Q    Okay.  The letter came next.  All right.

5         Did you have any other conversation with

6    Mr. Barber regarding the partial denial?

7    A    No, that was with him.

8    Q    Did you speak with him on December the

9    17th?

10    A    When?

11    Q    December the 17th.

12    A    I don't recall speaking to him on the --

13    December 17th.

14    Q    You haven't had -- did you ever have these

15    conversations with Mr. Barber or Mr. Teitelbaum in

16    which they advised that there was a difference with

17    regard to the damages that were estimated in

18    Travelers' estimate, to send them a contractor's

19    estimate that you might obtain?

20    A    I don't recall that conversation.

21    Q    You don't recall getting calls from your

22    insurance company asking you if you had obtained any

23    comparable or comparative estimates?

24    A    No, I don't recall.  I don't recall a call

25    about that.

1      Q    At one point in time you hired a

2   Mr. Fredrics.  We talked a little bit about that

3   last time.

4            Go ahead.

5      A    Mr. Who?  I can't hear you, ma'am.

6      Q    Mr. Fredrics.

7      A    Yes.

8      Q    When did you hire him?

9      A    January.  The first week of January of

10  2019.

11     Q    Did you advise your insurance company that

12  you had hired Mr. Fredrics?

13     A    I'm not sure if I did or not.

14     Q    Do you recall having another conversation

15  with Mr. Teitelbaum on January the 7th, 2019?

16     A    No.  I don't recall a call with him.

17     Q    You want to check your notes?

18     A    I don't have a note for that.

19     Q    When's the next time that you have a note

20  regarding any conversations with your insurance

21  company?

22     A    I talked to him on December 5th, not 7th.

23     Q    Okay.

24     A    I spoke with Jeff regarding the next step.

25  He said that he's still waiting to hear something.

1   I spoke with him yesterday and he was going to call

2   back.  That was at 1:00.  I didn't hear from him

3   until I called him on December 5th.  I spoke with

4   Ben at LED, at ServPro, regarding hearing from Jeff.

5   He said that he -- he hasn't heard from him since

6   Friday.  And when Jeff was here at 1:00, I left a

7   message for Angel to -- since Jeff would not call

8   back.

9        Q    Angel was Angel Marino?

10       A    Yes.

11       Q    Okay.  So what's your next contact with

12  your insurance company after December the 5th?

13       A    That's the last one that I have.

14       Q    Did you also keep notes of your -- of when

15  you spoke with Mr. Fredrics?

16       A    I didn't keep notes with him.

17       Q    You did or did not?

18       A    That's -- with him, because I knew we were

19  going to be talking one-on-one.

20            The reason I did notes with the insurance

21  company is because you speak to them, you speak to

22  different people; so I would want to know when I'm

23  talking to somebody what was said when I talked to

24  them, because I spoke to several people, not just

25  one.

1          MR. VILLANI:  Hold on.  I lost about two

2     minutes.  My computer just blanked out.  I'm sorry.

3     Can you just repeat the last two questions and

4     answers.

5          MS. KARABINOS:  I asked if she kept notes

6     of her discussions with Mr. Fredrics.

7          MR. VILLANI:  Okay.

8          MS. KARABINOS:  And she said no.

9          MR. VILLANI:  Okay.

10          And that was it?

11          THE WITNESS:  My answer to that was no.

12     And the reason being that I was talking to Bruce

13     one-on-one; whereas when I'm talking to the

14     insurance company, I'm talking to different people.

15     So when I'm talking to them, I want to have a record

16     of what was said and who I talked to.  That's why I

17     didn't keep notes on any conversation with Bruce and

18     I, because it would be one-on-one and not several

19     people.

20     BY MS. KARABINOS:

21          Q    I'm going to put up Exhibit Number 1.

22     This is the document that your attorneys produced

23     back on March the 8th of 2021.  We looked at some of

24     the pages in here before.  The first one we looked

25     at was Page 1 of that exhibit and that's when you

1  reached out to Mr. Fredrics on January the 2nd,

2  2019; is that right?

3       A    Yes.

4       Q    And you were asking -- you indicated to

5  him that you needed an estimate for my homeowners

6  insurance to compare their estimate to.

7            Did I read that correctly?

8       A    Yes, you did.

9       Q    Okay.  So you were asking him to provide

10 you with a comparison as submitted; is that correct?

11      A    I was asking him because I needed to know

12 what I could do and who could help me.  I'm trying

13 to get help to get my house fixed.  So I asked him

14 as an appraisal -- I was trying to find out what

15 would be my best options.

16      Q    Best options for responding?

17      A    Finding someone that would help me

18 compared -- I was trying to compare what the

19 insurance gave me to somebody else that could help

20 me trying to get some help to find out what I could

21 do, because the money that they gave was not enough

22 to get the work done.

23      Q    We talked about at your previous

24 deposition that y'all had a telephone call.  You had

25 a telephone call with Mr. Fredrics; right?

1       A     Yes, I did.

2       Q     And then you entered into an agreement

3    with him?

4       A     Actually Mr. Fredrics came to my house.

5       Q     When did he come to your house?

6       A     I think it was later that day or the next

7    day.  I'm not sure.  It was in that first week.

8       Q     On either January 2nd or 3rd?

9       A     Maybe.  I'm not sure exactly what day it

10   was.  It was -- it was that week.

11      Q     What did you and Mr. Fredrics do when he

12   came out?

13      A     We talked about how he could help me find

14   out how -- finding out how to get the insurance to

15   help me to pay to get the work done in my house.  He

16   said he could help me with that and that was what we

17   talked about about getting -- trying to get help to

18   get my house fixed.

19      Q     How did he advise that he could help you?

20      A     It was the appraisal and being the

21   appraisal he could talk to them for me.

22      Q     Last time we spoke in your deposition you

23   said that he was your public adjustor.  Now you're

24   saying he's your appraisal?

25      A     Appraisal.  He's an appraisal.

1    Q    So your previous testimony two weeks ago

2    that he was your public adjustor; was that

3    incorrect?

4    A    It was incorrect.

5    Q    And did anybody between now and -- between

6    then -- your deposition that we held two weeks ago

7    and now, did they correct you, tell you that that

8    was an incorrect response, that he was not your

9    public adjustor?

10   A    I'm not understanding what you mean.

11   Q    You previously testified that he was your

12   public adjustor and now you're saying he was your

13   appraiser.

14   A    He was appraiser.  I had it mixed up,

15   which appraiser and adjustor.  I thought they were

16   the same; so I had it mixed up.

17   Q    How did you determine that you had it

18   mixed up?

19   A    I went back over paperwork and read it.

20   Q    And what paperwork did you go over?

21   A    I have a appraisal from -- a letter from

22   Mr. Villani with the appraisal that he -- that

23   Mr. --

24        MR. VILLANI:  Miss Scott, you do not

25   discuss any communication between me and you.  Okay?

1           THE WITNESS:  Okay.  All right.

2     BY MS. KARABINOS:

3           Q     So what -- what was the appraisal that you

4     received?

5           A     The appraisal for my house.

6           Q     Do you recall telling Travelers/Charter

7     Oak/your insurance company that Mr. Fredrics was

8     your public adjustor?

9           A     No, I don't remember telling them that.

10          Q     Do you have any notes regarding any

11    conversation that you had with your insurance

12    company regarding the involvement of Mr. Fredrics

13    and his role in your claim?

14          A     I don't recall.

15          Q     And you don't have any notes, do you?

16          A     No, I don't.

17          Q     All right.  I'm going to show you Exhibit

18    1, Page 59 of that exhibit.  We looked at this a

19    little bit last time.  This is a retainer notice

20    that both you and Mr. Fredrics signed; is that

21    correct?

22          A     Correct.

23          Q     Okay.  And it says retainer notice.  Did

24    you give him any money?

25          A     No.  I have not given him anything.

1        Q    Have you executed any other documents with

2    Mr. Fredrics besides this one retainer notice and

3    the power of attorney notice that we looked at last

4    time?

5             Let me see if I can find that for you.

6    That's on Page 275.  There is the limited power of

7    attorney.  Do you recall signing any other documents

8    with him?

9        A    I signed this document with him.

10       Q    Okay.  So we've got the limited power of

11   attorney, the retainer notice that we just looked

12   at.  Were there any other documents that you signed

13   with Mr. Fredrics?

14       A    I'm not sure.  I don't have another one.

15       Q    Would you have copies of it if you had

16   signed anything else?

17       A    I'm not sure.  I'm looking through my

18   paperwork.  I don't see another one right off.

19       Q    Let me show you Page 235 of Exhibit 1.  Is

20   this the appraisal that you --

21       A    That's the appraisal that I got from him,

22   yes.

23       Q    So it looks like he inspected your home on

24   January 2nd, 2019.  Does that sound about right?

25       A    Yes.

1    Q    Okay.  Did anybody else come with him?

2    A    No.

3    Q    How many times has Mr. Fredrics been to

4  your home?

5    A    I don't remember exactly.

6    Q    Was it more than the first time on January

7  2nd, 2019?

8    A    I'm not exactly sure, ma'am.  To be

9  honest, I don't remember.

10    Q    Did anybody else come out with him when he

11  first inspected your home on January 2nd, 2019.

12    A    No.  He came out by himself at that point.

13    Q    All right.  I'm going to show you Page 396

14  of Exhibit Number 1.  And this is a -- some type of

15  report from David Hawkins dated October 16th, 2019.

16  Who is David Hawkins?

17    A    Can you enlarge it so I can see it good.

18    Q    Yes.  Is that better?

19    A    Yes.

20    Q    Have you ever seen this?  I guess it's a

21  report dated October 16th, 2019.

22    A    This would be from the insurance?

23    Q    No, ma'am, it's not.

24    A    It's not?

25    Q    No.

1      A    2019?  That -- oh, okay.  I don't remember

2  his name.  He came out.  He was a inspect -- what

3  you call that?  Engineer?  A engineer for --

4      Q    Who asked this engineer, Mr. Hawkins, to

5  come out to your home?

6      A    Bruce.

7      Q    Did you know why?

8      A    He came out to inspect the house, as far

9  as I know.

10      Q    Who was present with Mr. Hawkins when he

11  came out?

12      A    Excuse me?

13      Q    Who was with Mr. Hawkins when he came out?

14      A    He came out alone.

15      Q    Were you there?

16      A    Yes.

17      Q    Was Mr. Fredrics there?

18      A    No.

19      Q    What was your understanding about why

20  Mr. Hawkins was coming out at Bruce's request?

21      A    He was an engineer coming out to inspect

22  the home.

23      Q    Did you receive a copy of this October

24  16th, 2019, report?

25      A    No.  I don't have a copy of this.

1        Q    What did you see Mr. Hawkins do?

2        A    He looked at all the walls, the floors.

3    He went under the house.

4        Q    Did he take pictures?

5        A    He did.

6        Q    Did he take any measurements?

7        A    I'm not sure.

8        Q    You didn't see a measuring tape being

9    utilized?

10       A    I didn't follow him around the house.  I

11   don't know exactly what he did.

12       Q    Besides yourself and Mr. Hawkins, who else

13   was there?

14       A    Just me.

15       Q    And what did you and Mr. Hawkins talk

16   about?

17       A    We didn't.

18       Q    Y'all didn't talk about anything?

19       A    He just told me he was there to do the

20   inspection.  He went about doing his business and I

21   let him do what he needed to do.  And when he

22   finished, he said, have a good day and I'll get this

23   report to Mr. Fredrics.

24       Q    He didn't tell you anything about the

25   warping of the subfloors that he observed or any of

1    the water or moisture intrusion that he observed?

2         A    No.

3         Q    Did he ask you about the number of leaks

4    that you had had?

5         A    We didn't discuss that.

6         Q    Y'all didn't discuss anything about any of

7    the damage or any of the leaks?

8         A    No.  Just like we didn't discuss anything

9    when Travelers came out.  Travelers came out and did

10   the same thing; they walked through and did what

11   they had to do and didn't tell me anything.

12        Q    Okay.  I'm going to show you Page 377 of

13   Exhibit Number 1.  This is a bill in the amount of

14   $1,350 that Mr. Hawkins apparently sent

15   Mr. Fredrics.  Were you aware of this bill?

16        A    No.

17        Q    Do you know who paid that bill?

18        A    No.

19        Q    Were you ever asked to pay that 13 --

20        A    To my knowledge, nothing has been paid.

21        Q    Let me back up.

22             Did you ever know that Mr. Hawkins had

23   charged $1350 for his inspection?

24        A    No, ma'am, I didn't.

25        Q    So you never received a copy of that; is

1   that correct?

2       A    Correct.  I do not have a copy of it.

3       Q    And you have not paid it?

4       A    No, I have not paid it.

5       Q    Has Mr. Fredrics ever asked you to pay

6   anything following his involvement in the claim?

7       A    No, he has not asked me to pay anything.

8       Q    Let me show you Page 31.  This is an

9   e-mail from Mr. Fredrics to Mr. Hawkins dated June

10  30th, 2019, in which Mr. Fredrics says:  See

11  attached report from the insurance company engineer

12  for Janice Scott who we will be inspecting on

13  Wednesday.

14           So was Mr. Fredrics there when Mr. Hawkins

15  arrived or at any time?

16      A    No.

17      Q    Do you know what insurance company

18  engineer report that Mr. Fredrics is referring to in

19  this June 30th, 2019, e-mail?

20      A    No, I do not.

21      Q    Let's go to Exhibit Number 8, I believe.

22  Hold on just a minute.

23           MR. VILLANI:  Counsel, what exhibit is

24  that you're talking about?

25           MS. KARABINOS:  Can you repeat that,

1   Ralph.

2           MR. VILLANI:  I didn't hear.  You said

3   let's go to exhibit number, and I didn't hear what

4   exhibit number you're going to.

5           MS. KARABINOS:  I'm just getting to that.

6   I think we're going to have to go back to the same

7   page in the same exhibit.

8   BY MS. KARABINOS:

9       Q    Let's go to Page 323 of Exhibit 1.  It

10  looks like this is a fax note that you sent to

11  Mr. Villani and Mr. Fredrics dated April 2nd, 2019;

12  is that correct?

13      A    That's right, yes, ma'am.

14      Q    Okay.  And so you're sending a copy of the

15  denial letter from Travelers to Mr. Villani and

16  Mr. Fredrics; is that right?

17      A    Correct.

18      Q    When did you retain Mr. Villani as your

19  attorney in this matter?

20      A    I'm not sure the date that he became the

21  attorney.

22      Q    I guess it was prior to April 2nd, 2019.

23      A    Yes, but I'm not exactly sure what date.

24      Q    Do you know how long it was before you

25  sent this letter that you retained Mr. Fredrics?

1        A      Not right off, I don't.

2        Q      How were you referred to Mr. Villani?

3        A      Excuse me?

4        Q      How were you referred to Mr. Villani?

5        A      Through Mr. Fredrics.

6        Q      Let's look at Page 326 of Exhibit Number

7    1.  It looks like this is another handwritten fax

8    that you sent to Mr. Villani and Mr. Fredrics dated

9    April 14th, 2019; is that correct?

10       A      Yes.

11       Q      And it looks like you're sending a

12   certified letter from an Aldy -- A-L-D-Y -- Baker.

13       A      Right.

14       Q      And that's on the following page, 327 of

15   Exhibit Number 1.  Tell me when you received this

16   letter and what it was about.

17       A      They demanded that I pay a -- proof that

18   my house had been repaired.

19       Q      First of all, Aldy Baker?  Who is she?

20       A      She's from the insurance -- she's the

21   person that the insurance -- that the insurance came

22   through.

23              MR. VILLANI:  I'm sorry.  I didn't hear

24   that answer, Miss Scott.

25              THE WITNESS:  She's the person that -- in

1   the company that wrote the insurance.  Who get

2   the -- the agent that wrote the insurance.

3          MR. VILLANI:  Your insurance agent.  I'm

4   sorry.  Thank you.

5   BY MS. KARABINOS:

6     Q    She's your insurance agent with what

7   company?

8     A    The insurance agent was --

9     Q    Is that IAS?

10    A    Yeah.

11    Q    Okay.  So that's who you went to to get an

12  insurance policy; right?

13    A    That's who Habitat got the insurance

14  policy through.

15    Q    And so they're attaching a copy of the

16  notice that they received from Travelers in

17  regarding care needed at your home.  And so attached

18  to her letter to you is an April 8th, 2019, letter

19  noting your policy number on here with The Charter

20  Oak Fire Insurance Company and action requiring your

21  attention.  It says:  Conditions, the plumbing is

22  leaking in areas.  The bathroom floor is sinking.

23  There are extensive water damage throughout the

24  home.  There is mold in the crawlspace.

25          Did I read that correctly?

1       A    You read it correctly.

2       Q    So at the time of this letter, April 8th,

3    2019, is it true that the bathroom floor is sinking

4    at that time?

5       A    When -- we had got -- we fixed it

6    ourselves before we got this letter, but it was --

7    the toilet -- around the toilet, yes, it was from

8    the water damage.

9       Q    Was that the repair that you were telling

10   me about your boyfriend and y'all put in a piece of

11   plywood down; is that right?

12      A    Yes, yes.

13      Q    Okay.  And it says:  There are extensive

14   water damage throughout the home.

15           What damages existed in April of 2019?

16      A    The pipe that was busted behind the

17   bathtub, the one in between the wall between the

18   kitchen and the bathroom, and the one behind the

19   refrigerator.

20      Q    Had they been repaired?

21      A    Yes, they've been repaired.

22      Q    Did water damages -- as a result of the

23   pipe leak were they repaired?

24      A    It's been repaired --

25      Q    I'm sorry, Miss Scott.  We lost you.

1      A    I don't know what happened.

2      Q    Technology; right?

3      A    I can hear you well, but I can't see you.

4      Q    Okay.

5           MR. VILLANI:  I can barely hear you,

6   Karen.  It sounds like water.  It sounds like a pipe

7   burst behind you.

8           MS. KARABINOS:  No pun intended; is that

9   right, Ralph?

10          Okay.

11          THE WITNESS:  Uh-oh.

12          MS. KARABINOS:  Uh-oh what?

13          THE WITNESS:  I don't know what's

14   happening.  But I can --

15          Can you hear me?

16          (Crosstalk.)

17          THE WITNESS:  Can I go out and come back?

18          MS. KARABINOS:  Yes.  Thank you.

19          We'll go off the record for a second.

20          (Recess taken from 11:14 a.m. to 11:25

21   a.m.)

22          MS. KARABINOS:  Back on the record.

23   BY MS. KARABINOS:

24      Q    So, Miss Scott, we were looking at Page

25   328 of Exhibit Number 1.  The notification of --

1    regarding action requiring your attention,

2    preventative property maintenance before we took a

3    break.  And so at the time of this report dated

4    April the 8th, 2019, the water had stopped leaking

5    in your home; is that correct?

6         A    Correct.

7         Q    Had the damage that the water caused to

8    your home -- had it been repaired?

9         A    No.

10        Q    Does it -- is it still not repaired?

11        A    Correct.

12        Q    What needs to be done?

13        A    The floors need to be fixed.

14        Q    In your opinion -- I'm not asking you as a

15   construction expert, but as a homeowner, what is the

16   issue with the floors in your home?

17        A    In the bathroom.

18        Q    Just the bathroom?

19        A    Excuse me?

20        Q    Is it just the floors in the bathroom?

21        A    The one that I see.

22        Q    What else needs to be done that's been

23   caused by the water damage?

24        A    I can't understand you.

25        Q    What other repairs are needed that you as

1    a homeowner see needs to be repaired as a result of

2    water damage?

3        A    Where the water bust through the wall and

4    my cabinets need to be fixed.

5        Q    Okay.  In the kitchen?

6        A    The kitchen cabinets need to be replaced

7    and the wall behind the refrigerator needs to be

8    fixed.

9        Q    What else?

10       A    Also the wall behind the bathroom.

11       Q    Behind the bathtub?

12       A    Yes.

13       Q    Okay.  Anything else, in your opinion as a

14   homeowner?

15       A    No, not in my opinion.

16       Q    What mold still exists in your home?

17       A    The mold is in the crawlspace and I do not

18   go down there.

19       Q    Have you had anybody else come out and

20   take a look at the mold in your crawlspace?

21       A    No.  And then someone been down there to

22   change out the thing on the dryer and they didn't

23   say anything about mold; so I'm not sure what's

24   going on down there.

25       Q    What are you referring to?

```
 1              MR. VILLANI:  Counsel, I think that was
 2    asked and answered.  She said that Mr. Hawkins went
 3    into the crawlspace.
 4              MS. KARABINOS:  Mr. Who?
 5              MR. VILLANI:  Hawkins.  Her expert -- her
 6    engineering expert, David Hawkins, went into the
 7    crawlspace.
 8    BY MS. KARABINOS:
 9         Q    Did Mr. Hawkins go in the crawlspace?
10         A    Yes.
11         Q    Did he say anything about mold?
12         A    Mr. Hawkins really didn't discuss what he
13    found with me.
14         Q    Was anybody else in the crawlspace other
15    than Mr. Hawkins?
16         A    Not as far as mold goes, but someone came
17    and fixed my dryer and they didn't say anything
18    about mold, down there.  But they wasn't there for
19    that; so I don't know.
20         Q    Who came out to repair your dryer?
21         A    Somebody from -- I don't remember the
22    name.
23         Q    From who?
24              MR. VILLANI:  Can you repeat that question
25    and answer.  You both broke up very bad.
```

```
 1              MS. KARABINOS:  I'm going to let
 2     Michelle --
 3              Read it back if you can, Michelle.
 4              (Record read back as requested.)
 5         A    Someone from Angie's List.  I don't
 6     remember the name.
 7              MR. VILLANI:  Miss Scott, you talked over
 8     her and nobody heard either one of you.
 9              THE WITNESS:  I'm sorry.
10              MR. VILLANI:  Can you just say the name
11     very slowly and maybe you can spell it for all of
12     us.
13         A    Angie's List.  The one that they list --
14     show on the TV.
15     BY MS. KARABINOS:
16         Q    Do you have any paperwork regarding who
17     from an Angie's List came out?
18         A    No.  I just -- no, I just -- I don't
19     remember what I did with the paperwork.  It didn't
20     have anything to do with the insurance thing; so I
21     didn't keep it.
22         Q    So that was somebody who came out just to
23     repair your dryer; is that correct?
24         A    Correct.
25         Q    Okay.  Now I want to ask you about whether
```

1    you had any other communications with Aldy Baker,

2    with your insurance agency regarding the letter that

3    we have up on Page 328 of Exhibit Number 1.  Did you

4    call Mr. -- Miss Baker regarding that letter?

5         A    I haven't talked to her.

6         Q    What did you do, if anything, in response

7    to getting the letter that's on Page 327 of Exhibit

8    Number 1?

9         A    I gave it to Mr. Villani.  I haven't done

10   anything with the letter.

11        Q    Sitting here today, the only repairs, if

12   you will, that were made for where the leaks have

13   been stopped and the -- you and your boyfriend put

14   in a sheet of plywood near the toilet; is that

15   correct?

16        A    Correct.

17        Q    Okay.  So now I want to ask you if you

18   could -- do you recall -- I want to -- I want to go

19   over all the people who have come out to inspect

20   your home since September the 29th.  And I've been

21   keeping a list during your testimony and I want to

22   make sure that I've got everybody that's come out.

23             So the first folks were Hers & His

24   Plumbing; right?

25        A    Correct.

1      Q      Representatives of your insurance company;

2    correct?

3      A      Correct.

4      Q      We've got ServPro; right?

5      A      Correct.

6      Q      We've got Emergency Water & Fire; correct?

7      A      Correct.

8      Q      We have Mr. Fredrics; correct?

9      A      Correct.

10      Q      We have Mr. Hawkins.  David Hawkins?

11      A      Correct.

12      Q      And was there not also an engineer from --

13    that was sent out by your insurance company, Michael

14    Cannon with Forcon?

15      A      I don't know his name, but someone came

16    from Travelers company, yeah.

17      Q      Do you know when that person came out?

18      A      Excuse me?  Some music started playing

19    from somewhere, and I didn't hear you.

20      Q      Do you know when the engineer that was

21    sent out by your insurance company came out?

22      A      I don't remember the date, ma'am.

23      Q      Do you know who came out with him?

24      A      He came by hisself.

25      Q      Other than those companies and individuals

1    that we just went over, has there been any other

2    company or individual that's come out to your home

3    specifically to inspect the damages that you're

4    seeking to recover from your insurance company?

5         A    No.

6         Q    Have you had anybody else other than

7    Mr. Fredrics and ServPro come out at your request to

8    provide you with an estimate of the damages?

9         A    No.

10        Q    Did ServPro take photos?

11        A    I'm not sure if they did.  I don't

12   remember.

13        Q    Did Mr. Fredrics take photos?

14        A    Yes, he took photos.

15        Q    Did Hers & His Plumbing take photos?

16        A    No.

17        Q    And you're not sure whether Mr. Hawkins

18   took photos; is that correct?

19        A    I'm not sure what he did.

20        Q    All right.  We're going to go to Exhibit

21   Number --

22        A    Oh.

23        Q    Yes, ma'am?

24        A    A plumber came out, but I can't remember

25   the name, for Mr. Fredrics.

1      Q    Fredrics had a plumber come out?

2      A    Yeah, but I don't remember the name.

3      Q    What did the plumber do?

4      A    Check the pipes.  That was it.

5      Q    Were the pipes leaking at that time?

6      A    No.

7      Q    Did you get a bill from the plumber?

8      A    No.

9      Q    Did you know who the plumber was before

10   they arrived?

11     A    He told me.  I don't remember the name.  I

12   think it was Silver or something like that.

13     Q    Do you know when they came out?

14     A    It was sometime in '19.

15          MS. KARABINOS:  Ralph, do you know who

16   that is?

17          MR. VILLANI:  No, ma'am.  I don't have my

18   records in front of me.  I'm sorry.

19   BY MS. KARABINOS:

20     Q    All right.  I'm going to show you Exhibit

21   Number 11.

22          (Scott Deposition Exhibit 11 was marked

23   for identification and attached to the transcript.)

24   BY MS. KARABINOS:

25     Q    Do you see that on the screen, Miss Scott?

1        A     Yes, I do.

2        Q     Okay.  I'll represent to you that this is

3   a copy of the lawsuit that was filed by Mr. Villani

4   on your behalf.  It was filed back on September

5   22nd, 2020.  Okay.  Let me get my copy out here.

6              MR. VILLANI:  Just for the record,

7   Counsel, it was filed by me and Alex Hait, H-A-I-T.

8   So there's co-counsel on this case.

9   BY MS. KARABINOS:

10       Q     So it's filed by both Mr. Villani and

11  Mr. Hait; is that correct?

12       A     Yes.

13       Q     Let me back up.  I just want to make sure

14  I'm clear on one thing.

15             When you called HomeServe on September

16  29th, that's when you heard the water running;

17  correct?

18       A     Yes.

19       Q     And that water running did not stop until

20  Hers & His Plumbing came out on October the 5th; is

21  that right?

22       A     Correct.

23       Q     Okay.  So that's the loss that you

24  reported to your insurance company; correct?

25       A     Correct.  To begin with, yes.

1      Q     And what do you mean to begin with?

2      A     Excuse me.

3      Q     What do you mean by to begin with?

4      A     That's all that was -- that's the one that

5   I knew about with the mold.

6      Q     Do you know the amount of damages that

7   you're seeking from your insurance company as a

8   result of that loss?

9      A     Do I know what?

10      Q     The amount of damages that you are seeking

11   from your insurance company as a result of that

12   loss?

13      A     You're asking the amount we're suing for?

14   Is that what you're saying?

15      Q     Yes.

16      A     It's 200-and -- ooh, God, I'm bad with

17   numbers.  I know it's $200-and-something-thousand.

18   I can pull that up on my phone.

19      Q     I was going to see if I could find it for

20   you.  Hold on just a second.

21      A     It's 229 or 27,000.  Yeah, that's it.

22   $227,229.44.

23      Q     And 44 cents?

24      A     And 44 cents.  Yeah.  That's it.

25            MR. VILLANI:  Counsel, that paragraph

1   speaks for itself.  It says plus attorney fees,

2   expert fees, punitive damages, bad faith damage,

3   RICO damage, and prejudgment and postjudgment

4   interest.  So that's -- I would object to the fact

5   that you're trying to tender a document with the

6   exact number.

7           MS. KARABINOS:  Ralph, you interrupted me.

8   I was going to get to that.

9           MR. VILLANI:  Okay.  Sorry.  My bad.

10  BY MS. KARABINOS:

11      Q    So the loss and damage in the amount of

12  excess of $227,229.44.  Do you see that, Miss Scott?

13      A    Yes.

14      Q    And then there's a parentheses that says:

15  Plus both claims.

16      A    I didn't understand you.  You're breaking

17  up really bad.

18      Q    Can you hear me now?

19          MR. VILLANI:  I cannot hear you.  That hum

20  is back.

21  BY MS. KARABINOS:

22      Q    Can you hear me, Miss Scott?

23      A    I hear you now.

24      Q    Okay.  So it says right after -- if you

25  look on Page 4 of Exhibit Number 11, after that

```
 1   amount we just talked about, it says:  For both

 2   claims.

 3          And I'm asking you:  What does that mean?

 4   Both claims?

 5      A     Pipe -- the pipe burst -- the pipe

 6   bursting and the mold damage.

 7      Q     Is it the mold from the pipe burst that

 8   you heard the water running from?

 9      A     I have no idea where the mold came from,

10   but I know it's mold under there.

11      Q     Now, going -- on that same sentence, it

12   says:  Plus attorney fees and costs, expert fees,

13   punitive damages, bad faith damages, RICO damages,

14   and prejudgment and postjudgment interest.

15          Do you see that?

16      A   I see it.

17      Q     Are you aware that the Court has dismissed

18   some of those claims?

19      A     Did I do what?

20      Q     Are you aware that the Court has dismissed

21   some of those claims?

22      A     No, I'm not aware.

23      Q     I'll let you talk to your attorney about

24   that.

25      A     Are you aware that I was part of a class
```

 1  action lawsuit against Travelers also?

 2       Q    I was only aware by what your attorney has

 3  produced to us.

 4       A    And I opted out to go on my own.

 5       Q    What was that class action about,

 6  Miss Scott?

 7       A    The class action about Roe versus the

 8  Travelers Home & Marina Insurance.  It's about --

 9  it's Travelers right -- mediation coverage

10  settlement class action lawsuit.

11       Q    When were you first advised of that class

12  action?

13       A    I'm trying to find a date on it.

14       Q    Did you receive some type of notification?

15       A    Yeah, I got it in the mail.

16       Q    Okay.  Take your time.

17       A    I don't see a date on it.

18       Q    Did you file anything in response to that

19  notification?

20       A    I opted out.

21       Q    Did you send anything to them saying you

22  were opting out?

23       A    I sent the letter that said -- did I send

24  it?  I didn't send it.  No.  I called and talked to

25  someone, told them I was opting out.

1      Q    When did you do that?

2      A    September 29th of '18.

3      Q    And do you have a note or something there

4  that shows that's when you called?

5      A    I did have a form that I filled out, but I

6  didn't send it in.  I just talked to somebody.  I

7  spoke with Carlene -- no, I spoke to her on the --

8  that's the wrong date.  I'm sorry.

9          I spoke to her on 11/12 of '20 at 1:05

10 regarding opting out of the settlement.  And that's

11 Carlene.

12     Q    Carlene?

13     A    Carlene.

14     Q    What was the number -- what's the

15 telephone number you called?

16     A    Hold on.  Wait a minute.  There's a lot of

17 pages here.  I'm trying to go through to find the

18 number.

19          All right.  It's a 215-568-2900.  I'm not

20 sure if she's in Anthony -- and I don't know how to

21 pronounce his last name; it's D-I-U-L-I-O -- office

22 or if she was in Kenneth Grunfeld.  And that's

23 G-R-U-N-F-E-L-D.  His phone number is 215-985-9177.

24 I'm not sure which lawyer's office it was in.

25     Q    Okay.

```
 1        A     And the phone number if you have any

 2   questions -- that was the -- that was the phone

 3   numbers that I called.

 4        Q     Okay.  I'm going to show you what we've

 5   marked as Exhibit Number 12.

 6              (Scott Deposition Exhibit 12 was marked

 7   for identification and attached to the transcript.)

 8   BY MS. KARABINOS:

 9        Q     And this is a document called Plaintiff's

10   Initial Disclosures.  Have you ever seen this

11   document before?

12        A     Excuse me?

13        Q     It's called Plaintiff's Initial

14   Disclosures.  Have you seen this document?

15        A     Yes.

16        Q     Okay.  If you go on to Page 15 of this

17   document, it identifies the individuals likely to

18   have discoverable information that you may use in

19   support of your claims or defenses, unless solely

20   for impeachment.  It's got -- here your counsel has

21   listed you and him, Mr. Fredrics, Georgia General

22   Contracting and Consulting.

23              That is Mr. Fredrics -- one of his

24   companies; correct?

25        A     Yeah, I think so.
```

```
 1      Q    The remediation company defendant hired
 2  and sent to plaintiff's home to mitigate water
 3  damages which they failed to do.
 4           Do you see that?
 5      A    I see it.
 6      Q    Who is the mediation company that y'all
 7  are referencing here?
 8      A    As far as I know it's Mr. Fredrics.
 9      Q    Did --
10      A    I don't know who he hired to do that.
11      Q    So the remediation company defendant
12  hired.  That would be my client.  What remediation
13  company are you aware of that the insurance company
14  hired to mitigate the water damage?
15      A    My insurance company hired?
16      Q    That's what it says there.  Are you aware
17  of any remediation company that your insurance --
18      A    That you hired?  You said my insurance
19  company; right?
20      Q    Yes.  Are you aware of any?
21      A    I'm not aware who the insurance company
22  hired.
23      Q    I'm not either.
24      A    Excuse me?
25      Q    I am not either.  So I'm trying to figure
```

1  out who this is.

2       A    I don't know.  The only ones I know that

3  came out is the one that Mr. Hait sent out.  Water &

4  Fire something.  I don't remember their name.

5       Q    Emergency Water & Fire.  But they were not

6  there to actually mitigate the damages, were they?

7  They were just to inspect; is that right?

8       A    As far as I know.  I'm not sure what they

9  was there for.  They did an inspection and talked to

10  Mr. Hait.  They didn't -- they didn't give me any

11  information as to what they found.  They just said

12  everything was going to be all right.  And I just

13  said okay and I went with what he said.

14       Q    ServPro came out and they put out

15  dehumidifiers and fans; correct?

16       A    Correct.

17       Q    Did that mitigate the water damage?

18       A    It dried up some water, yeah.  The air and

19  whatever.

20       Q    Did it dry up all of the water?

21       A    I don't know.

22       Q    Has anybody told you that the work that

23  ServPro did at your home did not take care of the

24  water mitigation?

25       A    No.

1       Q    So as you can see these are the lists of

2  people that are -- have been identified that have --

3  likely to have discoverable information that you

4  would need to support your claims.  And is there

5  anybody else other than these individuals that you

6  are aware of that have discoverable information?

7       A    No, ma'am, there isn't anybody that I'm

8  aware of.

9       Q    All right.  Then the next one asks for --

10           MR. VILLANI:  Counsel, not to interrupt,

11  but would you mind asking my client if she

12  understands the term discoverable information.

13  BY MS. KARABINOS:

14       Q    I'll ask it this way:  Are you aware of

15  anybody else who has knowledge of the water leak and

16  damages that you have at your home?

17       A    I'm not.

18       Q    Do you know what I'm asking you,

19  Miss Scott?

20       A    You're asking if there's somebody else who

21  would know something?  Is that what you're asking?

22       Q    Yes.  Is there anybody else that would

23  know about the water leak and the damage that you

24  have at your home?

25       A    Outside of these people over here at the

1    top, I wouldn't know.

2         Q     Nobody else?

3         A     The insurance people.

4         Q     It's listed:  Defendants and its agents,

5    employees, adjustors, and counsel.

6               So I assume that would be everybody that's

7    associated with my -- with my client.

8         A     I have no idea.

9         Q     Okay.  All right.  Paragraph 4, which is

10   on Page 15 of Exhibit 12, asks about any experts.

11   Are you aware of any experts that had been retained

12   on your behalf to provide an expert opinion

13   regarding the issues in this case?

14              MR. VILLANI:  Karen, I object to that.

15   That's not what that statement says.  That no

16   experts were hired for trial.  I would object

17   because you know that Mr. Fredrics and Mr. Hawkins

18   are both experts that were hired by my client, and

19   we don't know if they're going to testify as experts

20   at trial.  So please don't mischaracterize what that

21   paragraph says.  That's my objection.

22   BY MS. KARABINOS:

23        Q     Miss Scott, are you aware of any experts

24   that have been hired on your behalf for any reason?

25        A     Mr. Fredrics.  That's who I thought you

1    was talking about.

2         Q    What about Mr. Hawkins?

3         A    And Mr. Hawkins.  Those two are the only

4    ones that I know of.  I asked you were you talking

5    about the people up at the top that we named

6    already.

7         Q    Well, Mr. Hawkins is not identified in the

8    Paragraph 3.

9         A    But Mr. Fredrics is.

10        Q    Yes.

11             MR. VILLANI:  Yes.  And, Counsel, I will

12   admit that's my fault and I will move to correct to

13   add Mr. Hawkins on there.  I don't know why I left

14   him off.  That's my -- my fault.  I'll take the

15   blame for that.

16             MS. KARABINOS:  You know, Ralph, as we

17   addressed in e-mails yesterday, if you're going to

18   have somebody identified as an expert and that

19   expert that's going to present that at trial, that

20   person needs to be identified and reports submitted,

21   along with the other information that's required

22   under the Rule 26(a)(2)(B).  And that needs to be

23   done before the end of discovery and in time for me

24   to depose them should you identify them.

25             MR. VILLANI:  Will do.

1  BY MS. KARABINOS:

2      Q    Miss Scott, were you aware that a

3  complaint had been filed with the Department of

4  Insurance regarding this claim?

5      A    Repeat, please.

6      Q    Are you aware that a complaint was filed

7  with the Georgia Department of Insurance regarding

8  your claim?

9      A    Department of Insurance?  I'm not sure

10  what you mean.

11      Q    I'll pull it up here.

12          (Scott Deposition Exhibit 4 was marked for

13  identification and attached to the transcript.)

14  BY MS. KARABINOS:

15      Q    Look at Exhibit Number 4 that I have in

16  front of you.  This is from the Office of Insurance

17  and Safety Fire Commissioner here in the State of

18  Georgia.  This is the complaint that was filed on

19  June the 1st, 2020.  Name of insured, it's got your

20  name.  And the complainant is Bruce Fredrics.  Did

21  you know that he had filed a complaint?

22      A    I wasn't aware that he had filed a

23  complaint, but I did put the case over into his

24  hands for him to do what is needed in this case for

25  me.  He's an expert at what he do; I'm not.  So

1   whatever he saw fit to do was what he was doing.

2        Q    My question was:  Were you aware that he

3   had filed a complaint?

4             And the answer to that question is what?

5             Miss Scott, were you aware that he had

6   filed a complaint?

7        A    I'm aware that he had been working on my

8   case.

9             MS. KARABINOS:  I'm going to object to the

10  responsiveness of the answer.

11       A    Yes.

12  BY MS. KARABINOS:

13       Q    Were you aware that he had filed a

14  complaint with the Office of Insurance and Safety

15  Fire Commissioner for the State of Georgia on your

16  behalf?

17       A    Yes.

18       Q    When did you -- when did you become aware

19  that he had filed this complaint?

20       A    I was aware that he was dealing with the

21  insurance, trying to get my case settled.

22       Q    With the --

23       A    Until -- I was not aware of all of that,

24  the details of it.

25       Q    So you were aware that he was working with

1    the Department of Insurance to get --

2         A    I was aware that he was working on the

3    case with the insurance -- working to get the

4    insurance to settle my case.

5         Q    Were you aware that he had actually filed

6    this complaint, though?

7         A    No, I wasn't.

8         Q    Okay.  So have you ever seen Exhibit 4,

9    which is in front of you right now?

10        A    No, ma'am, I haven't.

11             MR. VILLANI:  What exhibit is that, Karen,

12   that you're showing us now?  I can't see it because

13   the pictures are --

14             MS. KARABINOS:  I didn't mean to do that.

15             MR. VILLANI:  What exhibit?  It said an

16   exhibit number and I saw it and I'd like to use that

17   as part of my questioning to my client.  So what

18   exhibit was that?

19             MS. KARABINOS:  The one with the

20   Department of Insurance?

21             MR. VILLANI:  No.  The big old Travelers.

22   I wanted to see that one.

23             MS. KARABINOS:  Exhibit Number 5.

24             MR. VILLANI:  Exhibit Number 5.  Okay.

25             Madam Court Reporter, we're going to be

1    using that.

2              MS. KARABINOS:  Give me just a minute.

3    BY MS. KARABINOS:

4        Q    Miss Scott, did you have a maintenance

5    account with Habitat for Humanity?

6        A    I did.

7        Q    And what did you use that for?

8              MR. VILLANI:  I can't hear you.

9    BY MS. KARABINOS:

10       Q    What did you use that maintenance account

11   for?

12       A    It fixed the pipe in the yard.

13       Q    Did you have to put money in there in that

14   account?

15       A    The way that account was -- it came -- so

16   much came out of my mortgage and went into that

17   account.

18       Q    And when was the last time you used any

19   money out of that account?

20       A    When they did my hot water tank.

21       Q    When did they do that?

22       A    I don't remember what year they put in a

23   new hot water tank.

24       Q    Do you have any records regarding that?

25       A    What did that have to do with the damages

1  we're talking about?

2          MR. VILLANI:  Miss Scott, don't ask

3  questions.

4          THE WITNESS:  Okay.

5          MR. VILLANI:  Just answer.  Okay?

6          THE WITNESS:  Okay.

7  BY MS. KARABINOS:

8      Q    Was that before or after the loss that

9  we're talking about?

10     A    Before.

11     Q    Do you know who did the repairs?

12     A    I don't know the name of the company,

13  right off.

14     Q    Was it Hers & His?

15         MR. VILLANI:  I'm sorry.  I didn't hear

16  that, Karen.

17  BY MS. KARABINOS:

18     Q    Was it Hers & His?

19     A    No.

20     Q    Was it Head's Plumbing?

21     A    Who?

22     Q    Head, H-E-A-D, apostrophe S.

23     A    I don't remember who did it.

24     Q    Okay.  But you believe it was before the

25  water leaks?

1        A    It was before the water leaks.

2        Q    All right.  Miss Scott, did you understand

3    my questions?  And, if not, did you ask me to

4    rephrase them?

5        A    You asked me was it before the water leak?

6        Q    No.  I'm talking just globally.  I'm

7    finished with my questions right now.  Did you

8    understand my questions that I've asked you today?

9        A    Yes, ma'am.

10       Q    And did you answer them truthfully?

11       A    Yes, ma'am.

12            MS. KARABINOS:  Okay.  I pass the witness.

13            MR. VILLANI:  Okay.  Can you put up

14    Exhibit 5, please, Counsel, or Madam Court Reporter.

15            MS. KARABINOS:  I'll put it up.

16            MR. VILLANI:  I can't see it.

17            MS. KARABINOS:  Just give me a minute.

18            MR. VILLANI:  Okay.  That is Exhibit --

19    that is your Exhibit 5?

20            MS. KARABINOS:  That is correct.

21            MR. VILLANI:  Could you just make that

22    just a tad larger.

23            Okay.

24        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

25    BY MR. VILLANI:

```
 1        Q     Okay.  I just -- Miss Scott?

 2        A     Yes.

 3        Q     When you get these notices from Travelers,

 4   does it say Travelers with the umbrella on top of

 5   each one of them?

 6        A     Yes.

 7        Q     Did you ever get one that said Charter Oak

 8   Fire Insurance Company on the top of them and not

 9   have Travelers on it?

10        A     No.

11        Q     Okay.  When you went down to your agent to

12   purchase insurance, did you purchase insurance

13   through Travelers or The Charter Oak Fire Insurance

14   Company?

15        A     Travelers.

16        Q     And when you had that class action that

17   you opted out of, were you listed as one of the

18   homeowners who had mold insurance with Travelers?

19        A     Correct, I was.

20        Q     And the -- it was Travelers, not Charter

21   Oak?

22        A     Travelers.

23        Q     Okay.  And during the litigation for the

24   class action, were you ever -- did you ever receive

25   a notice from Travelers or the attorney for the
```

1    class itself that you were disqualified because you

2    were not a homeowner under that policy with

3    Travelers insurance?

4         A    No.

5         Q    So until -- until counsel said that on the

6    second page of your declaration page there was a

7    notation that it was Travelers -- I mean, Charter

8    Oak Fire Insurance Company, that was the first time

9    you heard about Charter Oak?

10        A    Correct.

11        Q    Okay.  Had anyone told you, hey, don't

12   send a check to Travelers, don't pay Travelers, pay

13   Charter Oak?

14        A    No.

15        Q    And did you get insurance with the Charter

16   Oak Fire Insurance Company at any time?

17        A    No, it was Travelers.

18        Q    Okay.  And all of the invoices that you

19   received and all the checks that were paid were to

20   Travelers?

21        A    Yes, everything was to Travelers.

22             MR. VILLANI:  Okay.  I just wanted to get

23   that -- thank you, Counsel.  I just wanted to get

24   that out of the way.

25   BY MR. VILLANI:

1    Q    Let's go back to some of the questions.

2    It may not have been in this part of the deposition,

3    but parts of the other deposition.

4         When ServPro came out there, was ServPro

5    one of the vendors that was recommended by

6    Travelers?

7    A    Yes.

8    Q    How did you get to choose ServPro over the

9    other vendors that were recommended?

10   A    They gave me a list and I went down the

11   list and I had several before I got to ServPro that

12   denied it.  They said it's hard to work with

13   Travelers.  They don't want to work with them.  They

14   don't want to pay.  So that's why I chose them,

15   because they were like, okay, we can work with them.

16   Q    Okay.  So ServPro said they couldn't --

17        MS. KARABINOS:  Hold on.  Hold on.

18        I object to the responsiveness of the

19   answer.

20        MR. VILLANI:  Well, she's telling you how

21   she chose ServPro over the other vendors.

22        MS. KARABINOS:  My objection stands.  We

23   don't need to argue about it.

24        MR. VILLANI:  Okay.

25   BY MR. VILLANI:

1      Q     And she cut you off.  You want to finish

2    your answer?  How did you choose ServPro over the

3    other vendors?

4      A     Travelers had sent a list that I could

5    work with.  And the ones that was on the list before

6    ServPro -- they denied -- they said it was hard to

7    work with Travelers and Travelers doesn't really

8    want to pay anything.  So when I got to ServPro,

9    they said, yes, they would work with me.  And once

10   they got in and said what was needed, then ServPro

11   denied the claim.

12     Q     So part of --

13     A     Travelers denied the claim to ServPro.

14     Q     Yeah.

15           Part of your allegations against Travelers

16   is they methodically and purposely deny claims so

17   they don't have to pay any money?

18     A     Correct.

19           MS. KARABINOS:  Objection as to form.

20   BY MR. VILLANI:

21     Q     And we -- the notice that you received

22   that counsel had shown you before -- and, I'm sorry,

23   I don't have the exhibit number, but where it was a

24   two-page document that showed the change in coverage

25   and telling you that if coverage -- they would no

1    longer cover the diminution of value, which means

2    they no longer cover for any loss of value due to

3    any damage to your home.  Do you remember that

4    document?

5         A    Yes.

6         Q    And when you received that document, did

7    Travelers cancel your insurance and write another

8    insurance policy for you?

9         A    No.  They did a non -- they did a

10   nondenial.  They said they would not renew my

11   insurance.

12        Q    No, no, no.  I'm not -- you're not

13   listening to my question.  Listen carefully, please.

14        A    Okay.

15        Q    When you received that notice, they're

16   saying that they are no longer going to cover

17   diminution of value, which means they will no longer

18   cover the loss in value of your home due to your

19   injury.  For example, if you're in a car wreck, and

20   the car is repaired, you still have loss of value

21   because now you have to sell the car and tell

22   somebody it was wrecked.  Do you understand loss of

23   value?

24        A    Yes.

25        Q    So when your house is damaged, you repair

1  it.  You have to disclose that on your disclosure

2  statement and it can lead to a loss in value.  Do

3  you understand that?

4      A    Yes.

5      Q    So when Travelers sent you that letter

6  changing your policy and restricting your benefits

7  in that policy, did they terminate your insurance

8  and rewrite you a new insurance policy?

9          MS. KARABINOS:   Object as to form.

10 BY MR. VILLANI:

11     Q    Did Travelers -- when they sent that

12 letter, did they terminate your policy and reissue a

13 new policy with the new restrictions in it,

14 Miss Scott?

15     A    I don't remember.  I don't remember.

16     Q    Miss Scott, listen to my question, please.

17 Okay?

18     A    Okay.

19     Q    When you received that letter, did you

20 receive a new policy?

21     A    I'm trying to see if I did.  I don't

22 remember if I did or not.

23     Q    Well, did you always have the same policy

24 number?

25     A    Yes, always had the same policy number.

1        Q    So did the policy number change with a new
2   policy?
3        A    No.
4        Q    So if you did not receive a policy with a
5   new number, did your agent tell you that there's a
6   new policy with your new restrictions in it?
7             MS. KARABINOS:  Object as to form.
8   BY MR. VILLANI:
9        Q    Did your agent ever tell you that?
10       A    No, they didn't tell me it was a new
11  policy.
12       Q    Okay.  And when -- when the fire
13  department came and cleaned up your mess, how long
14  were they there helping you to clean up the water
15  mess?
16       A    They was here about an hour-and-a-half.
17       Q    Okay.  What were they actually doing?  Do
18  you -- first of all, how many were there?  How many
19  fire -- firemen were there?
20       A    It was three firemen that came.
21       Q    Okay.  And can you describe what they were
22  doing.
23       A    They -- what you call that squeegee thing?
24       Q    Okay.  Squeegee.  Okay.
25       A    They squeegeed all the water out.  We

1    mopped up water and they squeegeed the water out

2    pushing it outside.  We dried it up with towels.  We

3    dried it up with the mop.  And then I set fans out

4    to dry up anything that was left that we missed.

5        Q    Okay.  Where was that water?

6        A    The water was in the kitchen and dining

7    room.

8        Q    Okay.  In kitchen and dining room.  How

9    close are those two rooms to doors leading to the

10   outside?

11       A    The kitchen -- the kitchen door is right

12   there in the kitchen and then the dining room is

13   close to the front door.

14       Q    Okay.  So when they were squeegeeing, were

15   they squeegeeing the water towards the exits of the

16   home?

17       A    Out of both doors.

18       Q    Yeah.  Okay.

19            And when they left, did you ask them --

20   did y'all get up all the water?

21       A    They said they got up all the water

22   that -- that we could see we got it all up.

23       Q    Okay.  What type of flooring do you have

24   in the kitchen and in the dining room?

25       A    It's -- what's that -- fresh wood.  It's

1   not really wood-wood, whatever kind of wood that is.

2   And linoleum.  It was carpet then.

3        Q    Where's the linoleum?

4        A    It was --

5        Q    In the kitchen?

6             THE COURT REPORTER:  Okay.  You need to

7   repeat that.  Both of you were talking at the same

8   time.

9   BY MR. VILLANI:

10       Q    Miss Scott, can you look at the camera,

11  because all I'm seeing is your ear.

12       A    Yeah, I'm trying to hear.

13       Q    I'm sorry.

14            Tell me what kind of flooring is in the

15  kitchen.

16       A    The kitchen has the linoleum and the floor

17  in the dining room had carpet at the time.

18       Q    It was carpet?

19       A    Yeah, it was carpet.

20       Q    Okay.  And did anyone vacuum up with the

21  water from the carpet?

22       A    I vacuumed up as much as I could.  I

23  didn't know it was more down there.

24       Q    Okay.  When they cleaned the water from

25  the carpet, how did they clean the water from the

1   carpet?

2        A    Well, I took towels and --

3        Q    How -- how did -- how did the firemen

4   clean the water from the carpet?

5        A    They had a -- I don't know what you call

6   it.  A Shop-Vac thing.

7        Q    A what?

8        A    A Shop-Vac where they soak the water up.

9        Q    A Shop-Vac?  One of those big Shop-Vacs

10  that sops up water?

11       A    Yes.

12       Q    Did you notice that the water tank on the

13  Shop-Vac got full at all?

14       A    It did.

15       Q    How many times would you say it got full?

16       A    About two.

17       Q    About two times.  Okay.

18            And where did they dump that water?

19       A    Outside.

20       Q    Okay.  And how many Shop-Vacs did they

21  have?

22       A    They had one.

23       Q    Okay.  And were they doing anything else

24  with the carpet to sop up the water?

25       A    I took some towels and blankets and stuff

 1    and put down on the floor and we blotted it up like

 2    that.

 3         Q    Okay.  And did the towel and blankets get

 4    soaked with water?

 5         A    They got soaked.

 6         Q    Okay.

 7         A    And we wrung them out and put them back

 8    down and soaked up some more water.

 9         Q    And when you squeegeed them -- squeezed

10    them out, did you go outside, or did you do it in

11    the bathtub?  How did you get the water out of those

12    towels?

13         A    Out the back door.

14         Q    Okay.

15         A    Outside on the porch, off the back door.

16         Q    How many times did you do that process?

17         A    I did it about five or six.

18         Q    Five or six times.

19              Were the firemen doing the same thing?

20         A    They was squeegeeing it with the squeegee

21    things.  They were squeegeeing the water out.

22         Q    And they were using the Shop -- they

23    weren't -- were you using the Shop-Vac or were they

24    using the Shop-Vac?

25         A    I was using a Shop-Vac.

1    Q    Okay.  And how big was the tank in the

2  Shop-Vac?  Was it like a kitchen -- a kitchen, you

3  know, a little basket that you have for your kitchen

4  disposable stuff -- little garbage can in the

5  kitchen, or was it bigger than that, or smaller than

6  that?

7    A    It was bigger than that.

8    Q    Okay.  If you could, will you guesstimate

9  it was ten gallon?  Five gallons?  15 gallons?

10        MS. KARABINOS:  Form.

11  BY MR. VILLANI:

12    Q    Have -- have you ever seen one of those

13  orange Home Depot five-gallon tubs?

14    A    It was a little bigger than that.  It was

15  a little bigger than that.

16    Q    It was bigger than that?  Okay.

17        Would you guesstimate 10, 15, 20 gallons?

18    A    15 to 20.

19    Q    Okay.  And they emptied that two times?

20    A    Right.

21    Q    And did you know, when they were finally

22  finished, was there anything more in that that was

23  left in the -- in other words, after they emptied it

24  twice, did they stop you -- did you stop using the

25  Shop-Vac or did you continue using it?

```
 1        A    When they left, I continued to use it,
 2   because I couldn't even go to work that morning,
 3   getting all the water up.
 4        Q    Okay.  How long did you use the Shop-Vac?
 5        A    After they left, I was still doing it
 6   maybe about two hours.
 7        Q    Okay.  And were you emptying it at all?
 8        A    I didn't hear it.
 9        Q    Did you empty the Shop-Vac container at
10   all?
11        A    I emptied about four times getting it out
12   of the carpet.
13        Q    Okay.  So when they were there, they
14   emptied it twice.  They put all these towels down
15   and, you say, four or five times.  And then you
16   emptied that 15-, 20-gallon container of water about
17   four or five times; is that correct?
18        A    Correct.
19        Q    Okay.  And when you felt the carpet after
20   you used the fans and everything, did the carpet
21   feel dry?
22        A    It was a little damp.  That's why I set
23   fans out to blow it.
24        Q    And how long did you keep the fans going?
25        A    They stayed on all day.
```

1        Q    Okay.  And do you recall --

2        A    They stayed all day and overnight.

3        Q    Okay.  Do you recall what the temperature

4    was outside that day?  Was it very cold or was it

5    warm?  I know it was September/October.

6        A    It was warm.

7        Q    Warm?

8        A    Uh-huh.

9        Q    And when you stopped using the fans, how

10   did the carpet feel?

11       A    It felt dry.

12       Q    Okay.  So as far as you were concerned,

13   you got rid of all the water?

14       A    As far as I know, I did.

15       Q    Okay.  So you're not a -- an expert on

16   water damage and -- did you realize that the water

17   could have gone down into the subflooring where the

18   carpet was sitting on?

19       A    No, sir, I did not.

20       Q    And did you realize that the carpet could

21   have -- water travels up and down or all over the

22   place.  It could have gone between the floorboards,

23   it could have gone up the walls, or anywhere else in

24   your house.  Are you aware of that?

25       A    No.

```
 1       Q    Okay.  And that's why you hired experts to
 2  come in and check your house; is that correct?
 3       A    Correct.
 4       Q    And did anyone from Travelers say to you,
 5  the water that was -- caused the mold had to be from
 6  years ago and the water --
 7            MS. KARABINOS:  Objection as to form.
 8            MR. VILLANI:  I'm sorry?
 9            MS. KARABINOS:  I'm sorry.  I thought you
10  were finished.
11            MR. VILLANI:  No.
12  BY MR. VILLANI:
13       Q    And the water that was in -- that caused
14  the mold happened years ago and it -- it was not the
15  water damage that happened recently.  Did anyone
16  ever tell you that from Travelers?
17            MS. KARABINOS:  Object --
18       A    No --
19            MS. KARABINOS:  -- as to form.
20       A    -- they did not.
21            MR. VILLANI:  You just spoke over her
22  answer.
23  BY MR. VILLANI:
24       Q    Can you repeat your answer, Miss Scott.
25       A    No, they did not.
```

1      Q    Okay.  And so let me get -- let me see if
2  I have the exact timeline.  Okay.  On -- you have
3  testified that sometime during the day on September
4  the 29th you went to the bathroom and you heard
5  water running?
6      A    That's correct.
7      Q    Okay.  Now, I don't mean to be indelicate,
8  but I need to ask this question.  Do you go to the
9  bathroom every day?  Once a month?  How often do you
10  go to the bathroom?
11     A    About 10 or 20 times a day.
12     Q    Okay.
13     A    I have one kidney; so I have to go a lot.
14     Q    So any of those times before -- the day
15  before or that day -- did you hear any water
16  running?
17     A    No.
18     Q    Okay.  So that very first time that you
19  heard water running was the time that you were going
20  to the bathroom at that very moment?
21     A    That's correct.
22     Q    Okay.  And the water hadn't been running
23  two or three days or even a couple of hours, because
24  you didn't hear?
25     A    No, I didn't hear it; so I didn't know

1  until I sat down on the toilet that -- that's when I

2  heard it.

3      Q    Okay.  And when the plumbers came in, did

4  you explain to them how you heard the water running?

5      A    I did.

6      Q    And when the plumber came in, why didn't

7  they address that water?  Why did they go to the tub

8  first?

9          MS. KARABINOS:  Objection as to form.

10 BY MR. VILLANI:

11     Q    Do you know why?  Did they tell you why

12 they repaired the line by the tub rather than the

13 line behind the bowl?

14     A    The one behind the tub is the one he saw

15 when he looked up under the house, but he didn't see

16 any leak over by the toilet.

17         MR. VILLANI:  Okay.  And -- somebody's

18 buzzing.

19         Karen, it might be you again.

20         No.

21         MR. VILLANI:  Maybe it's me.

22         (Off-the-record discussion.)

23 BY MR. VILLANI:

24     Q    I'll ask you the question and then I'll

25 turn my microphone off so you can answer,

```
 1   Miss Scott, is that okay?

 2        A    Okay.

 3        Q    All right.  So on the 29th you first

 4   noticed the water leak and you called your

 5   maintenance company; is that correct?

 6        A    Correct.

 7        Q    And when you called them it was the

 8   weekend; is that correct?

 9        A    Correct.

10        Q    And they told you that they couldn't come

11   over until Monday, which was the 1st -- October the

12   1st; is that correct?

13        A    Yes, that's correct.

14        Q    And then when they came over October 1st,

15   they repaired the leak only behind the tub; is that

16   correct?

17        A    Correct.

18        Q    And did you call anybody -- did you still

19   hear the water running after they left?

20        A    I did.

21             MS. KARABINOS:  Hold on.

22             Miss Scott, if you would wait maybe half a

23   second before you respond so I can get my objections

24   in.  So we won't be talking over each other.  Is

25   that okay?
```

```
 1              THE WITNESS:  Okay.

 2              MS. KARABINOS:  All right.  Objection as

 3    to form.

 4    BY MR. VILLANI:

 5         Q    Miss Scott, when the plumber left, did you

 6    still hear the water -- when the plumber left on

 7    October the 1st, did you still hear the water in the

 8    bathroom leaking?

 9              MS. KARABINOS:  Object --

10         A    Yes.

11              MS. KARABINOS:  -- as to form.

12         A    Yes.

13              MR. VILLANI:  Counsel, tell me what's

14    wrong with the form so I can correct it.

15              MS. KARABINOS:  She did not say that she

16    still heard the water leaking throughout her

17    testimony.

18              MR. VILLANI:  Okay.  I'll change words.

19    Well taken.

20    BY MR. VILLANI:

21         Q    Miss Scott?

22         A    Yes.

23         Q    When the plumber left on October 1st --

24         A    Excuse me.

25         Q    -- did you still hear the water running in
```

1    the bathroom?

2        A    Yes.

3        Q    And when you still heard it running in the

4    bathroom, what did you do?

5        A    I called HomeServe back and told them that

6    I still heard water leaking in the bathroom.

7        Q    Okay.  What was the next person that came

8    to the house to investigate the water running -- the

9    noise of water running that you heard?

10       A    They sent someone out from HomeServe on

11   Wednesday, which was -- the 3rd is when they came

12   back and they said it was mold under the house and

13   they would not go under the house until it was

14   fixed.

15            And I asked them, well, who does that?

16            They said, well, you need to call your

17   insurance company.

18            And that's when I called the insurance

19   company.

20       Q    I'm sorry.  That's my phone.

21            And when -- do you remember the exact date

22   that you called your insurance company, Travelers?

23       A    I called Travelers on the 3rd of October.

24            MS. KARABINOS:  Hey, Ralph, we lost you

25   again.

```
 1              MR. VILLANI:  Sorry.  I froze up, guys.

 2   BY MR. VILLANI:

 3      Q     When?

 4      A     On October 3rd after the plumber left.

 5      Q     Okay.  Let me -- let me try to calculate

 6   the number of days.  So September the 29th,

 7   September the 30th, October 1st, October 2nd,

 8   October 3rd.  Okay.  So within the span of four or

 9   five days, you contacted your insurance company

10   almost immediately?

11      A     When I first heard it, I did.  Immediately

12   when I heard it.

13      Q     The reason why you're making two claims is

14   because there was two incidents.  One in the

15   bathtub, one in the toilet bowl; is that correct?  I

16   mean, not the toilet, the wall near the toilet.

17              MS. KARABINOS:  Objection as to form.

18   BY MR. VILLANI:

19      Q     In your complaint you said there were two

20   claims?

21      A     Yes.

22      Q     So there were two water incidents.  Those

23   are the two claims you're talking about?

24      A     Yes.

25              MS. KARABINOS:  Objection as to form.
```

```
 1   BY MR. VILLANI:
 2       Q    All right.  Now, when you hired
 3   Mr. Fredrics, did Mr. Fredrics in his contract give
 4   you a cap on his charges that he's going to give
 5   you?  Did he tell you, hey, look, I'm going to
 6   charge you X number of dollars an hour, but when it
 7   gets to this point, I'm not going to charge you any
 8   more?  Do you recall that?
 9           MS. KARABINOS:  Objection as to form.
10       A    Yes.
11   BY MR. VILLANI:
12       Q    Do you recall that, Miss Scott?
13       A    Yes.
14       Q    Do you know how much that cap was?
15       A    Yes.
16       Q    How much was that?
17       A    15,000.
18       Q    Okay.  As far as you're concerned, as of
19   this day, you owe Mr. Fredrics $15,000 for his work;
20   is that correct?
21       A    Correct.
22       Q    Okay.  And right now, do you -- do you
23   smell mold or must in your house?
24       A    Sometimes I do, but we have a lot of those
25   air fresheners to hide the scent.
```

1      Q    I'm sorry.  I didn't hear that.

2      A    Sometimes I do, but we have a lot of air

3    fresheners in the house to hide the scent.

4      Q    Okay.  And when you contacted Travelers,

5    did anyone ever tell you that -- I know you

6    mentioned somebody and I can't remember his name.

7    Ben or somebody said your policy does not cover

8    mold.  Do you have any idea what he meant by that?

9           MS. KARABINOS:  Objection as to form.

10          MR. VILLANI:  Tell me what's wrong with

11   the form, Counsel.

12          MS. KARABINOS:  You said somebody named

13   Ben.  Who said it?

14   BY MR. VILLANI:

15     Q    All right.  Who told you that your house

16   was not covered -- mold?

17     A    At Travelers.  That was --

18     Q    Barber?

19     A    Jeff Teitelbaum.

20     Q    And what about Mr. Barber?

21     A    What's his name?  Justin Barber also.

22     Q    Okay.  Did Justin Barber tell you that

23   your house -- your policy does not cover mold?

24     A    Yes, that's what he was saying.

25     Q    Okay.  And is that part -- was that

1  part -- was that part of -- was that part of the

2  class action suit that Travelers would write

3  policies for mold and then never cover the mold?

4          MS. KARABINOS:  Objection as to form.

5          MR. VILLANI:  What's wrong with the form?

6          MS. KARABINOS:  You're assuming that she

7  knows.

8          MR. VILLANI:  Well, I'm asking her.

9  BY MR. VILLANI:

10     Q    Do you know that the class action lawsuit

11 was because Travelers gave you a premium policy for

12 mold but never covered the mold when you made a --

13         MS. KARABINOS:  Objection as to form.

14 BY MR. VILLANI:

15     Q    Did you know that Miss Scott?

16     A    The class action lawsuit said it was

17 because of the rot.

18     Q    Mold and rot?

19     A    Uh-huh.

20     Q    And you purchased from Travelers that

21 extended coverage for mold and rot; is that correct?

22     A    Correct.

23     Q    Have they ever honored that part of the

24 policy in either one of your claims?

25     A    No.

1      Q    And is that what you're asking them to do

2   to be fair and honest and pay what they owe you?

3      A    Excuse me?  I'm sorry.  I didn't

4   understand your question.

5      Q    Is that what you're asking them, to be

6   fair and honest and to pay you what they owe you?

7      A    Yes.

8      Q    And you're not asking for anything else

9   that you don't deserve?

10     A    No.

11     Q    And you'd like them to pay you for all of

12  your damages?

13     A    Yes.

14         MS. KARABINOS:  Objection.  Leading.

15  BY MR. VILLANI:

16     Q    And you'd like them to pay for the repair

17  and replacement of anything that's been damaged,

18  like the walls and the cabinets and floors?

19         MS. KARABINOS:  Same objection.

20     A    Yes.

21  BY MR. VILLANI:

22     Q    And you want to mitigate all the mold in

23  the house?

24         MS. KARABINOS:  Same objection.

25  BY MR. VILLANI:

1        Q      In your complaint?

2        A      Yes.

3        Q      And you would like them to pay for your

4    attorney's fees in your complaint?  You asked for

5    that?

6               MS. KARABINOS:  Same objection.

7        A      Yes.

8    BY MR. VILLANI:

9        Q      And you would like them to pay all of your

10   costs for litigation; is that also correct?

11       A      Yes.

12              MS. KARABINOS:  Same objection.

13   BY MR. VILLANI:

14       Q      And you asked -- you're asking in your

15   prayers for relief, whatever jury determines -- a

16   fair and impartial jury determines that you deserve;

17   is that correct?

18       A      Yes.

19       Q      And you're not asking for a lottery or

20   anything else that you don't deserve?

21       A      No.

22       Q      And how long have you been living in this

23   house, Miss Scott?

24       A      33 -- I think it's 33 or 34 years.  It was

25   built in '88.

1    Q    Okay.  Was that by Jimmy Carter and the

2   Habitat for Humanity?

3    A    It was.

4    Q    And did you participate in the

5   construction of the house?

6    A    I did.

7    Q    And did you -- did you have the pleasure

8   of ever meeting Jimmy Carter out there?

9    A    I did.

10   Q    He's a wonderful guy.  I was his delegate

11  up in New Jersey when he ran for president.  So him

12  and his son Jack are really, really -- especially

13  his wife, beautiful people.  I'm sorry to --

14        But so you actually laid hands on and

15  helped build your own home?

16   A    I did.

17   Q    And that -- did that make you proud?  Hey,

18  look, I helped build this house.

19   A    Yes, it did.

20   Q    Did you ever hide from Travelers insurance

21  that this was a home built by Habitat for Humanity?

22   A    No.

23   Q    Okay.  And would you think that Travelers,

24  being a big insurance company, would know what homes

25  Habitat for Humanity -- how they were built?

```
 1        A    Yes.

 2             MS. KARABINOS:  Objection as to form.

 3   BY MR. VILLANI:

 4        Q    And they -- they insured you for that

 5   house without a problem?

 6        A    Correct.

 7        Q    And when they insured you, did they tell

 8   you to replace all the blue pipes?

 9        A    No.

10        Q    Did they ever tell you to replace all the

11   blue pipes?

12        A    No.

13        Q    And so they kept insuring you, knowing

14   that you had the pipes that have a tendency to

15   burst?

16             MS. KARABINOS:  Objection as to form.

17        A    Correct.

18   BY MR. VILLANI:

19        Q    Did they ever put in your policy a

20   disclaimer, say, hey, look, if your pipes burst,

21   we're not paying for it?

22        A    No.

23        Q    Okay.  And then when you found out the

24   reason why your pipes were bursting, what did you

25   do?
```

1      A     When I found the reason, one, we needed a

2   pressure valve, which Habitat didn't put in; I had

3   that put in.  And when the pipes would burst, I

4   would just call the warranty people and they would

5   come out and fix them.

6      Q     Okay.  And so as soon as you were told

7   about -- I don't want to misquote you, but as soon

8   as you were told that, hey, you need a pressure

9   regulator for your pipes so they don't burst

10  anymore, did you immediately get a pressure

11  regulator put into the house -- in the house?

12     A     I did.

13     Q     And how much did that cost you?

14     A     $350.

15     Q     And you're not asking Travelers to pay

16  that, are you?

17     A     No, I'm not.

18     Q     That's your expense?

19     A     Yes.

20     Q     And how have the pipes been acting now

21  since you replaced that pressure valve?

22     A     I haven't had any to bust.

23     Q     Do you think the experts that Travelers

24  sent out there should have known that?

25     A     Yes.

```
 1        Q     Did they ever tell you to replace your

 2   pressure valve?

 3        A     No.

 4        Q     So they kept letting your pipes burst and

 5   then denying coverage?

 6             MS. KARABINOS:   Objection as to form.

 7   BY MR. VILLANI:

 8        Q     They kept denying -- they denied coverage

 9   over $5,000, didn't they?

10             MS. KARABINOS:   Objection as to form.

11        A     Yes.

12   BY MR. VILLANI:

13        Q     Did they deny you -- did they -- let's

14   strike that.

15             They paid your claim and they sent you a

16   check for a little over $5,000; is that correct?

17        A     Correct.

18        Q     Did they pay anything else?

19        A     No.

20        Q     And they denied you coverage over that

21   $5,000; is that correct?

22        A     Correct.

23        Q     And your engineering expert came out and

24   did a report; is that correct?

25        A     Yes.
```

```
 1        Q    And your expert, Mr. Fredrics, did an

 2   estimate; is that correct?

 3        A    Yes.

 4        Q    And both of your experts disagreed with

 5   Travelers; is that correct?

 6        A    Yes.

 7        Q    And Travelers still did not change their

 8   mind even after getting the two expert reports; is

 9   that correct?

10        A    Yes.

11        Q    And that's --

12        A    Yes.

13        Q    -- when you filed suit?

14        A    Yes.

15        Q    And did you purchase insurance so that you

16   would have to go through all this trouble?

17        A    No.

18        Q    Why did you purchase insurance --

19   homeowner's insurance?

20        A    I purchased homeowner's insurance so if

21   something happened I would be covered.

22        Q    Okay.  Okay.  Did you expect Travelers to

23   cover you for these two incidents?

24        A    I expected them to.

25        Q    And do you know why Travelers is saying
```

1  that -- that the long-term leaks of water for weeks,

2  for months, for years caused your damage?  Do you

3  know why they're saying that?

4      A    No, I don't.

5      Q    Could it be that they just don't want to

6  pay claims?

7           MS. KARABINOS:  Objection as to form.

8      A    It could be.

9  BY MR. VILLANI:

10     Q    And part of that class action was -- was

11  the fact that, hey, we don't want to pay claims.  So

12  they settled with that class action for hundreds of

13  millions of dollars, didn't they?

14          MS. KARABINOS:  Objection as to form.

15     A    Correct.

16  BY MR. VILLANI:

17     Q    And you opted out of that so that you

18  could bring an independent lawsuit; is that correct?

19     A    Yes.

20     Q    And you could have received $2500 if you

21  stayed in that class action; is that correct?

22          MS. KARABINOS:  Objection as to form.

23     A    Correct.

24  BY MR. VILLANI:

25     Q    But your damages were much greater than

1    $2500; is that correct?

2        A    Correct.

3        Q    And did Mr. Fredrics call you every day

4    and tell you the progress of his appraisal and his

5    work for you that was going on?

6        A    Not every day, but he called pretty often.

7        Q    Okay.  And is there anything that

8    Mr. Fredrics did for you that you -- looking back at

9    it, you didn't want them to do?

10       A    No, he did not.

11       Q    And whether or not he mentioned to you

12   that he filed a complaint with the insurance, would

13   that cause you any kind of trouble or concern?

14       A    No.

15       Q    And, in fact, would that be something you

16   would expect him to do to report Travelers to the

17   Insurance Commissioner?

18       A    Yes.

19       Q    And Mr. Hawkins?  He didn't sit there and

20   go over all of his findings with you, did he, when

21   he was there?

22       A    No, he didn't.

23       Q    Did anybody from Travelers do that?

24       A    No, they didn't.

25       Q    And did anybody from Travelers give you a

1   reasonable reason why they were denying your claim?

2           MS. KARABINOS:  Objection as to form.

3   BY MR. VILLANI:

4       Q    Did they ever give you a reasonable -- in

5   your opinion, a reasonable reason for denying your

6   claim?

7           MS. KARABINOS:  Same objection.

8       A    No.

9   BY MR. VILLANI:

10      Q    And I think -- I think that's about --

11  hang on just -- there was something I wanted to ask

12  you.  Please hold on a second.

13          I didn't understand the -- can you explain

14  to me why you only took copious notes when you spoke

15  to the insurance company and their agents and their

16  employees and not with Mr. Hawkins or Mr. Fredrics?

17  What was the difference?

18      A    The difference reason I took notes with

19  the insurance company was because I knew I would

20  probably talk to more than one person; so to know

21  who I spoke to that's why I took notes of what was

22  said.

23          And to talk to Bruce, it was going to be a

24  one-on-one thing; so I wouldn't have to keep up with

25  who I talked to the last time of what they said when

1    I know I could talk to him and we would get an

2    understanding of what was going on.

3         Q    Would part of that reason also be the

4    positions that you had with the insurance company as

5    an adversary and the position with Mr. Fredrics and

6    Mr. Hawkins as somebody who's your advocate trying

7    to help you?

8              MS. KARABINOS:  Objection to form.

9         A    Yes.

10   BY MR. VILLANI:

11        Q    You wanted to make sure that you had exact

12   notes for people who are trying to deny your

13   legitimate claim?

14        A    Correct.

15        Q    As you sit here today, do you feel that

16   your claim -- the two claims due to burst water

17   pipes that you filed with Travelers are legitimate?

18        A    I do.

19             MS. KARABINOS:  Objection as to form.

20   BY MR. VILLANI:

21        Q    And do you feel that Travelers has paid

22   you enough money to repair the damages for those two

23   incidents?

24        A    No.

25             MR. VILLANI:  I have nothing to say --

1   nothing else.  I'm sorry.  Thank you.

2           MS. KARABINOS:  I've got some follow-up

3   questions.

4     FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT

5   BY MS. KARABINOS:

6       Q    Miss Scott, at the time your house was

7   built, were you aware of what type of pipes you had

8   in the home?

9       A    No.

10      Q    And I believe you testified two weeks ago

11  that the first time that you were aware that there

12  was polybutylene pipes in your home was when Head's

13  Plumbing Sales & Service came out on September 6th,

14  2018.  Do you recall that?

15      A    Excuse me?  Say that again.  I can't hear

16  good.

17      Q    I'm going to slow down too.

18           I believe you testified earlier, a couple

19  of weeks ago, that the first time that you were

20  aware that you had polybutylene pipes was when

21  Head's Plumbing Service came out to your home in

22  response to a call on September the 6th, 2018, and

23  you took a look at that invoice last time; is that

24  correct?

25      A    I don't recall what I said back then.

1       Q    Okay.  Well, let's -- let me ask you

2    again.  Let's look at this.  I'm going to show you

3    what we've marked as Exhibit Number 13.  It is Page

4    3 of 6.  And you'll see that this is a Head's

5    Plumbing Sales & Service invoice dated September

6    6th, 2018.  And it says:  Service line to base is --

7    I think it's 3/4-inch gray poly.  We recommend

8    replacement.

9       A    That pipe was outside in the yard.

10      Q    Okay.  When was the first time that you

11   became aware that you had polybutylene pipe?

12           MR. VILLANI:  I'm going to object to the

13   form.  You're not going to ask her if she even knows

14   what polybutylene pipes are?

15           MS. KARABINOS:  We talked about that last

16   time at her deposition two weeks ago.

17   BY MS. KARABINOS:

18      Q    Are you aware of what polybutylene pipe is

19   or what the word means?

20      A    No.

21      Q    Do you know if you were ever -- so if you

22   didn't know that you had polybutylene pipe, did

23   you -- do you know if Travelers ever knew that you

24   had polybutylene pipes?

25      A    I don't know what kind of pipes were under

1    the house.

2        Q    Okay.  So do you know if Travelers knew

3    what type of pipes you had underneath your house?

4             MR. VILLANI:  I would object to my client

5    being asked to speculate what Travelers knew, but

6    she can answer that question.

7    BY MS. KARABINOS:

8        Q    Do you know?

9        A    No, I don't.

10       Q    Did you ever discuss a type of pipes you

11   had with anyone at Travelers or Charter Oak?

12       A    No, I didn't.

13       Q    Did you ever discuss the type of pipes you

14   had with your insurance agency?

15       A    No, I didn't.

16       Q    Okay.  Let's look at Page -- Exhibit

17   Number 1, Page 3 -- 397.  This is the dec page for

18   the policy from which you have filed this suit.  We

19   looked at this at your last deposition; correct?

20            MR. VILLANI:  Can you repeat what that

21   exhibit is again.  You broke up, Counsel.

22            MS. KARABINOS:  Exhibit 1, Page 397.

23            MR. VILLANI:  39?

24            MS. KARABINOS:  7.

25            MR. VILLANI:  397.  Thank you.

1        MS. KARABINOS:   The page numbers are right

2   here at the top.

3        MR. VILLANI:   That says 417.

4        MS. KARABINOS:   It says 397 of 437.

5        MR. VILLANI:   I can't see that blue.

6        THE WITNESS:   I can't see it either.

7   BY MS. KARABINOS:

8        Q    So on the following page it says:  Your

9   insurer, The Charter Oak Fire Insurance Company.

10       Doesn't it?

11       A    That's what that says.

12       Q    This is the only policy that you ever

13  received; right?

14       A    That's the only policy I have, yes.

15       Q    Okay.  And if you'll look at Exhibit

16  Number 2, which we've looked at before, which is the

17  letter from Jeff Teitelbaum.  You see at the last --

18  the signature there -- the signature line?  It's

19  dated October the 12th, 2018.  And just above the

20  Travelers umbrella, it says:  The Charter Oak Fire

21  Insurance Company.

22       Doesn't it?

23       A    It does.

24       Q    And then you look on Exhibit Number 5,

25  which is the notification that the check is on the

1  way.  It also identifies the company name:  The

2  Charter Oak Fire Insurance Company.

3          Doesn't it?

4      A    It also has Travelers at the top.

5      Q    It does, but the company name is The

6  Charter Oak Fire Insurance Company, doesn't it?

7  That's what it says?

8      A    But I always thought it was Travelers.

9      Q    But that's not what the documents are only

10 saying Travelers with an umbrella.  It says The

11 Charter Oak Fire Insurance Company, which is on

12 Exhibit 6, which is another letter to you dated

13 November the 9th, 2018; correct?

14     A    Correct.

15     Q    And then on Exhibit 7, which is another

16 letter dated December 13th, 2018, it has the name

17 Charter Oak Fire Insurance Company; correct?

18     A    It does.

19     Q    Now, when you had the water leak in which

20 the firemen came, back in 2016, did you ever hire

21 anybody to do any testing to see if any moisture

22 remained following that loss?

23     A    No.

24     Q    And you didn't report that loss to

25 Travelers, did you?

1      A     No, I didn't know I was supposed to.

2      Q     Whether you were supposed to or not,

3  Travelers had no knowledge of that loss; right?

4      A     No, I didn't.

5      Q     Okay.  You didn't report it.

6            Now, sitting here today, you've not made

7  any other repairs to the damage, except for putting

8  in that piece of plywood around your toilet that you

9  and your boyfriend did; is that correct?

10     A     That's it.

11     Q     You haven't had anybody come out and test

12  for mold, have you?

13     A     No.

14     Q     Okay.  Are you aware that Travelers had an

15  engineer come out; correct?

16     A     They had an engineer come out, yes.

17     Q     Okay.  And are you aware that that

18  engineer does not agree with Mr. Fredrics or

19  Mr. Hawkins?

20     A     No, I was not aware.

21     Q     You're not aware of that?

22     A     No.

23     Q     So Mr. Fredrics didn't tell you that the

24  Travelers engineer did not agree with them?

25     A     No.

 1          MS. KARABINOS:  Okay.  I believe that's
 2    all the questions I have at this time.
 3          MR. VILLANI:  I have one last question.
 4     FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
 5    BY MR. VILLANI:
 6       Q    Miss Scott, as we sit here today, do you
 7    have any idea who Charter Oak Fire Insurance Company
 8    is?
 9       A    No, I do not.
10       Q    And I said one question -- I meant -- look
11    at that name, Charter Oak Fire Insurance Company.
12    What do you think that is for?
13       A    Fire.
14          MS. KARABINOS:  Objection.
15    BY MR. VILLANI:
16       Q    Fire insurance.  Okay.
17          So you think that might be in case your
18    house burned down?
19       A    Correct.
20       Q    Did your house burn down?
21       A    No.
22       Q    So this is for water damage, just the
23    opposite of fire?
24       A    Correct.
25       Q    So did you pay any attention to The

1    Charter Oak Fire Insurance Company?

2        A    No.   I thought it was Travelers.

3                MR. VILLANI:  Okay.  Nothing further,

4    Counsel.  Thank you.

5                MS. KARABINOS:  All right.  One of the

6    things that we didn't -- I don't think we talked

7    about was whether or not she reserved signature.

8                MR. VILLANI:  I'm sorry.  You're breaking

9    up real bad.

10               MS. KARABINOS:  Does she reserve

11   signature?

12               MR. VILLANI:  Yes, please do.

13               And if the court reporter would give me

14   electronic copy.

15               Have we done the electronic copy for the

16   other two parts of her examination?  Okay.  I'm

17   going to need electric -- Counsel, would you agree

18   that once the electronic copy on this deposition is

19   done that she'll have 30 days from the day she

20   receives this transcript to sign all three.

21               MS. KARABINOS:  I was just going to put

22   the two portions together as one, if that's okay

23   with you.

24               MR. VILLANI:  Yeah.  We'll take all three

25   portions together as one.  Very good.

```
 1              MS. KARABINOS:  There's only two portions.

 2              MR. VILLANI:  I'm sorry.

 3              MS. KARABINOS:  There's only two portions,

 4     not three.

 5              MR. VILLANI:  Well, there was the first

 6     one, the second one, and the third one.  However

 7     there many are.  Okay.

 8              My wife is calling me.  There's a problem

 9     in the kitchen.  The electricity went out.  Are we

10     done?

11              MS. KARABINOS:  We are.

12              (Deposition concluded 12:54 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        ERRATA SHEET

2          I, JANICE SCOTT, the witness herein, do hereby

3     certify that I have read the transcript of my

4     deposition testimony dated July 28, 2021, and August

5     10, 2021, and the same is true and correct to the

6     best of my knowledge with the exception of the

7     following changes noted below, if any:

8     _____ 1)   There are no changes noted.
       _____ 2)   The following changes are noted:
9
              Pursuant to Rule 30(7) (e) of the Federal
10    Rules of Civil Procedure and/or the Official Code of
       Georgia Annotated 9-11-30 (e), both of which read in
11    part:  Any changes in form or substance which you
       desire to make shall be entered upon the deposition
12    with a statement of the reasons given for making
       them.  Accordingly, to assist you in effecting
13    corrections, please use the form below:

14    Page No. _____ Line No. _____

15    Change to:_____

16    Reason for Change:_____

17

18    Page No. _____ Line No. _____

19    Change to:_____

20    Reason for Change:_____

21

22    Page No. _____ Line No. _____

23    Change to:_____

24    Reason for Change:_____

25

```
 1   Deposition of JANICE SCOTT

 2

 3   Page No. _____ Line No. _____

 4   Change to:_____

 5   Reason for Change:_____

 6

 7   Page No. _____ Line No. _____

 8   Change to:_____

 9   Reason for Change:_____

10

11   Page No. _____ Line No. _____

12   Change to:_____

13   Reason for Change:_____

14

15   Page No. _____ Line No. _____

16   Change to:_____

17   Reason for Change:_____

18

19                      _____

20                      JANICE SCOTT

     Sworn to and subscribed before me,
21   this the _____ day of _____, 20___.

22

23                      _____
                        Notary Public
                        My commission expires:
24

25
```

```
 1                    D I S C L O S U R E

 2

 3        I, Michelle Lowe, (WSG Reporting, LLC) do
    hereby disclose pursuant to Article 10.B of the
 4  Rules and Regulations of the Board of Court
    Reporting of the Judicial Council of Georgia, that I
 5  was contacted by the party taking the deposition to
    provide court reporting services for this
 6  deposition, and there is no contract that is
    prohibited by O.C.G.A. 15-14-37(a) and (b) or
 7  Article 7(c) of the Rules and Regulations of the
    Board for the taking of this deposition.

 8

 9        There is no contract to provide reporting
    services between WSG Reporting, LLC or any person
10  with whom I have a principal and agency relationship
    nor any attorney at law in this action, party to
11  this action, or party having a financial interest in
    this action.

12

13        Any and all financial arrangements beyond my
    usual and customary rates have been disclosed and
14  offered to all parties.

15

16

17

18

19

20

21

22  _____
    Michelle Lowe, CCR-2748
23  July 28, 2021, and August 10, 2021

24

25
```

1                    C E R T I F I C A T E

2    G E O R G I A:

3    GWINNETT COUNTY

4

5

         I hereby certify that the total transcript,
6    pages 1 through 236, represent a true, complete, and
     correct transcript of the proceedings taken down by
7    me in the case aforesaid (and exhibits admitted, if
     applicable); that the foregoing transcript is a true
8    and correct record of the evidence given to the best
     of my ability.

9

10        The above certification is expressly withdrawn
     upon the disassembly or photocopying of the
11   foregoing transcript, unless said disassembly or
     photocopying is done under the auspices of myself,
12   and the signature and original seal is attached
     thereto.

13

14        I further certify that I am not a relative or
     employee or attorney of any party, nor am I
15   financially interested in the outcome of the
     actions.

16

17        This the 17th day of August 2021.

18

19

20        *Michelle Lowe*

21   _____
     Michelle Lowe, CCR-2748
22

23

24

25

## $

**$1,000 (2)**
84:19;90:10
**$1,312 (1)**
19:13
**$1,350 (1)**
160:14
**$125 (2)**
38:3,6
**$1350 (1)**
160:23
**$15,000 (1)**
214:19
**$200-and-something-thousand (1)**
176:17
**$227,229.44 (2)**
176:22;177:12
**$2500 (2)**
224:20;225:1
**$318 (1)**
23:20
**$350 (2)**
45:24;221:14
**$4,000 (1)**
90:12
**$4,100-some (1)**
90:12
**$4,178.61 (1)**
90:11
**$5,000 (4)**
77:7;222:9,16,21
**$5,000-something (1)**
135:18
**$5,178 (2)**
75:18;82:7
**$5,178.17 (2)**
147:7,17
**$5,178.61 (6)**
79:24;80:9;84:12;
90:5;97:20;136:2
**$506 (2)**
18:24;19:7
**$5100 (1)**
96:16
**$5178.61 (1)**
136:18
**$6,004.18 (1)**
135:25

## [

**[sic] (2)**
40:1;100:16

## A

**ability (1)**
118:21
**able (7)**
6:16;27:19;33:2;
55:14;114:8,20;129:4

**above (1)**
231:19
**Absolutely (1)**
120:18
**accident (7)**
18:10;20:24;21:10;
74:24;75:1,1;146:13
**accidents (2)**
75:14;146:7
**According (2)**
44:10;114:3
**account (8)**
46:19;90:14;190:5,
10,14,15,17,19
**accurately (2)**
8:20;119:2
**act (2)**
100:20;105:1
**acting (1)**
221:20
**action (15)**
164:20;167:1;
179:1,5,7,10,12;
193:16,24;216:2,10,
16;224:10,12,21
**actual (2)**
55:2,12
**actually (11)**
21:9;29:18;69:25;
112:19;123:8;143:13;
153:4;183:6;189:5;
199:17;219:14
**add (1)**
186:13
**additional (1)**
98:14
**address (8)**
12:5;14:5;38:19;
39:23;47:17,19;
144:9;209:7
**addressed (1)**
186:17
**adjourn (1)**
116:11
**adjourned (2)**
116:20;117:13
**Adjustment (1)**
104:3
**adjustor (17)**
104:22;105:2,3,4,6,
7,10,13,25;107:1;
128:1;153:23;154:2,
9,12,15;155:8
**adjustors (1)**
185:5
**Administration (3)**
18:15;19:1,16
**admit (1)**
186:12
**adversary (1)**
227:5
**Advil (1)**
115:2

**advise (5)**
105:9;117:10;
141:13;149:11;
153:19
**advised (3)**
71:1;148:16;179:11
**advocate (1)**
227:6
**affirmed (1)**
5:3
**afford (2)**
63:7;129:4
**afforded (3)**
128:24;135:24;
137:6
**again (32)**
17:17;22:7;24:15;
40:6,13;41:25;54:9;
55:14;57:7;60:20;
71:6;72:7;73:17,18;
85:25;91:13,16;
98:10;99:11;103:19;
115:19;118:12;
120:25;130:6;136:24;
138:19;144:3;209:19;
212:25;228:15;229:2;
230:21
**against (9)**
7:19;12:11;20:20,
21;21:10;30:25;
128:14;179:1;196:15
**agency (2)**
171:2;230:14
**agent (11)**
27:17,25;28:2;
100:21;164:2,3,6,8;
193:11;199:5,9
**agents (3)**
27:18;185:4;226:15
**ages (1)**
15:16
**ago (17)**
12:7,8;36:5,8,14;
102:13;117:14;
118:25;119:8,12;
154:1,6;207:6,14;
228:10,19;229:16
**agree (4)**
6:9;233:18,24;
235:17
**agreeable (1)**
116:16
**agreed (2)**
59:21;135:4
**agreement (2)**
5:12;153:2
**ahead (12)**
9:20;19:12;37:17;
47:15;48:14;56:3;
80:25;81:6,7,14;
110:21;149:4
**Ain't (1)**
50:19

**air (3)**
183:18;214:25;
215:2
**air-conditioning (1)**
37:25
**Aldy (3)**
163:12,19;171:1
**A-L-D-Y (1)**
163:12
**Alex (1)**
175:7
**allegations (1)**
196:15
**allow (1)**
9:16
**allowed (1)**
6:23
**almost (1)**
213:10
**alone (1)**
158:14
**along (4)**
91:1;118:7;135:18;
186:21
**always (5)**
49:8;51:13;198:23,
25;232:8
**America (4)**
46:17,20;102:19;
103:2
**amount (6)**
90:5;93:24;94:14;
96:2,14;99:23;136:2,
18;145:1;160:13;
176:6,10,13;177:11;
178:1
**Angel (10)**
70:1,12;71:1,8;
73:17,18;76:18;
150:7,9,9
**Angie's (3)**
170:5,13,17
**answered (3)**
106:18;119:3;169:2
**Anthony (1)**
180:20
**anymore (1)**
221:10
**Apartments (1)**
14:14
**apologize (2)**
23:21;31:12
**apostrophe (1)**
191:22
**apparently (1)**
160:14
**APPEARANCE (1)**
2:1
**appears (1)**
34:3
**appraisal (15)**
100:16;105:3;
152:14;153:20,21,24,

25,25;154:21,22;
155:3,5;156:20,21;
225:4
**appraiser (5)**
105:5,7;154:13,14,
15
**appreciate (4)**
120:9,12,14,15
**approved (1)**
19:17
**April (8)**
39:17;162:11,22;
163:9;164:18;165:2,
15;167:4
**area (6)**
124:17;131:15;
132:3,6;140:13,25
**areas (3)**
67:20;144:24;
164:22
**argue (1)**
195:23
**argument (1)**
59:20
**Around (9)**
12:17;30:16;61:15;
82:18;95:3;108:15;
159:10;165:7;233:8
**arrive (1)**
11:19
**arrived (2)**
161:15;174:10
**assigned (1)**
101:1
**assistant (1)**
17:3,6;22:17
**assisted (1)**
130:17
**associated (2)**
107:24;185:7
**assume (2)**
101:16;185:6
**assuming (1)**
216:6
**Atlanta (4)**
2:18;14:5;83:21;
117:7
**attached (12)**
33:11;65:8;72:9;
79:22;89:8;120:20;
142:6;161:11;164:17;
174:23;181:7;187:13
**attaching (1)**
164:15
**attend (1)**
16:25
**attention (5)**
33:24;144:10;
164:21;167:1;234:25
**Attorney (33)**
2:4,14;10:21;11:5;
21:11;33:15;35:3;
42:1;45:20;50:4;

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 243 of 265

Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

54:10;55:3;71:15;
73:6;81:7;100:11,14,
19;120:6;121:1;
130:8;142:24;143:18;
156:3,7,11;162:19,21;
177:1;178:12,23;
179:2;193:25
**attorney-client (1)**
6:2
**attorneys (1)**
151:22
**attorney's (2)**
93:5;218:4
**audio (2)**
17:16;23:20
**August (4)**
34:10,21;116:13;
117:1
**authority (1)**
104:17
**automobile (1)**
146:20
**aware (41)**
51:3;62:13,14;
160:15;178:17,20,22,
25;179:2;182:13,16,
20,21;184:6,8,14;
185:11,23;187:2,6,22;
188:2,5,7,13,18,20,23,
25;189:2,5;206:24;
228:7,11,20;229:11,
18;233:14,17,20,21
**away (1)**
133:22

## B

**back (76)**
11:20,21;12:7;17:5;
18:11;22:20;25:12;
31:20;32:3,4;41:22;
53:14;55:13;57:14;
59:3;62:7,15;65:12;
67:20;68:11;71:8;
72:22;74:1,3;81:10,
11;82:16;83:23;85:5;
92:10;93:19,20;99:8;
101:13;102:4;108:25;
111:19;113:2,20;
116:8;123:19,22;
124:24;125:14;126:5,
8;127:17,18;130:15;
131:1,10;138:19,23;
140:9;150:2,8;
151:23;154:19;
160:21;162:6;166:17,
22;170:3,4;175:4,13;
177:20;195:1;203:7,
13,15;212:5,12;
225:8;228:25;232:20
**background (1)**
16:18
**bad (10)**

18:11;107:25;
114:24;169:25;
176:16;177:2,9,17;
178:13;235:9
**Baker (4)**
163:12,19;171:1,4
**bank (12)**
46:13,14,16,17,20;
90:14;102:14,15,16,
18,19;103:1
**Barber (24)**
73:21;74:15;76:19;
88:3,20;139:3,4,5,13,
17;141:17;143:23;
144:14;145:21,22,25;
146:1,25;148:6,15;
215:18,20,21,22
**barely (1)**
166:5
**base (1)**
229:6
**based (3)**
7:20;27:15;30:19
**basement (1)**
87:1
**basket (1)**
204:3
**Bates (2)**
34:2;45:18
**bathroom (33)**
26:7;29:13;61:23;
63:21;65:1,13,18,22;
85:2,3;86:9,10;91:2;
120:4;122:25;125:10;
130:19;133:23;
164:22;165:3,18;
167:17,18,20;168:10;
208:4,9,10,20;211:8;
212:1,4,6
**bathtub (13)**
26:9;29:14;34:12,
14;37:4;40:24;131:5;
132:13;134:9;165:17;
168:11;203:11;
213:15
**beautiful (1)**
219:13
**became (4)**
17:6;32:24;162:20;
229:11
**become (1)**
188:18
**bedroom (2)**
65:12,12
**begin (3)**
175:25;176:1,3
**behalf (13)**
2:2,12;33:5,6;
92:24;105:1;107:24;
108:4;112:17;175:4;
185:12,24;188:16
**behind (56)**
26:9;29:13;32:10,

22;34:12,14,17,21;
35:5,8,13;36:16,25;
40:23;62:9;66:5,7,11,
12;67:17,18;122:5,5,
22;123:2,3,19,22;
124:23;125:2,15;
129:12;130:12,18;
131:2,8,19,20;132:6,
16,17,21;133:7,9,15;
134:9;140:12;165:16,
18;166:7;168:7,10,
11;209:13,14;210:15
**below (1)**
100:23
**Ben (6)**
84:3;138:14,16;
150:4;215:7,13
**B-E-N (2)**
138:16,17
**benefits (2)**
19:16;198:6
**beside (1)**
125:3
**Besides (8)**
11:5;12:20;20:19;
61:1;134:11;141:17;
156:2;159:12
**best (5)**
32:16;76:12;
114:25;152:15,16
**bet (1)**
86:1
**better (11)**
50:13;108:22;
116:19;117:20;120:7;
130:7;134:19,20;
136:8,10;157:18
**beyond (1)**
21:23
**Bible (1)**
13:4
**big (7)**
80:13;92:3;138:6;
189:21;202:9;204:1;
219:24
**bigger (6)**
35:4;204:5,7,14,15,
16
**bill (7)**
43:14;55:20;121:8;
160:13,15,17;174:7
**bit (6)**
16:17;35:4;80:2;
83:24;149:2;155:19
**blame (1)**
186:15
**blank (4)**
113:22;114:2,10,12
**blanked (1)**
151:2
**blankets (2)**
202:25;203:3
**blocking (1)**

136:6
**blotted (1)**
203:1
**blow (1)**
205:23
**blue (3)**
220:8,11;231:5
**born (1)**
15:21
**both (14)**
16:14;37:12,13;
146:22;155:20;
169:25;175:10;
177:15;178:1,4;
185:18;200:17;201:7;
223:4
**bottom (2)**
34:1;104:5
**bowl (2)**
209:13;213:15
**Box (1)**
38:21
**boyfriend (4)**
91:22;165:10;
171:13;233:9
**break (9)**
7:22,25;53:22,22,
25;103:10,13;108:22;
167:3
**breaking (4)**
107:25;108:19;
177:16;235:8
**briefly (1)**
121:20
**bring (1)**
224:18
**broke (6)**
74:13;75:5;81:20;
108:8;169:25;230:21
**Bruce (11)**
11:9,12;83:6,7;
93:10;101:8;151:12,
17;158:6;187:20;
226:23
**Bruce's (1)**
158:20
**buck (1)**
70:23
**Buckhead (1)**
83:21
**build (2)**
219:15,18
**building (1)**
143:25
**built (6)**
14:9;41:6;218:25;
219:21,25;228:7
**burn (1)**
234:20
**burned (1)**
234:18
**burst (35)**
25:12;26:11;28:13;

29:18,19,21;30:11;
32:9;34:12;35:23;
41:15;44:1,6;45:4;
48:3,4,22;51:10,12;
63:13;66:8;129:12,
12;146:15,16;147:20;
166:7;178:5,7;
220:15,20;221:3,9;
222:4;227:16
**bursted (1)**
41:5
**bursting (3)**
147:10;178:6;
220:24
**business (1)**
159:20
**bust (6)**
32:11,12,22;34:14;
168:3;221:22
**busted (2)**
64:24;165:16
**buzzing (1)**
209:18

## C

**cabinet (20)**
123:9;124:7,15,17,
18;131:3,5,6,14,18,
19;132:20,20,22,25;
133:8,8,15,25;134:4
**cabinets (8)**
123:10,19;124:7,
19;131:13;168:4,6;
217:18
**calculate (1)**
213:5
**calculation (2)**
144:1,5
**calendar (1)**
69:19
**call (59)**
24:8;32:15,17,24;
44:3;47:24;49:8,12;
51:9,12,16;52:7;
53:14,15;57:14,18;
59:2,6;64:10;69:9;
71:8;73:13,24;74:1,3;
75:14;83:11;88:5;
94:25;95:4;106:8;
125:16;126:19;127:7,
9,9,11,14,20;129:23;
142:15;146:5,15;
147:4;148:24;149:16;
150:1,7;152:24,25;
158:3;171:4;199:23;
202:5;210:18;212:16;
221:4;225:3;228:22
**called (72)**
25:10,13;32:16;
36:15;47:23;48:1,4,
21;51:21,22;52:1;
53:17,20;54:13;

56:10;59:3,5,7,9,17,
24;60:1;61:5;63:16;
66:20;67:1,5;69:3,5,
11;73:14;74:21,22;
75:11;80:22;83:14,
20;92:19;99:1;
100:15;106:13;
111:12,20;113:16;
119:16,18,20;122:10,
13,16;126:5,6;127:2,
4,18,23;129:14;
150:3;175:15;179:24;
180:4,15;181:3,9,13;
210:4,7;212:5,18,22,
23;225:6

**calling (4)**
95:3,9;146:7;236:8

**calls (2)**
95:10;148:21

**came (156)**
25:13;29:6,10;
32:12,19;34:11,18,23,
25;35:25;36:1,20;
40:19;41:2;44:1,14,
16;45:19;47:4,4,5,16,
19;49:15,21;55:22;
56:4,9,14;57:1,1,5;
60:12,15;61:6;62:8;
63:8,24,25;64:6;
67:12;68:11;70:15,
16;77:3,6;78:2,11;
80:13;81:1,1;82:19;
83:6,25;84:1,2;85:11,
19;87:10,20,23;88:4,
4,16,20,25;89:2,17;
92:5,12;95:2,11,17;
98:22;109:6;111:3,4;
112:16,18;122:12;
125:21;126:10,11;
127:1,10;128:3,20;
129:19;130:2,13,22;
131:1,12;132:7,13;
134:7;135:17;137:21;
138:3,5,19,21;139:7,
8,12;141:11,17;
142:1;143:4,5,7;
144:17,18,21;148:3,4;
153:4,12;157:12;
158:2,8,11,13,14;
160:9,9;163:21;
169:16,20;170:17,22;
172:15,17,21,23,24;
173:24;174:13;
175:20;178:9;183:3,
14;190:15,16;195:4;
199:13,20;209:3,6;
210:14;212:7,11;
222:23;228:13,21;
232:20

**camera (1)**
201:10

**can (84)**
6:6;9:8;10:3,11;

13:2;22:6;23:17;
24:23;26:16;28:17,
21;31:10;32:3;33:20;
34:16;35:4,11;38:13,
15;49:10;51:7;53:6,
21;54:18;58:23,24;
59:23;60:20;66:1;
71:5,7;72:22;74:14;
75:4,6;80:2,18;81:23;
94:14;96:12;103:10,
12;108:22;110:10;
114:25;115:16,20;
120:17;121:5;129:21;
134:17;136:7;146:2;
151:3;156:5;157:17,
17;161:25;166:3,5,14,
15,17;169:24;170:3,
10,11;176:18;177:18,
22;184:1;192:13;
195:15;198:2;199:21;
201:10;204:4;207:24;
209:25;210:23;
211:14;226:13;230:6,
20

**cancel (2)**
53:19;197:7

**Cannon (1)**
172:14

**cap (2)**
214:4,14

**capacity (3)**
100:21;104:18,19

**car (12)**
18:10;20:24;21:10;
74:25;75:14;140:4,6;
146:7,13;197:19,20,
21

**card (2)**
46:9,19

**care (6)**
21:11;28:18;
129:11;135:14;
164:17;183:23

**carefully (1)**
197:13

**Carlene (4)**
180:7,11,12,13

**carpet (15)**
201:2,17,18,19,21,
25;202:1,4,24;205:12,
19,20;206:10,18,20

**carrier (11)**
84:7;87:10;90:4;
96:3,15;98:12;99:4;
105:25;106:25;
144:23;145:13

**Carter (2)**
219:1,8

**case (20)**
10:15,21;11:6;
20:19;21:16,23;55:2;
100:2;107:20;117:5;
142:25;175:8;185:13;

187:23,24;188:8,21;
189:3,4;234:17

**cash (2)**
80:5;81:8;82:2,14

**cashed (2)**
81:3;83:3

**Cassandra (1)**
10:2

**C-A-S-S-A-N-D-R-A (1)**
10:4

**cause (3)**
113:9,12;225:13

**caused (8)**
79:2;113:3,5;167:7,
23;207:5,13;224:2

**causing (5)**
29:12,15;45:4;
55:20;121:8

**cave (2)**
139:21;147:4

**caved (1)**
139:19

**caving (3)**
74:21;75:11;146:5

**ceiling (1)**
27:1

**cell (1)**
39:24

**cents (2)**
176:23,24

**certain (1)**
10:22

**certified (2)**
6:16;163:12

**change (11)**
7:4;37:10;41:23;
96:16;103:10;121:4;
168:22;196:24;199:1;
211:18;223:7

**changed (1)**
143:1

**changing (1)**
198:6

**charge (2)**
214:6,7

**charged (1)**
160:23

**charges (1)**
214:4

**Charter (45)**
7:16,19;12:11;
20:20;30:25;51:17,
21;54:7,23;55:3;
59:16,22,23;72:12;
78:7;89:10;116:11;
117:5;142:12,14,19,
21,22;143:1,6,9,13;
164:19;193:7,13,20;
194:7,9,13,15;230:11;
231:9,20;232:2,6,11,
17;234:7,11;235:1

**Chattanooga (1)**
40:3

**check (31)**
46:6,8,10;70:14;
77:6;79:16,16,24;
80:3,11;81:3,8;82:2,
14;83:2;106:3;132:6;
135:17,17;136:2,16,
17,23;137:2;143:7;
149:17;174:4;194:12;
207:2;222:16;231:25

**checked (1)**
95:2

**checking (2)**
86:13,14

**checks (1)**
194:19

**children (3)**
12:22;15:14;16:1

**choose (4)**
137:17,18;195:8;
196:2

**chose (2)**
195:14,21

**Chris (1)**
13:7

**Christian (3)**
12:23;13:9,11

**circle (1)**
122:1

**Civil (1)**
5:10

**claim (24)**
30:15;38:23;51:25;
71:19;72:15;76:25;
89:12;100:25;134:24;
138:9;144:11;146:20,
20;155:13;161:6;
187:4,8;196:11,13;
222:15;226:1,6;
227:13,16

**claims (15)**
177:15;178:2,4,18,
21;181:19;184:4;
196:16;213:13,20,23;
216:24;224:6,11;
227:16

**claims-related (2)**
100:22,22

**clarified (1)**
110:15

**clarify (5)**
31:10;32:1;54:5;
59:18;110:22

**clarifying (2)**
125:20;127:22

**class (14)**
178:25;179:5,7,10,
11;193:16,24;194:1;
216:2,10,16;224:10,
12,21

**Clayton (4)**
17:7,13,15,19

**clean (4)**
6:8;199:14;201:25;

202:4

**cleaned (4)**
126:20;127:17;
199:13;201:24

**clear (3)**
55:8;103:5;175:14

**clearer (1)**
130:7

**client (11)**
6:20;59:10,16;
101:4;120:11;182:12;
184:11;185:7,18;
189:17;230:4

**close (4)**
63:14;133:4;200:9,
13

**closed (1)**
129:16

**closer (3)**
63:15;83:18;132:25

**closet (1)**
125:24

**co-counsel (1)**
175:8

**cold (2)**
95:10;206:4

**college (1)**
16:25

**color (1)**
7:2

**comfortable (1)**
8:10

**coming (17)**
19:21;34:5;47:1;
49:7;50:10;57:22,24;
61:21;78:12;87:13,
22;138:23;139:2,3,6;
158:20,21

**comment (3)**
139:18,23;146:19

**Commissioner (3)**
187:17;188:15;
225:17

**communication (1)**
154:25

**communications (1)**
171:1

**companies (10)**
24:9;55:1;83:12,12;
93:4;106:14;137:15,
17;172:25;181:24

**company (146)**
20:21;21:1,5;24:12;
27:22;30:5;36:15,19;
44:7;49:8,9;51:8,13;
54:5,24;55:4,12,22;
56:19;59:10,22,24;
60:2;61:5;64:10;
66:21;72:12;73:13,
20;75:24;76:4,11,17;
78:3,9;82:3;86:22,22;
87:17;88:17;89:11,
20;92:23;94:9,23;

95:11,13;97:19;
100:14;101:1;105:9,
12,19;111:21;112:4,
16;117:5;118:22;
119:19;120:2;121:21;
126:8;127:2,5,8,8,11,
14,21,24;129:10,16,
24,25;130:24;135:7;
137:13;140:20;
141:11,19;142:15,16,
23;143:2,14,14,15,16;
146:17;147:4;148:22;
149:11,21;150:12,21;
151:14;155:7,12;
161:11,17;164:1,7,20;
172:1,13,16,21;173:2,
4;175:24;176:7,11;
182:1,6,11,13,13,15,
17,19,21;191:12;
193:8,14;194:8,16;
210:5;212:17,19,22;
213:9;219:24;226:15,
19;227:4;231:9,21;
232:1,2,5,6,11,17;
234:7,11;235:1

**company's (2)**
88:18;92:24

**comparable (1)**
148:23

**comparative (1)**
148:23

**compare (5)**
93:23;99:3;140:3;
152:6,18

**compared (1)**
152:18

**comparing (1)**
146:20

**comparison (1)**
152:10

**compensable (1)**
100:19

**complainant (1)**
187:20

**complaining (1)**
56:6

**complaint (19)**
10:16;11:1;31:5;
57:23;71:20;187:3,6,
18,21,23;188:3,6,14,
19;189:6;213:19;
218:1,4;225:12

**completely (1)**
56:7

**computer (1)**
151:2

**concern (2)**
67:11;225:13

**concerned (3)**
70:22;206:12;
214:18

**concluded (1)**
236:12

**condition (4)**
45:19;86:16,17;
116:14

**Conditions (1)**
164:21

**confidential (1)**
6:1

**confused (1)**
116:1

**connected (2)**
20:6;124:4

**consider (1)**
98:15

**consistently (1)**
87:7

**Construction (13)**
34:4,5,7,9,18;36:19,
24;50:23;62:8;
130:10;141:2;167:15;
219:5

**Consulting (2)**
104:4;181:22

**contact (12)**
26:23;27:6,12;38:7;
82:17;91:20;93:12;
94:4;105:12;106:24;
145:12;150:11

**contacted (1)**
105:8;213:9;215:4

**contacting (1)**
83:13

**container (1)**
205:9,16

**contemporaneously (1)**
76:3

**continue (3)**
115:16,25;204:25

**continued (1)**
205:1

**contract (2)**
39:13;214:3

**Contracting (1)**
181:22

**contractor's (1)**
148:18

**conversation (15)**
76:3;105:18;112:6,
8,21,25;137:4;140:1;
146:24;147:23;148:5,
20;149:14;151:17;
155:11

**conversations (5)**
25:23;112:11,15;
148:15;149:20

**copies (2)**
120:7;156:15

**copious (1)**
226:14

**copy (29)**
6:23,24;10:16,18;
39:14;46:6,10;50:1,
13;54:12;55:16;
71:14;72:23;73:3;

80:3;95:21;121:2;
137:25;158:23,25;
160:25;161:2;162:14;
164:15;175:3,5;
235:14,15,18

**corrected (1)**
55:3

**corrections (1)**
124:3

**correctly (7)**
23:10;43:22;94:2;
145:9;152:7;164:25;
165:1

**cost (3)**
79:5;135:24;221:13

**costed (1)**
82:7

**costs (3)**
98:15;178:12;
218:10

**COUNSEL (38)**
2:1;5:12,22;7:13,
16;23:21;27:11;
28:16;30:13;35:15;
60:21;108:8;111:6;
115:6,18,24;116:10;
121:12;161:23;169:1;
175:7;176:25;181:20;
184:10;185:5;186:11;
192:14,24;194:5,23;
196:22;211:13;
215:11;228:4;230:21;
234:4;235:4,17

**county (9)**
15:7,9,10,24,25;
16:5,11;21:12,14

**couple (10)**
36:5,7,14;117:14;
118:25;119:1;120:13;
124:2;208:23;228:18

**court (21)**
6:12,16;8:14,20;
9:5;10:19;14:13,15;
21:6,8,13;23:22;
60:18;110:2;117:7;
178:17,20;189:25;
192:14;201:6;235:13

**cover (23)**
52:3;81:5;84:8;
94:17;96:10;97:2,5,6,
7,9,10;138:11;147:9,
18,19;197:1,2,16,18;
215:7,23;216:3;
223:23

**coverage (17)**
71:1;89:20;90:5;
96:7,22;97:21,23;
128:24;135:24;145:8;
179:9;196:24,25;
216:21;222:5,8,20

**coverages (1)**
129:3

**covered (9)**

46:3,4;95:18;97:15,
15;98:14;215:16;
216:12;223:21

**covering (2)**
137:11;146:18

**covers (1)**
25:1

**COVID (1)**
6:24

**Craig (6)**
76:20,21;77:9;
79:13;89:23;135:3

**crawl (1)**
56:18

**crawlspace (15)**
52:16;53:7;56:15;
64:7;87:2;126:16,17;
128:18;164:24;
168:17,20;169:3,7,9,
14

**Crosstalk (1)**
166:16

**crying (1)**
115:22

**cure (1)**
6:3

**current (3)**
14:20;17:25;28:9

**currently (5)**
11:16;14:4;24:4;
25:6;113:25

**cursor (1)**
34:1

**cut (4)**
86:6;129:18;131:6;
196:1

**cutting (1)**
58:17

---

# D

**damage (42)**
12:12,15;76:18;
78:21;79:2,2;93:8,24;
97:7,8,15;98:14;
113:6,12,19;118:22;
130:25;143:25;
144:11,25;147:10,20;
160:7;164:23;165:8,
14;167:7,23;168:2;
177:2,3,11;178:6;
182:14;183:17;
184:23;197:3;206:16;
207:15;224:2;233:7;
234:22

**damaged (2)**
197:25;217:17

**damages (27)**
30:25;55:5;96:4;
136:21;137:1,5,14;
144:12;146:18;
148:17;165:15,22;
173:3,8;176:6,10;

177:2;178:13,13,13;
182:3;183:6;184:16;
190:25;217:12;
224:25;227:22

**damp (1)**
205:22

**date (39)**
5:11;12:14,17;25:5;
30:18,24;31:15,21,24,
25;45:14;47:21;
49:15;50:12;55:18;
56:22;70:3;83:24,25;
87:20,25;89:16;
92:10;107:13;108:14;
109:9;110:25;120:2;
124:13;130:1,4;
144:14;162:20,23;
172:22;179:13,17;
180:8;212:21

**dated (19)**
28:10;72:12;99:13;
130:10;134:22;
135:22;143:19;
145:11;147:24;
157:15,21;161:9;
162:11;163:8;167:3;
229:5;231:19;232:12,
16

**dates (3)**
30:15;31:6;69:10

**daughter (6)**
11:20;12:17,21;
13:21;114:5;141:24

**daughter's (1)**
11:23

**David (3)**
157:15,16;169:6;
172:10

**Dawsonville (1)**
2:6

**day (28)**
45:22;59:12;60:12;
74:8,19;109:7;118:3;
119:17;126:3;134:9;
144:17;153:6,7,9;
159:22;205:25;206:2,
4;208:3,9,11,14,15;
214:19;225:3,6;
235:19

**daylight (1)**
32:15

**days (9)**
57:11;64:15;85:6,
10;86:21;208:23;
213:6,9;235:19

**de (2)**
102:21;103:2

**dealing (1)**
188:20

**debit (2)**
46:8,19

**dec (2)**
54:13;230:17

**December (19)**
19:17;74:12,15;
106:13;143:19;144:4;
145:12;146:3,25;
147:25,25;148:1,8,11,
13;149:22;150:3,12;
232:16
**decide (1)**
51:24
**decision (1)**
71:2
**declaration (1)**
194:6
**deductible (5)**
37:17,18;38:1,5;
135:25
**Defendant (8)**
2:12;7:13,17;55:2;
142:25;182:1,11;
228:4
**Defendants (1)**
185:4
**defenses (1)**
181:19
**degree (1)**
17:19
**dehumidifiers (9)**
81:2;82:20;84:22,
23;85:6;140:16,21;
141:14;183:15
**Dehydration (1)**
118:6
**DeKalb (2)**
15:10,25
**delegate (1)**
219:10
**Delmar (16)**
34:4,5,7,9,18,23,25;
36:1,19,24;40:19;
50:22;62:8;130:10;
141:1,11
**demand (2)**
94:1,8
**demanded (1)**
163:17
**denial (7)**
70:24;71:13;77:10,
11;97:21;148:6;
162:15
**denied (18)**
74:19;75:10;77:1;
81:16;82:5;96:9;97:1;
129:1,8;134:24;
138:10;146:4;195:12;
196:6,11,13;222:8,20
**deny (3)**
196:16;222:13;
227:12
**denying (7)**
82:3;96:7;147:6;
222:5,8;226:1,5
**department (14)**
32:12,18;71:20;

**disclaimer (1)**
220:20
**disclose (1)**
198:1
**disclosure (1)**
198:1
**Disclosures (2)**
181:10,14
**discoverable (4)**
181:18;184:3,6,12
**discovery (5)**
5:8;21:24;27:12;
54:10;186:23
**discuss (12)**
99:15;129:2;
140:25;145:13;
146:25;154:25;160:5,
6,8;169:12;230:10,13
**discussed (3)**
11:6,10;110:1
**discussion (5)**
17:23;26:19;99:18;
108:24;209:22
**discussions (1)**
151:6
**disinterested (1)**
100:20
**dismissed (2)**
178:17,20
**disposable (1)**
204:4
**dispute (1)**
142:24
**disqualified (1)**
194:1
**District (2)**
117:6,7
**D-I-U-L-I-O (1)**
180:21
**Division (1)**
117:8
**Divorce (3)**
15:1,5,9
**doctor (5)**
117:22,24;118:1,4,
5
**document (20)**
26:17;33:9;41:23;
54:11;57:24;89:5;
104:11,15;130:7;
136:6;151:22;156:9;
177:5;181:9,11,14,17;
196:24;197:4,6
**documentation (1)**
42:1
**documents (22)**
10:6,8,9,11,14,22,
23;11:2,2;33:15;51:2;
54:9;62:19;100:3;
107:3,9;120:17;
130:8;156:1,7,12;
232:9
**dollars (2)**

214:6;224:13
**done (27)**
45:24;68:12;73:8;
76:5;80:12;90:10;
93:25;94:14,17,22;
96:10,23;98:25;
99:24;100:17;104:20;
138:12;141:4;152:22;
153:15;167:12,22;
171:9;186:23;235:15,
19;236:10
**door (19)**
27:24;56:18;57:5;
58:3;64:7;123:20,22,
23,25;124:23,24;
125:2,2,3;126:18;
200:11,13;203:13,15
**doors (2)**
200:9,17
**Douglas (1)**
16:22
**down (33)**
8:15,17;48:19;
54:22;69:14;76:2,6,9;
86:7;95:7,7;106:4;
126:18;128:14;134:2;
136:7;165:11;168:18,
21,24;169:18;193:11;
195:10;201:23;203:1,
8;205:14;206:17,21;
209:1;228:17;234:18,
20
**draw (1)**
121:22
**drawing (5)**
113:22;114:2,10,
12;123:5
**drawn-out (2)**
6:4,5
**DREW (1)**
2:15
**dried (9)**
51:14;129:20,21;
141:1,4,10;183:18;
200:2,3
**drip (2)**
133:24,25
**Drive (3)**
40:1,3,8
**dry (9)**
80:13;85:16;
129:22;138:6;141:5;
183:20;200:4;205:21;
206:11
**dryer (5)**
37:24;168:22;
169:17,20;170:23
**due (4)**
116:13;197:2,18;
227:16
**duly (1)**
5:3
**dump (1)**

202:18
**during (12)**
6:3;9:13;10:21;
27:12;76:3;82:20;
112:11;118:13;
146:24;171:21;
193:23;208:3

**E**

**ear (1)**
201:11
**earlier (9)**
30:18,24;31:2,14;
54:6;58:8;98:9;
131:16;228:18
**early (3)**
11:20;32:22;129:13
**earphones (2)**
103:8,10
**easier (2)**
120:17;131:8
**ECKL (1)**
2:15
**Edgewood (2)**
14:13,15
**education (1)**
20:13
**educational (1)**
16:18
**either (15)**
35:10;88:16;92:22;
93:5;98:1;109:25;
110:12,17;112:12;
153:8;170:8;182:23,
25;216:24;231:6
**electric (1)**
235:17
**electricity (1)**
236:9
**electronic (4)**
6:24;235:14,15,18
**elongated (1)**
81:25
**else (53)**
11:6;12:20;56:14;
58:24;61:6;62:6;
73:19;76:17;79:14;
83:1,4,9,11;84:9;
87:10,17,19,22,23;
88:4,23,24;89:2,24;
90:21;97:25;108:2,3;
126:22;141:16,18;
152:19;156:16;157:1,
10;159:12;167:22;
168:9,13,19;169:14;
173:6;184:5,15,20,22;
185:2;202:23;206:23;
217:8;218:20;222:18;
228:1
**e-mail (6)**
6:24;93:20;99:13;
102:2;161:9,19

**disclaimer column continued / various**

**depose (1)**
186:24
**deposed (1)**
9:2
**DEPOSITION (43)**
5:1,7,10;6:3,8,14,
25;9:13,21;10:6;11:7,
11,17;29:1;33:10;
65:7;72:8;79:21;89:7;
115:16;116:12,15,20;
117:3,14;118:13,25;
119:7;120:16,19;
142:5;152:24;153:22;
154:6;174:22;181:6;
187:12;195:2,3;
229:16;230:19;
235:18;236:12
**Depot (1)**
204:13
**depreciation (1)**
136:1
**describe (1)**
199:21
**deserve (3)**
217:9;218:16,20
**detailed (1)**
69:17
**details (2)**
112:5;188:24
**determine (2)**
135:11;154:17
**determined (2)**
59:21;145:1
**determines (2)**
218:15,16
**difference (4)**
74:25;148:16;
226:17,18
**different (8)**
30:14;35:6;41:10;
56:22;99:24;126:14;
150:22;151:14
**difficulty (1)**
117:16
**digging (1)**
120:12
**diminution (2)**
197:1,17
**dining (7)**
65:13;125:12;
200:6,8,12,24;201:17
**direct (1)**
33:24
**directing (1)**
21:25
**disability (6)**
18:12,13,17,20;
19:1,18
**disagreed (1)**
223:4

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 247 of 265
Janice Scott v.
The Charter Oak Fire Insurance Company
Part 1 (7-28-21) Part 2 (8-10-21)
Janice Scott
July 28, 2021

**e-mailed (2)**
101:12;102:4
**e-mails (1)**
186:17
**Emergency (10)**
78:5,17;87:21;
88:19;89:17;112:21;
135:7,10;172:6;183:5
**employed (3)**
19:23;92:22;103:1
**employees (3)**
88:17;185:5;226:16
**employer (2)**
18:18;21:2
**employment (1)**
22:13
**emptied (5)**
204:19,23;205:11,
14,16
**empty (1)**
205:9
**emptying (1)**
205:7
**end (6)**
14:25;39:21;
106:12;107:20;108:1;
186:23
**ended (1)**
118:2
**engage (1)**
140:1
**engineer (16)**
88:11;89:1;138:20,
22;158:3,3,4,21;
161:11,18;172:12,20;
233:15,16,18,24
**engineering (2)**
169:6;222:23
**enlarge (3)**
33:8,9;157:17
**enough (18)**
8:10;84:8,10;93:25;
94:18,22;95:13;96:3,
9;97:2,5,10,16;98:15;
99:25;115:18;152:21;
227:22
**enter (1)**
5:13
**entered (2)**
83:24;153:2
**equipment (3)**
85:7;86:15,20
**ER (1)**
118:2
**Eric (9)**
77:2,17;78:3,9;
87:21,23;88:19;
89:16;112:21
**errata (1)**
6:25
**errors (1)**
7:1
**especially (1)**

219:12
**established (1)**
46:22
**estimate (21)**
93:22,23;94:1,8;
95:19;96:22;98:13;
99:3;106:1;107:1;
110:24;136:21;137:1,
13,24;148:18,19;
152:5,6;173:8;223:2
**estimated (1)**
148:17
**estimates (2)**
106:10;148:23
**estimator's (1)**
84:3
**even (14)**
25:20;82:8;92:2;
94:17;95:6;113:23;
114:4,14;126:3;
143:7;205:2;208:23;
223:8;229:13
**events (1)**
69:12
**everybody (5)**
92:21;94:16;142:1;
171:22;185:6
**Everything's (1)**
78:24
**evidence (5)**
5:25;6:1;51:20;
77:20;110:8
**exact (4)**
177:6;208:2;
212:21;227:11
**exactly (19)**
8:24;29:3;32:9;
35:23;36:11;37:9;
68:5;86:12;109:9,23;
110:19;137:11;
142:18;145:23;153:9;
157:5,8;159:11;
162:23
**EXAMINATION (5)**
7:13;192:24;228:4;
234:4;235:16
**examined (1)**
5:5
**example (1)**
197:19
**except (3)**
5:15;90:22;233:7
**excess (1)**
177:12
**Excuse (20)**
17:10;22:7;30:22;
46:15;91:14;104:12;
117:25;131:24;144:3;
147:25;158:12;163:3;
167:19;172:18;176:2;
181:12;182:24;
211:24;217:3;228:15
**execute (1)**

100:3
**executed (1)**
156:1
**Exhibit (85)**
33:10,14,22;36:23;
41:22;43:9;50:9;54:9;
62:15,18;65:4,7;72:7,
8;79:19,21;80:1;89:6,
7;90:3;93:19;99:11;
100:10;103:19;
108:18;110:24;
120:19,23;121:13,16,
19;130:6,10;134:17;
135:20;136:17;
140:10;142:3,5;
151:21,25;155:17,18;
156:19;157:14;
160:13;161:21,23;
162:3,4,7,9;163:6,15;
166:25;171:3,7;
173:20;174:20,22;
177:25;181:5,6;
185:10;187:12,15;
189:8,11,15,16,18,23,
24;192:14,18,19;
196:23;229:3;230:16,
21,22;231:15,24;
232:12,15
**existed (1)**
165:15
**exists (1)**
168:16
**exits (1)**
200:15
**expect (3)**
11:19;223:22;
225:16
**expected (1)**
223:24
**expense (1)**
221:18
**expenses (1)**
107:23
**expert (13)**
167:15;169:5,6;
177:2;178:12;185:12;
186:18,19;187:25;
206:15;222:23;223:1,
8
**experts (9)**
185:10,11,16,18,19,
23;207:1;221:23;
223:4
**explain (6)**
48:13;74:24;
139:24;142:18;209:4;
226:13
**explained (2)**
70:13;76:24
**explaining (1)**
6:6
**extended (1)**
216:21

**extensive (2)**
164:23;165:13

## F

**fact (3)**
177:4;224:11;
225:15
**facts (3)**
5:25;7:20;110:7
**failed (1)**
182:3
**fair (3)**
217:2,6;218:16
**faith (2)**
177:2;178:13
**family (2)**
109:16;111:8
**fans (14)**
37:25;84:23;
129:21;140:16,21;
141:9,10,14;183:15;
200:3;205:20,23,24;
206:9
**far (13)**
16:16;50:6;51:14;
71:5,7;92:25;158:8;
169:16;182:8;183:8;
206:12,14;214:18
**FARNHAM (1)**
2:15
**fast (1)**
8:6
**faucets (1)**
43:19
**fault (2)**
186:12,14
**fax (3)**
28:24;162:10;163:7
**Federal (2)**
5:9;6:4
**feel (8)**
8:10;116:19;
117:20;118:12;
205:21;206:10;
227:15,21
**feeling (4)**
117:15,19;118:10;
120:13
**fees (5)**
177:1,2;178:12,12;
218:4
**felt (3)**
134:4;205:19;
206:11
**figure (9)**
48:18;58:24;61:16;
88:15;98:2;99:6;
114:19;116:3;182:25
**file (5)**
21:9;38:23;51:25;
71:19;179:18
**filed (29)**

7:18;10:19;12:10;
20:20,21;21:6,10,13,
15;22:11;30:24;
175:3,4,7,10;187:3,6,
18,21,22;188:3,6,13,
19;189:5;223:13;
225:12;227:17;
230:18
**filing (1)**
6:14
**filled (1)**
180:5
**finally (2)**
70:24;204:21
**find (12)**
27:9;69:4;73:14;
76:15;113:18;152:14,
20;153:13;156:5;
176:19;179:13;
180:17
**Finding (2)**
152:17;153:14
**findings (1)**
128:22;225:20
**finish (6)**
9:7,9;17:21,22;
72:25;196:1
**finished (4)**
159:22;192:7;
204:22;207:10
**fire (52)**
32:12,17;54:23;
55:4;72:12;78:5,17;
87:22;88:20;89:10,
17;112:22;117:5;
129:14,19;130:1,13,
17;135:8,10;142:14,
19,19,22;143:2,9,10,
13;164:20;172:6;
183:4,5;187:17;
188:15;193:8,13;
194:8,16;199:12,19;
231:9,20;232:2,6,11,
17;234:7,11,13,16,23;
235:1
**firemen (6)**
141:5;199:19,20;
202:3;203:19;232:20
**FIRM (1)**
2:5
**first (62)**
5:3;25:3;31:21,24,
25;32:5,7,22;33:13;
34:16;36:7;39:17;
40:19,22,23;45:9;
48:8;49:9;57:1;58:23;
72:22;82:25;83:19;
91:12,15,18;93:7,12;
94:4;106:16;108:13;
109:10,24;110:14,20;
111:3,14;115:8;
119:6;121:2,3;
126:21;128:1;132:7;

Min-U-Script®
WSG Reporting, LLC - (770) 367-7822
www.wsgreporting.com
(6) e-mailed - first

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 248 of 265
Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

149:9;151:24;153:7;
157:6,11;163:19;
171:23;179:11;194:8;
199:18;208:18;209:8;
210:3;213:11;228:11,
19;229:10;236:5
**fit (1)**
188:1
**five (11)**
41:17,19;85:9,10;
86:20;203:17,18;
204:9;205:15,17;
213:9
**five-gallon (1)**
204:13
**five-minute (1)**
103:10
**fix (13)**
49:10;64:18;75:18,
19;82:6,8;92:7;97:16;
98:21;113:18;126:6;
134:7;221:5
**fixed (38)**
29:24,24;30:3;44:2,
4;53:14;56:6;57:12;
58:23,25;60:7;64:16;
66:12;67:7;91:3;
97:11;98:3,19;
127:16;131:2,2,3,6,
17,21;133:22;134:8,
9;145:16;152:13;
153:18;165:5;167:13;
168:4,8;169:17;
190:12;212:14
**fixes (1)**
51:8
**fixing (5)**
44:5;74:20,20;
75:10;146:4
**floor (9)**
65:10;67:16;91:3,
25;92:8;164:22;
165:3;201:16;203:1
**floorboards (1)**
206:22
**flooring (5)**
85:20;86:5;90:25;
200:23;201:14
**floors (5)**
159:2;167:13,16,
20;217:18
**Florida (1)**
38:21
**flow (1)**
5:20
**foggy (1)**
115:17
**folks (3)**
132:5;141:1;171:23
**follow (1)**
159:10
**following (5)**
119:24;161:6;

163:14;231:8;232:22
**follows (1)**
5:5
**follow-up (1)**
228:2
**foot (1)**
18:7
**Foote (2)**
12:5;14:5
**Forcon (2)**
89:2;172:14
**forgive (2)**
5:18,19
**forgot (1)**
15:18
**form (42)**
5:16,24,25;6:10;
22:23;25:17,21;
30:14;31:23;51:19;
59:14;77:18;180:5;
196:19;198:9;199:7;
204:10;207:7,19;
209:9;211:3,11,14;
213:17,25;214:9;
215:9,11;216:4,5,13;
220:2,16;222:6,10;
224:7,14,22;226:2;
227:8,19;229:13
**formalities (1)**
6:13
**Fort (1)**
38:21
**found (20)**
52:21;55:16;56:4,
13;62:9;65:25;68:14;
120:2;121:21;122:8,
12;125:22;126:7;
132:13;144:24;
145:14;169:13;
183:11;220:23;221:1
**four (7)**
12:7,8;27:23;
205:11,15,17;213:8
**Frederick (1)**
16:22
**Fredrics (80)**
11:9,14;83:6;93:9,
10,13,16,21;94:5;
99:2,8,13,19;102:3;
104:7;105:20;107:8,
12;108:6,11;109:6,17,
20;110:25;111:23,24;
112:3,8;113:3,15;
149:2,6,12;150:15;
151:6;152:1,25;
153:4,11;155:7,12,20;
156:2,13;157:3;
158:17;159:23;
160:15;161:5,9,10,14,
18;162:11,16,25;
163:5,8;172:8;173:7,
13,25;174:1;181:21,
23;182:8;185:17,25;

186:9;187:20;214:3,
3,19;223:1;225:3,8;
226:16;227:5;233:18,
23
**Fredrics's (2)**
93:6;100:14
**freezer (16)**
35:5,7,8,13;62:9;
123:7,11,13,14,17,18;
124:5,11,20,21;
125:11
**fresh (1)**
200:25
**fresheners (2)**
214:25;215:3
**Friday (4)**
85:12;113:23;
114:16;150:6
**fridge (2)**
34:17,22
**friend (2)**
91:3,6
**front (15)**
10:13;26:12;62:22;
67:20;84:18;95:6;
101:21,24;102:8;
107:6;121:16;174:18;
187:16;189:9;200:13
**froze (2)**
75:6;213:1
**full (5)**
9:23;104:19;
144:10;202:13,15
**fully (1)**
41:9
**Fulton (4)**
19:25;20:6;22:14,
16
**further (5)**
105:17;139:24;
228:4;234:4;235:3

## G

**Gainesville (1)**
2:8
**gallon (1)**
204:9
**gallons (3)**
204:9,9,17
**garbage (1)**
204:4
**gave (17)**
27:11;39:24;50:4;
73:6;75:17;84:12;
94:15;96:21;104:16;
137:15,19,20;152:19,
21;171:9;195:10;
216:11
**gears (1)**
93:3
**General (1)**
181:21

**Generally (1)**
10:14
**Georgia (11)**
2:8,18;14:6;16:15;
17:5;20:5;117:7;
181:21;187:7,18;
188:15
**gets (1)**
214:7
**given (8)**
50:3;93:24;95:12;
96:3,15;98:22;99:23;
155:25
**glad (5)**
8:9;9:16;72:19
**globally (1)**
192:6
**God (2)**
15:18;176:16
**goes (1)**
169:16
**good (5)**
118:10;157:17;
159:22;228:16;
235:25
**Gotcha (1)**
13:5
**graduate (1)**
16:19
**grandchild (1)**
141:24
**grandchildren (2)**
13:8,18
**gray (1)**
229:7
**Great (6)**
7:11;8:13;9:12,19;
117:21;119:5
**greater (1)**
224:25
**green (2)**
7:4,4
**Grunfeld (1)**
180:22
**G-R-U-N-F-E-L-D (1)**
180:23
**guess (5)**
6:23;41:6;53:24;
157:20;162:22
**guesstimate (2)**
204:8,17
**guy (12)**
47:5;56:25;57:1;
59:12;64:6;78:3;
127:10;139:7,10,12,
13;219:10
**guys (1)**
213:1
**guy's (1)**
49:23

## H

**Habitat (1)**
23:9,11;164:13;
190:5;219:2,21,25;
221:2
**Hait (4)**
175:7,11;183:3,10
**H-A-I-T (1)**
175:7
**half (1)**
210:22
**hall (1)**
65:12;85:1
**hallway (2)**
85:1;86:10
**hand (1)**
128:14
**hands (3)**
128:15;187:24;
219:14
**handwriting (2)**
101:3,4
**handwritten (1)**
163:7
**hang (1)**
79:18;226:11
**happen (2)**
8:5;92:7
**happened (34)**
32:13;34:17;35:22;
48:4;51:15;53:19;
62:16;68:19,21;69:1;
79:14,15;92:9;
106:22;110:12;
113:21;114:5,7,14,20,
21;118:21,24;121:10;
127:7;129:13;130:4;
138:2,4;139:16;
166:1;207:14,15;
223:21
**happening (1)**
166:14
**hard (4)**
9:1;137:7;195:12;
196:6
**Hawkins (31)**
157:15,16;158:4,
10,13,20;159:1,12,15;
160:14,22;161:9,14;
169:2,5,6,9,12,15;
172:10,10;173:17;
185:17;186:2,3,7,13;
225:19;226:16;227:6;
233:19
**head (3)**
8:17;103:6;191:22
**H-E-A-D (1)**
191:22
**headache (4)**
114:24;115:2;
117:15;118:7
**Head's (9)**
42:2,14;50:7,16;
62:20;191:20;228:12,

21;229:4

**hear (45)**
7:7;9:14;17:12;
27:5;38:16;48:24;
52:21;53:3,9;58:16,
20;69:4;75:5;109:3;
128:5,7;131:24;
132:9;149:5,25;
150:2;162:2,3;
163:23;166:3,5,15;
172:19;177:18,19,22,
23;190:8;191:15;
201:12;205:8;208:15,
24,25;210:19;211:6,7,
25;215:1;228:15

**heard (39)**
38:16;48:17,20;
49:5,6;56:5;57:13,23;
62:11;63:18;64:3;
67:9;98:11;119:13;
122:18,21,22;125:14;
126:2,21;131:23;
132:1,4,11;150:5;
170:8;175:16;178:8;
194:9;208:4,19;
209:2,4;211:16;
212:3,6,9;213:11,12

**hearing (7)**
6:5;57:15;61:9;
64:21;115:8;131:22;
150:4

**hearsay (1)**
47:13

**heater (7)**
42:5,9,11,15,19;
43:6;50:8

**heating (2)**
43:3,4

**held (1)**
154:6

**help (21)**
32:18;95:3;97:4;
99:7;100:16;111:13;
113:17;129:14;130:2;
147:5;152:12,13,17,
19,20;153:13,15,16,
17,19;227:7

**helped (5)**
32:12,19;129:19;
219:15,18

**helpful (1)**
125:8

**helping (2)**
111:13;199:14

**helps (1)**
125:6

**Here's (3)**
72:7,21;130:9

**herself (1)**
88:1

**hey (8)**
8:8;194:11;212:24;
214:5;219:17;220:20;

221:8;224:11

**hide (3)**
214:25;215:3;
219:20

**high (8)**
16:18,19,21;43:14,
14;45:5;55:20;121:8

**highlight (2)**
66:1,2

**highlighted (1)**
131:16

**highlighting (2)**
65:21;131:16

**himself (4)**
60:24;88:2,22;
157:12

**hire (2)**
149:8;232:20

**hired (16)**
6:17;105:25;149:1,
12;182:1,10,12,14,15,
18,22;185:16,18,24;
207:1;214:2

**hisself (1)**
172:24

**hit (1)**
21:3

**Hite (5)**
76:20;77:9;79:13;
89:24;135:3

**Hold (21)**
27:3;33:25;54:17;
60:16;66:4;69:10;
81:17;83:10;100:7;
102:10;108:23;110:2;
124:2;151:1;161:22;
176:20;180:16;
195:17,17;210:21;
226:12

**hole (1)**
131:6

**holidays (1)**
83:18

**home (95)**
11:16;17:3;19:21;
23:11;24:8,10,13,19;
25:3,6,10,14;26:14;
30:2,7;31:22;32:6;
38:20;40:19,20;
43:17;44:9;45:15;
47:2;51:3;52:14,18;
56:16;61:7;62:12;
65:11,11;66:18;
67:13;77:14;80:23;
83:5;85:7;86:23;
87:18;88:16;89:25;
92:13,18,22;93:5;
96:10;98:19;108:7,
12;109:21;121:20;
123:17;126:23;
130:24;138:3;139:17;
141:12,16;143:5,23;
144:25;145:2,5,15;

146:6;147:1;156:23;
157:4,11;158:5,22;
164:17,24;165:14;
167:5,8,16;168:16;
171:20;173:2;179:8;
182:2;183:23;184:16,
24;197:3,18;200:16;
204:13;219:15,21;
228:8,12,21

**H-O-M-E (1)**
39:18

**homeowner (4)**
167:15;168:1,14;
194:2

**homeowners (4)**
93:22;143:11;
152:5;193:18

**homeowner's (4)**
140:4;146:14;
223:19,20

**homes (1)**
219:24

**home's (1)**
145:3

**HomeServe (61)**
24:20,21,25;25:4,
10;26:21,24;27:7,14,
15,18,19;28:3,11,18;
32:15,24;33:4;34:8,
15,17,25;36:2,9,10,
12,13,14;37:11,17,19;
38:24;39:2,5,7,10,12,
18;46:3;47:24,25;
48:1;49:18;55:23;
56:10;57:14;59:3;
63:17,25;119:18,20;
122:17;125:16;127:7,
9,18;129:15;131:1;
175:15;212:5,10

**honest (3)**
157:9;217:2,6

**honored (1)**
216:23

**hope (2)**
106:15;116:19

**Hospital (1)**
20:7

**host (1)**
118:8

**hot (4)**
42:11;125:25;
190:20,23

**hour (1)**
214:6

**hour-and-a-half (1)**
199:16

**hours (2)**
205:6;208:23

**house (81)**
14:9;32:7;34:6,10;
41:6;42:3;43:11,15;
44:17,22,23,24;45:2,
7;50:20,25;51:12;

53:12,13;57:6;60:6;
62:23;63:9,14;74:19,
21;75:1,10,10,11,19;
78:17;80:12;81:2;
85:16;86:18;87:14;
95:12;125:7;128:20;
129:20;130:23;
132:10;138:5;139:19;
144:21;146:5;147:3;
152:13;153:4,5,15,18;
155:5;158:8;159:3,
10;163:18;197:25;
206:24;207:2;209:15;
212:8,12,13;214:23;
215:3,15,23;217:23;
218:23;219:5,18;
220:5;221:11,11;
228:6;230:1,3;
234:18,20

**Huh (2)**
38:14;47:7

**hum (1)**
177:19

**Humanity (6)**
23:9,11;190:5;
219:2,21,25

**hundreds (1)**
224:12

**HVAC (1)**
125:23

**Hwy (1)**
2:6

---

# I

**IAS (1)**
164:9

**icebox (1)**
124:12

**idea (5)**
101:19;178:9;
185:8;215:8;234:7

**identification (10)**
33:11;65:8;72:9;
79:22;89:8;120:20;
142:6;174:23;181:7;
187:13

**identified (5)**
102:8;184:2;186:7,
18,20

**identifies (2)**
181:17;232:1

**identify (2)**
10:11;186:24

**immediately (3)**
213:10,11;221:10

**impartial (2)**
100:19;218:16

**impeachment (1)**
181:20

**important (1)**
8:16

**incidents (4)**

213:14,22;223:23;
227:23

**income (2)**
19:20,21

**incorrect (4)**
119:8;154:3,4,8

**indelicate (1)**
208:7

**independent (3)**
77:15,19;224:18

**independently (1)**
71:10

**indicated (3)**
7:15;59:15;152:4

**indicates (1)**
145:4

**indicating (1)**
59:16

**individual (4)**
30:5;44:12;57:7;
173:2

**individuals (4)**
28:11;172:25;
181:17;184:5

**infection (1)**
118:6

**information (20)**
6:1;9:17;26:24;
27:7,12,15,19;28:7;
38:7;44:17,19;91:20;
99:14;119:9;181:18;
183:11;184:3,6,12;
186:21

**Initial (2)**
181:10,13

**initially (1)**
118:24

**injury (2)**
18:11;197:19

**inside (1)**
64:24

**inspect (12)**
78:2,12;87:11,18;
89:24;93:7;158:2,8,
21;171:19;173:3;
183:7

**inspected (5)**
111:1,3;144:12;
156:23;157:11

**inspecting (1)**
161:12

**inspection (11)**
68:23;77:4;78:19,
23;113:19;128:4;
132:16;133:14;
159:20;160:23;183:9

**install (2)**
43:18;45:9

**installed (1)**
45:21

**instead (1)**
6:4

**Institute (1)**

17:6
**instruct (1)**
  31:8
**instructions (1)**
  9:22
**insurance (194)**
  21:4,5;51:10,25;
  52:6;53:16,17,18;
  54:24;55:4;59:6,7,9,
  24;60:1;61:5;64:10;
  66:20;68:22;71:19,
  20,21;72:12;73:13,
  20;74:19;75:10,15,
  23;76:4,10,17;81:5;
  82:3;84:7;87:10,17;
  88:17,18;89:11,19;
  90:4;92:23,24;93:23,
  25;94:9,11,23;95:13,
  20,22;96:3,7,15;97:1,
  19;98:7,12;99:4,23;
  100:21;101:1;105:8,
  12,19,24;106:24;
  111:21;112:4,16;
  113:17;117:5;118:22;
  127:2,5,11,14,21,23;
  129:24;140:4,4,6;
  142:15,16,19,19,22,
  23;143:2,5,10,11,14;
  144:23;145:13;146:4,
  8,14;147:4,9,19;
  148:22;149:11,20;
  150:12,20;151:14;
  152:6,19;153:14;
  155:7,11;157:22;
  161:11,17;163:20,21,
  21;164:1,2,3,6,8,12,
  13,20;170:20;171:2;
  172:1,13,21;173:4;
  175:24;176:7,11;
  179:8;182:13,15,17,
  18,21;185:3;187:4,7,
  9,16;188:14,21;189:1,
  3,4,20;193:8,12,12,
  13,18;194:3,8,15,16;
  197:7,8,11;198:7,8;
  212:17,18,22;213:9;
  219:20,24;223:15,18,
  19,20;225:12,17;
  226:15,19;227:4;
  230:14;231:9,21;
  232:2,6,11,17;234:7,
  11,16;235:1
**insured (3)**
  187:19;220:4,7
**insurer (2)**
  54:23;231:9
**insuring (1)**
  220:13
**intended (1)**
  166:8
**interest (2)**
  177:4;178:14
**Internet (5)**

8:4;93:17;95:7,9,9
**interrupt (2)**
  80:18;184:10
**interrupted (1)**
  177:7
**into (15)**
  5:13;19:21;52:18,
  20;75:6;126:16,17,
  23;153:2;169:3,6;
  187:23;190:16;
  206:17;221:11
**introduced (1)**
  139:11
**intrusion (1)**
  160:1
**investigate (1)**
  212:8
**investigator (1)**
  88:7
**invoice (12)**
  34:3;35:2;36:22,24;
  42:13;43:13;45:17;
  50:13;55:15;84:18;
  228:23;229:5
**invoices (3)**
  120:7;121:1;194:18
**involvement (2)**
  155:12;161:6
**issue (4)**
  41:4;67:6;118:20;
  167:16
**issued (1)**
  136:1
**issues (1)**
  185:13

**J**

**Jack (1)**
  219:12
**James (1)**
  15:4
**Janet (1)**
  117:4
**JANICE (9)**
  5:1,2,7;9:25;17:9;
  19:3;120:15;144:12;
  161:12
**January (28)**
  50:18;62:20;63:9;
  80:6;83:4,6;93:14,21;
  99:14;108:13;109:10,
  25,25;110:12,15,17,
  18,20;111:1;113:15;
  149:9,9,15;152:1;
  153:8;156:24;157:6,
  11
**Jeff (12)**
  70:2,15;76:18;
  88:18;106:9;139:3;
  149:24;150:4,6,7;
  215:19;231:17
**Jeffrey (2)**

60:17;128:2
**Jerry (1)**
  44:13
**Jersey (1)**
  219:11
**Jewish (1)**
  17:3
**Jimmy (2)**
  219:1,8
**John (11)**
  55:18;56:17;57:1,4,
  8,11;64:17,21;65:24;
  131:2,11
**Johnson (5)**
  12:22,23,24;13:7,9
**jot (1)**
  69:14
**Judge (1)**
  117:6
**June (3)**
  161:9,19;187:19
**jury (2)**
  218:15,16
**Justin (11)**
  73:21;74:15;76:19;
  88:3,4,20;139:4,5;
  145:21;215:21,22

**K**

**KARABINOS (194)**
  2:13;5:6;6:9,18;
  7:11,14;13:5,6;17:15,
  18,24;19:10,14;
  21:25;22:4;23:1,4,24;
  25:2,22;26:22;27:4,
  10,13;28:5;29:2,5;
  30:17,23;31:7,13;
  32:2;33:12;35:12,16,
  19;38:18;40:10,17;
  47:14;51:23;53:24;
  54:3;59:20,25;60:18,
  22,23;65:9;70:11;
  72:10,24;73:2;74:17;
  77:21,24;79:23;
  81:22;89:9;91:9,19;
  103:8,14,17;106:19;
  108:10,21,25;109:5;
  110:11,16;111:7;
  115:4,13;116:4,8,10,
  18;117:2,9;120:9,18,
  21;121:14,15;124:14;
  136:8,10,14,15;142:7;
  151:5,8,20;155:2;
  161:25;162:5,8;
  164:5;166:8,12,18,22,
  23;169:4,8;170:1,15;
  174:15,19,24;175:9;
  177:7,10,21;181:8;
  184:13;185:22;
  186:16;187:1,14;
  188:9,12;189:14,19,
  23;190:2,3,9;191:7,

17;192:12,15,17,20;
  195:17,22;196:19;
  198:9;199:7;204:10;
  207:7,9,17,19;209:9;
  210:21;211:2,9,11,15;
  212:24;213:17,25;
  214:9;215:9,12;
  216:4,6,13;217:14,19,
  24;218:6,12;220:2,
  16;222:6,10;224:7,14,
  24;226:2,7;227:8,19;
  228:2,5;229:15,17;
  230:7,22,24;231:1,4,
  7;234:1,14;235:5,10,
  21;236:1,3,11
**karabinosk@deflawcom (1)**
  2:20
**KAREN (11)**
  2:13;5:23;8:8;
  28:21;32:1;116:10;
  166:6;185:14;189:11;
  191:16;209:19
**keep (12)**
  35:23;75:22;92:2;
  110:8;144:17,19;
  150:14,16;151:17;
  170:21;205:24;
  226:24
**keeping (1)**
  171:21
**Kenneth (1)**
  180:22
**kept (6)**
  48:16;69:19;151:5;
  220:13;222:4,8
**kidney (1)**
  208:13
**kids (1)**
  7:6
**kind (12)**
  9:1,6;61:15;65:10;
  70:19;81:25;115:18;
  136:1;201:1,14;
  225:13;229:25
**kitchen (33)**
  26:6;29:13;61:23;
  65:1,13;84:25;
  122:24;123:23;
  124:25;125:1,10,12;
  130:20;133:15,24;
  134:12;165:18;168:5,
  6;200:6,8,11,11,12,
  24;201:5,15,16;204:2,
  2,3,5;236:9
**knew (7)**
  29:3;150:18;176:5;
  226:19;229:23;230:2,
  5
**knock (1)**
  27:24
**knowing (2)**
  75:18;220:13
**knowledge (4)**

13:18;160:20;
  184:15;233:3
**known (3)**
  51:9;104:4;221:24
**knows (2)**
  216:7;229:13

**L**

**ladies (1)**
  102:7
**lady (1)**
  102:14
**laid (2)**
  65:13;219:14
**laptop (2)**
  26:25;27:2
**large (1)**
  37:16
**larger (3)**
  35:11;103:23;
  192:22
**last (37)**
  8:6;11:13;12:6;
  15:17,19;17:1,11;
  21:20;25:9,11;29:6;
  47:4;64:14;77:2;94:7;
  120:13;121:20;128:2;
  134:21;135:3,21;
  137:22;143:12;
  147:14;149:3;150:13;
  151:3;153:22;155:19;
  156:3;180:21;190:18;
  226:25;228:23;
  229:15;230:19;
  231:17;234:3
**late (1)**
  113:24
**lately (1)**
  11:10
**later (4)**
  58:25;135:16;
  148:3;153:6
**Lauderdale (1)**
  38:21
**Law (3)**
  2:4,5,14
**lawsuit (18)**
  7:17,19,20;12:10;
  20:21;21:10,13,14;
  30:19,25;31:25;
  33:16;175:3;179:1,
  10;216:10,16;224:18
**lawsuits (2)**
  20:23;22:10
**lawyer (1)**
  10:9
**lawyer's (1)**
  180:24
**layout (1)**
  65:10
**lead (1)**
  198:2

**leading (2)**
200:9;217:14
**leak (44)**
13:23;29:12;31:15,
22;32:1,5,8;34:21;
35:5,8,13;36:25;
40:20,22,23;43:5;
45:15;56:4,13;62:9,
10;65:25;79:7;120:3;
121:21;125:22;
130:12,16;131:2,2,4,
17,21;133:19;134:10;
140:11;165:23;
184:15,23;192:5;
209:16;210:4,15;
232:19
**leaked (2)**
52:18;145:6
**leaking (26)**
13:25;36:16;48:9,
11;49:4;50:25;53:10;
55:19;58:10,12;
63:12;64:8;66:10;
121:8;122:19,20;
132:11,12;133:21;
145:4;164:22;167:4;
174:5;211:8,16;212:6
**leaks (14)**
13:18;46:24;62:12;
66:22,24;67:14;
147:1,2;160:3,7;
171:12;191:25;192:1;
224:1
**leaky (1)**
26:4
**leaned (1)**
48:17
**leaning (1)**
48:16
**least (1)**
55:10
**leaves (1)**
68:25
**led (2)**
122:23;150:4
**left (23)**
18:7;56:5;67:20;
73:23,23;85:14,19;
86:20;126:3;128:23,
25;150:6;186:13;
200:4,19;204:23;
205:1,5;210:19;
211:5,6,23;213:4
**legal (1)**
59:20
**legitimate (2)**
227:13,17
**Leon (2)**
102:21;103:2
**less (1)**
41:19
**letter (50)**
28:8,19;69:3;70:24;

71:13;72:11;73:3;
77:10,11;89:10,12,21;
90:2;97:19;104:2;
129:1;134:22;135:2,
21;142:10;143:19,22;
144:1,4,6,9;145:11;
147:24;148:3,4;
154:21;162:15,25;
163:12,16;164:18,18;
165:2,6;171:2,4,7,10;
179:23;198:5,12,19;
231:17;232:12,16
**letting (1)**
222:4
**liable (2)**
55:5;59:22
**Life (2)**
18:21;19:4
**light (4)**
7:2,4;32:25;42:18
**likely (2)**
181:17;184:3
**limited (7)**
100:11,14,15,15,18;
156:6,10
**line (29)**
7:1;24:21,22,25;
37:20;51:1,1,10;
55:19,20;56:13;
57:12;62:20,25;63:1,
2,4;64:2,23;91:1;
120:3;121:7,8;123:5;
124:4;209:12,13;
229:6;231:18
**lines (2)**
25:1;39:8
**linoleum (5)**
86:6,9;201:2,3,16
**list (15)**
29:3;80:11,19;
137:15,19,20;170:5,
13,13,17;171:21;
195:10,11;196:4,5
**listed (3)**
181:21;185:4;
193:17
**listen (3)**
126:24;197:13;
198:16
**listening (1)**
197:13
**lists (1)**
184:1
**litigation (2)**
193:23;218:10
**little (18)**
7:21;16:17;28:19;
35:4,11;80:2;83:24;
92:1;103:22;122:1;
149:2;155:19;204:3,
4,14,15;205:22;
222:16
**live (5)**

14:12,17;15:23;
16:5,11
**lived (5)**
12:4;14:8,13;23:2;
87:7
**living (4)**
12:21;14:5;65:12;
218:22
**LLP (1)**
2:15
**located (3)**
20:4;84:24;145:3
**location (1)**
102:20
**log (1)**
144:17
**long (23)**
6:4,5;12:4;14:8,17;
18:3;19:15;20:11;
22:15;36:6;37:6;
64:14;68:3,8,10;79:7;
102:13,13;162:24;
199:13;205:4,24;
218:22
**longer (6)**
27:17,25;197:1,2,
16,17
**long-term (5)**
18:16,17,20;
144:25;224:1
**look (27)**
27:2;33:13;43:9;
60:10;61:7;65:11,14;
69:11;83:5;87:4;
95:20;100:6;115:22;
163:6;168:20;177:25;
187:15;201:10;214:5;
219:18;220:20;
228:23;229:2;230:16;
231:15,24;234:10
**looked (23)**
37:3;50:6,10;70:16;
86:6;95:17;107:4;
121:20;134:16,21;
135:21;136:16;
139:18;144:6;151:23,
24;155:18;156:3,11;
159:2;209:15;230:19;
231:16
**looking (26)**
27:1,8;28:6;34:3,
20;35:2;36:23;41:22,
24;44:23;54:12;
62:18;71:11;75:20;
76:14;95:8;99:7,11;
100:9;103:20;108:17;
137:9;143:9;156:17;
166:24;225:8
**looks (9)**
35:14;50:14;80:5;
93:20;125:23;156:23;
162:10;163:7,11
**loss (28)**

12:14;13:15;30:18;
34:16;40:18;51:17;
69:13;92:19;94:19;
98:4,8;109:18;111:9,
11;127:3;175:23;
176:8,12;177:11;
191:8;197:2,18,20,22;
198:2;232:22,24;
233:3
**lost (5)**
112:1;114:13;
151:1;165:25;212:24
**lot (17)**
9:2;73:7;74:24;
75:2,14;103:5;
115:23;117:20;
120:17;125:6;134:20;
140:5;146:7;180:16;
208:13;214:24;215:2
**lottery (1)**
218:19
**Lowe (1)**
6:16
**L-R-E-G-A (1)**
77:3

---

**M**

**ma'am (33)**
14:7;19:19;25:5;
35:21;41:1;48:13;
50:3;63:7;68:15,17;
75:21;92:14;95:5;
101:15;103:3;107:7,
25;108:19;112:9;
117:18;136:5;149:5;
157:8,23;160:24;
162:13;172:22;
173:23;174:17;184:7;
189:10;192:9,11
**machine (1)**
80:13
**machines (1)**
138:6
**Madam (3)**
23:21;189:25;
192:14
**mail (1)**
179:15
**main (3)**
50:25;67:4,11
**mainly (1)**
97:13
**maintenance (4)**
167:2;190:4,10;
210:5
**makes (1)**
120:16
**making (4)**
29:2;91:24;123:11;
213:13
**man (2)**
49:24;141:17

**many (14)**
25:19;41:13;66:8,
13;85:6;88:16;
109:20;157:3;199:18,
18;202:15,20;203:16;
236:7
**March (3)**
28:10;50:25;151:23
**Marina (1)**
179:8
**Marino (1)**
150:9
**marked (13)**
33:10;65:7;72:8;
79:21;89:7;120:19,
23;142:5;174:22;
181:5,6;187:12;229:3
**Marmur (1)**
2:23
**marriage (1)**
14:25
**married (3)**
14:21,23;15:18
**Mary (1)**
82:23
**master (1)**
65:12
**matter (4)**
9:2;47:17,19;
162:19
**matters (1)**
100:22
**May (6)**
6:11;11:20;46:18;
108:3;181:18;195:2
**maybe (15)**
8:4;9:14;32:15;
36:5;53:10;68:4;
98:13;109:22;130:5;
136:7;153:9;170:11;
205:6;209:21;210:22
**mean (19)**
6:15;29:17;42:17;
46:10;68:20;71:19;
87:12;92:3;104:13;
131:5;154:10;176:1,
3;178:3;187:10;
189:14;194:7;208:7;
213:16
**means (5)**
6:22,25;197:1,17;
229:19
**meant (4)**
7:3;135:16;215:8;
234:10
**measurements (1)**
159:6
**measuring (1)**
159:8
**Mediation (4)**
21:8,17;179:9;
182:6
**Medical (4)**

17:6,6;22:17;
116:14
**medications (1)**
118:16
**meeting (1)**
219:8
**members (1)**
111:8
**memory (3)**
32:4;111:2;114:3
**mentioned (2)**
215:6;225:11
**mentions (1)**
31:5
**mess (2)**
199:13,15
**message (2)**
73:23;150:7
**methodically (1)**
196:16
**Michael (4)**
16:8,9,14;172:13
**Michelle (3)**
9:5;170:2,3
**microphone (2)**
75:7;209:25
**middle (2)**
133:1;143:6
**might (12)**
48:22;51:4;52:21;
61:14;62:3;88:8,12;
96:17;129:3;148:19;
209:19;234:17
**millions (1)**
224:13
**mind (3)**
115:17;184:11;
223:8
**Minor (1)**
12:24
**minute (11)**
55:9;74:6;80:19;
101:10;102:10;115:4;
116:5;161:22;180:16;
190:2;192:17
**minutes (2)**
68:4;151:2
**mischaracterize (1)**
185:20
**misconstrue (1)**
58:8
**misinterpret (1)**
119:6
**misquote (1)**
221:7
**Miss (73)**
6:16,22;7:15;18:1;
22:6;23:18;24:24;
26:23;27:5;28:7,17,
22;29:7;31:14;33:21;
35:20;47:15;50:14;
54:4,20;60:1;74:13;
75:4,4;79:20;81:20;

88:15;89:13;95:24;
103:18;109:2;110:5,
17,23;114:17;115:9,
15;116:11,19;117:3,
10;146:19;154:24;
163:24;165:25;
166:24;170:7;171:4;
174:25;177:12,22;
179:6;184:19;185:23;
187:2;188:5;190:4;
191:2;192:2;193:1;
198:14,16;201:10;
207:24;210:1,22;
211:5,21;214:12;
216:15;218:23;228:6;
234:6
**missed (3)**
114:2,3;200:4
**missing (1)**
76:13
**missummarize (1)**
119:7
**misunderstood (1)**
95:24
**mitigate (5)**
182:2,14;183:6,17;
217:22
**mitigation (6)**
20:16,17;83:12;
86:22,22;183:24
**mixed (3)**
154:14,16,18
**moisture (4)**
85:13;86:17;160:1;
232:21
**mold (87)**
12:11,15;13:19;
14:2;20:16;47:8;52:2,
2,3,8,9,14,24;53:6,12;
57:6;58:4,23,25;59:2,
4,5,12,13;60:6;64:7;
67:4,7,11;69:2;78:21;
79:2;82:9;86:17,22,
25;90:18,22;93:24;
94:18;97:3,6,9,13,14;
98:8;113:3,9,18;
126:16,18,21;127:6,
11,16;130:25;147:10,
20;164:24;168:16,17,
20,23;169:11,16,18;
176:5;178:6,7,9,10;
193:18;207:5,14;
212:12;214:23;215:8,
16,23;216:3,3,12,12,
18,21;217:22;233:12
**mom (1)**
17:4
**moment (3)**
5:20;11:18;208:20
**Monday (8)**
49:17;57:2;64:1;
85:11;113:24;114:16;
119:24;210:11

**money (24)**
81:10,18;82:13,13,
15;84:10;93:24;
94:15,22;95:12;96:2,
4,14;98:20,21;99:23;
108:4;138:11;152:21;
155:24;190:13,19;
196:17;227:22
**month (6)**
18:23;28:15;29:9;
38:4;71:16;208:9
**monthly (2)**
23:12,15
**months (3)**
8:6;145:7;224:2
**mop (1)**
200:3
**mopped (1)**
200:1
**more (20)**
17:8;34:13;41:17;
64:15;69:24;82:7,7;
90:18;91:8;97:24;
98:20;99:14;138:11;
143:17;157:6;201:23;
203:8;204:22;214:8;
226:20
**morning (10)**
31:2;32:11,14,16,
23;36:17;116:15;
129:14,17;205:2
**mortgage (3)**
23:12,25;190:16
**mortgages (1)**
24:5
**most (3)**
5:21;97:13;143:4
**move (3)**
72:19,25;186:12
**moved (3)**
12:6,7;76:12
**much (26)**
7:12;18:22;19:1,6,
9;21:21;22:8;23:15;
30:9;38:1;63:6;79:4,
17;84:17;91:24;92:6;
107:12;109:2;129:21;
136:13;190:16;
201:22;214:14,16;
221:13;224:25
**music (1)**
172:18
**must (1)**
214:23
**myself (1)**
61:16

# N

**name (48)**
9:23;11:23;15:2,17,
18,19;21:1;24:12;
40:7;44:13;49:23;

56:17;60:19;77:2;
82:23,25;83:14;84:3;
87:24;88:6,13;91:12,
15,18;95:5;138:14;
139:9;141:18;145:20;
158:2;169:22;170:6,
10;172:15;173:25;
174:2,11;180:21;
183:4;187:19,20;
191:12;215:6,21;
232:1,5,16;234:11
**named (5)**
57:8;70:1;139:3;
186:5;215:12
**names (3)**
15:16;94:11;95:7
**nature (1)**
7:19
**NE (1)**
2:16
**Neal (1)**
12:24
**near (5)**
63:18;67:17;
171:14;213:16
**need (34)**
24:10;30:6;31:9;
33:8,9;35:3;42:9;
51:12;52:4,5;53:14;
58:23;60:7;93:22;
94:13;96:18;99:14,
15,24;109:3;110:6;
115:6;127:19;137:8;
167:13;168:4,6;
184:4;195:23;201:6;
208:8;212:16;221:8;
235:17
**needed (21)**
44:2,3;45:5;51:9,
25;96:23;97:10;
104:17,19;129:23;
138:12;140:25;141:4;
152:5,11;159:21;
164:17;167:25;
187:24;196:10;221:17
**needs (7)**
96:10;167:12,22;
168:1,7;186:20,22
**Nehemiah (3)**
12:22;13:1,11
**N-E-H-E-M-I-A-H (1)**
13:3
**Neurology (3)**
19:25;22:14,17
**neutral (1)**
100:19
**new (16)**
15:17;45:6,8,8;
130:7;190:23;198:8,
13,13,20;199:1,5,6,6,
20;219:11
**next (24)**
9:9;43:8,9;57:4;

60:12;68:14,18,20,25;
69:1;72:18;79:14,15;
99:7;124:15;130:23;
138:3;148:4;149:19,
24;150:11;153:6;
184:9;212:7
**night (1)**
129:17
**Nobody (6)**
51:10;70:21;90:17,
21;170:8;185:2
**noise (1)**
212:9
**non (1)**
197:9
**nondenial (1)**
197:10
**nonparty (1)**
27:15
**North (5)**
19:25;20:6;22:13,
16;83:21
**Northern (1)**
117:6
**notary (5)**
101:21,22,23;
102:8,25
**notation (1)**
194:7
**note (11)**
28:20;62:24;71:9,
11;74:7,10,12;149:18,
19;162:10;180:3
**notepad (2)**
69:20,21
**notes (29)**
69:11,12;75:9,22,
25;76:2,5;106:3;
112:7,9,13,14,18,20,
24;137:8;144:19;
149:17;150:14,16,20;
151:5,17;155:10,15;
226:14,18,21;227:12
**notice (14)**
5:11;104:2;107:6;
108:17;155:19,23;
156:2,3,11;164:16;
193:25;196:21;
197:15;202:12
**noticed (3)**
48:8,15;210:4
**notices (1)**
193:3
**notification (5)**
136:16;166:25;
179:14,19;231:25
**noting (1)**
164:19
**November (13)**
42:6,14;71:18;
82:18;83:3,24;89:11,
15;90:3;97:18;
135:22;144:12;

Case 1:20-cv-04420-TWT   Document 56-3   Filed 10/27/21   Page 253 of 265

Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

232:13
**number (75)**
28:3;33:14,22;
36:23;38:9,11,12;
39:25;40:13;41:22;
54:9;62:15,18;65:4;
72:7;79:19;80:1;89:6;
90:3;93:19;99:12;
100:10,25;101:5;
103:19;109:23;
110:24;120:23;
121:13,16,19;124:16;
130:6;134:17;136:17;
140:10;142:4;151:21;
157:14;160:3,13;
161:21;162:3,4;
163:6,15;164:19;
166:25;171:3,8;
173:21;174:21;177:6,
25;180:14,15,18,23;
181:1,5;187:15;
189:16,23,24;196:23;
198:24,25;199:1,5;
213:6;214:6;229:3;
230:17;231:16,24
**numbers (4)**
95:6;176:17;181:3;
231:1
**numerous (3)**
43:16;44:18;66:21
**nursing (1)**
17:3

**O**

**Oak (44)**
7:16,20;12:11;
20:20;30:25;51:17,
21;54:7,23;55:4;
59:22,23;72:12;78:7;
89:10;116:11;117:5;
142:12,14,19,21,22;
143:1,6,9,13;164:20;
193:7,13,21;194:8,9,
13,16;230:11;231:9,
20;232:2,6,11,17;
234:7,11;235:1
**Oak/your (1)**
155:7
**oath (1)**
117:11
**object (27)**
21:22;22:23;25:17,
21;30:13,17;31:5,7,
23;35:9;47:11,13;
51:19;59:14;77:18;
110:7;177:4;185:14,
16;188:9;195:18;
198:9;199:7;207:17;
211:9;229:12;230:4
**objection (39)**
5:22,23,25;22:2,5;
51:22;106:17;110:3,

5;115:7;185:21;
195:22;196:19;207:7;
209:9;211:2;213:17,
25;214:9;215:9;
216:4,13;217:14,19,
24;218:6,12;220:2,
16;222:6,10;224:7,14,
22;226:2,7;227:8,19;
234:14
**objections (3)**
5:14;6:10;210:23
**observe (4)**
13:24;14:2;25:16;
64:8
**observed (10)**
25:24;45:1;52:9,14;
59:12;111:15;129:3;
133:19;159:25;160:1
**obtain (2)**
17:19;148:19
**obtained (3)**
24:13;106:25;
148:22
**occupation (1)**
17:25
**occurred (3)**
12:15;31:15;109:25
**occurring (1)**
79:8
**October (65)**
29:10;43:13,25;
45:22;46:23;47:2,5,
17,22;49:17;50:10;
51:18;56:9,23;59:10;
60:13;61:4;64:1,5,19;
67:13;70:5;71:16,17;
72:12;73:24,24;74:4;
76:22;77:9;87:14;
89:21;92:19;119:24;
121:6,22;122:8;
125:22;127:13,24;
128:3;130:11,23;
131:1,12;132:7,15,16;
133:13,14;134:22;
157:15,21;158:23;
175:20;210:11,14;
211:7,23;212:23;
213:4,7,7,8;231:19
**off (22)**
23:13,25;24:2;
26:16;32:18,19;54:4;
58:18;101:12;103:9;
107:11;108:23;
129:15,18;156:18;
163:1;166:19;186:14;
191:13;196:1;203:15;
209:25
**offered (2)**
77:13,25
**office (9)**
20:1,3;27:16;39:24;
101:16;180:21,24;
187:16;188:14

**Off-the-record (3)**
17:23;26:19;
108:24;209:22
**often (2)**
208:9;225:6
**old (6)**
13:10;16:3,9;69:19;
103:5;189:21
**once (15)**
5:19;32:13,14;
80:10,17;81:1,6;88:4;
95:17;127:10,16;
128:14;196:9;208:9;
235:18
**one (115)**
7:6;8:13;17:8;26:6,
9;28:9,9;29:13;30:10,
15,15;31:17;32:22;
34:13;39:17,19,20;
43:8;45:7,8;50:23;
51:8;52:10;54:25;
55:17;56:5;62:7;64:6;
65:18;69:23;70:20,
20,21,21;84:6,11,25,
25;91:8;94:24;97:16;
98:9,16;99:3;102:21,
24;106:6;107:4;
109:24;121:4,4;
122:9,10,11,13,14;
126:7,14;127:12,20;
129:12,13;133:20,21;
134:8,9,11,13,21;
137:17;138:24;
144:16;145:23;149:1;
150:13,25;151:24;
156:2,14,18;165:17,
18;167:21;170:8,13;
175:14;176:4;181:23;
183:3;184:9;189:19,
22;193:5,7,17;195:5;
202:9,22;204:12;
208:13;209:14,14;
213:14,15;216:24;
221:1;226:20;234:3,
10;235:5,22,25;236:6,
6,6
**one-on-one (4)**
150:19;151:13,18;
226:24
**ones (4)**
99:24;183:2;186:4;
196:5
**ongoing (1)**
129:9
**only (22)**
30:18;31:4;52:23;
65:18;75:17;82:13;
86:13;95:11;112:14;
134:13;135:12;
171:11;179:2;183:2;
186:3;210:15;226:14;
231:12,14;232:9;
236:1,3

**ooh (1)**
176:16
**open (5)**
62:1;67:16,19,22;
129:16
**opened (6)**
27:2;56:18;57:5;
58:3;64:6;126:18
**opinion (8)**
77:15;78:1,13;
167:14;168:13,15;
185:12;226:5
**opposite (1)**
234:23
**opted (4)**
179:4,20;193:17;
224:17
**opting (3)**
179:22,25;180:10
**options (2)**
152:15,16
**orange (1)**
204:13
**order (3)**
34:4;121:2;130:9
**organization (1)**
23:12
**originally (2)**
89:19;134:24
**others (3)**
16:7;24:17;51:4
**otherwise (1)**
6:17
**ourselves (2)**
91:2;165:6
**out (268)**
7:7;8:5;9:4,22;
12:6;17:17;23:21;
25:13;26:21,21;
27:22;28:12,15,23;
29:6,10;32:13,20;
33:4,5,6;34:5,9,11,18;
36:1,15,20;39:5,6;
40:19;41:2;42:3;
43:11,24;44:1,14,16;
45:22;47:2,16,19,21;
48:18;49:10,15,16,18,
21;50:10;55:22;56:4,
9,15,22,25;57:1,2,5,
11,22,25;58:24;60:10,
11,12,15;61:6,16;
62:8;63:9,10,24,25;
64:6;65:13;67:12;
68:22;69:4;70:16;
73:14;77:3,14,25;
78:2,10,12,18;79:12,
1,24;83:24,25;84:1,2;
87:10,13,17,19,20,22;
88:4,15,16,20;89:2,
17,24;90:17,21;91:4;
92:5,5,22,23;93:7;
95:2,11,17;98:2,16,

22;99:1,6,9;102:6;
106:15;108:6,11;
109:6;111:3,4,9;
112:16,18;114:19;
116:3;119:19,23;
122:7,12;125:7,21;
126:9,10,11,20;
127:17;128:3;129:18,
20,21,21;130:2,13,24;
131:12;132:7,13;
134:7;135:4,13,25;
137:21;138:3,7,19,20,
22,24;139:2,6,7,8;
140:16,20;141:1,9,10,
14,16,18,23;142:1;
151:2;152:1,14,20;
153:12,14,14;157:10,
12;158:2,5,8,11,13,
14,20,21;160:9,9;
166:17;168:19,22;
169:20;170:17,22;
171:19,22;172:13,17,
21,21,23;173:2,7,24;
174:1,13;175:5,20;
179:4,20,22,25;180:5,
10;183:1,3,3,14,14;
190:16,19;193:17;
194:24;195:4;199:25;
200:1,3,17;203:7,10,
11,13,21;205:11,23;
212:10;219:8;220:23;
221:5,24;222:23;
224:17;228:13,21;
233:11,15,16;236:9
**outside (9)**
48:25;184:25;
200:2,10;202:19;
203:10,15;206:4;
229:9
**over (47)**
8:6;35:22;48:16,16;
66:22,24;72:4;84:19;
92:4,5,21;104:17;
111:12;113:22;114:1,
15,18;119:1;123:19;
124:23;133:13;
136:20,21,25;145:4,6;
146:21;154:19,20;
170:7;171:19;173:1;
184:25;187:23;195:8,
21;196:2;206:21;
207:21;209:16;
210:11,14,24;222:9,
16,20;225:20
**overnight (1)**
206:2
**owe (4)**
81:10;214:19;
217:2,6
**owing (1)**
82:13
**own (3)**
98:2;179:4;219:15

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 254 of 265
Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

**P**

**PACS (3)**
100:15,15;104:4
**P-A-C-S (1)**
104:4
**page (57)**
33:17,25;34:20;
36:23;41:23,24;43:9;
50:6,8,23;54:11,13,
23;62:18;72:19,21,
23;80:1;93:20;99:12,
12;100:9;103:20;
108:17;110:23;121:2,
13;125:19;130:9;
143:7;144:8;151:25;
155:18;156:6,19;
157:13;160:12;161:8;
162:7,9;163:6,14;
166:24;171:3,7;
177:25;181:16;
185:10;194:6,6;
229:3;230:16,17,17,
22;231:1,8
**pages (3)**
33:15;151:24;
180:17
**paid (18)**
23:11,12,25;46:7,8;
96:16;107:12,24;
108:2,3,3;160:17,20;
161:3,4;194:19;
222:15;227:21
**pain (1)**
115:23
**paper (1)**
28:19
**paperwork (10)**
28:18;68:16;100:5,
7;137:9;154:19,20;
156:18;170:16,19
**paragraph (5)**
144:10;176:25;
185:9,21;186:8
**parentheses (1)**
177:14
**part (19)**
5:21;6:6;34:7;42:1;
54:8;91:4;97:3;
178:25;189:17;195:2;
196:12,15;215:25;
216:1,1,1,23;224:10;
227:3
**partial (1)**
148:6
**participate (1)**
219:4
**particular (8)**
20:1;42:13;50:13;
55:15;66:1,3,15;
76:18
**parts (2)**

195:3;235:16
**pass (1)**
192:12
**passing (1)**
70:23
**passion (1)**
5:20
**pay (36)**
24:2;30:9;37:17,18;
38:6;45:25;46:5,8;
81:19;83:4;90:10;
96:4;97:1;107:17,20;
153:15;160:19;161:5,
7;163:17;194:12,12;
195:14;196:8,17;
217:2,6,11,16;218:3,
9;221:15;222:18;
224:6,11;234:25
**paying (3)**
49:10;55:11;220:21
**payment (1)**
144:5
**payments (1)**
23:15
**Peachtree (1)**
2:16
**Peck (1)**
84:3
**P-E-C-K (1)**
84:4
**pencil (1)**
121:23
**pending (2)**
7:24;117:6
**people (27)**
25:18,19;80:11;
82:13;88:16;93:4;
94:21,25;112:15,16,
18,19;137:19;138:14;
141:7;150:22,24;
151:14,19;171:19;
184:2,25;185:3;
186:5;219:13;221:4;
227:12
**per (3)**
18:22;38:4;145:2
**Perimeter (2)**
40:1,2
**period (2)**
145:5,6
**permanent (1)**
19:18
**permitted (1)**
5:9
**person (15)**
21:3;60:11;70:20;
82:21;94:12;95:2;
102:23;112:12;
146:22;163:21,25;
172:17;186:20;212:7;
226:20
**perspective (1)**
70:22

**pertaining (1)**
10:15
**phone (20)**
28:3;38:9,11,11;
94:25;99:15,19;
106:8;112:12;136:21;
137:3;140:3;144:20;
146:21,23;176:18;
180:23;181:1,2;
212:20
**photographs (1)**
92:16
**photos (5)**
173:10,13,14,15,18
**phrased (1)**
110:13
**physical (1)**
90:24
**physically (1)**
42:19
**pick (1)**
94:24
**picked (1)**
85:11
**pictures (3)**
136:5;159:4;189:13
**piece (4)**
28:19;92:4;165:10;
233:8
**pipe (48)**
25:12;26:4,11;
28:12;29:18,21,25;
30:2,7,10,10;32:9;
34:11,14;35:5,8,13;
41:5,14;43:16;44:1,2,
18;48:3,4,22;51:11;
62:9;63:13;66:15;
67:6;129:11;134:7;
146:15;147:10,20;
165:16,23;166:6;
178:5,5,5,7;190:12;
229:9,11,18,22
**piped (2)**
43:15;44:17
**pipes (32)**
29:22;30:11;32:6;
35:23;43:17,18;44:6;
45:4;51:8;63:6;66:8;
174:4,5;220:8,11,14,
20,24;221:3,9,20;
222:4;227:17;228:7,
12,20;229:14,24,25;
230:3,10,13
**piping (2)**
41:7,11
**place (5)**
5:11;14:20;100:20;
140:20;206:22
**Plaintiff (4)**
2:2;5:7;192:24;
234:4
**Plaintiff's (3)**
181:9,13;182:2

**plan (1)**
65:10
**playing (1)**
172:18
**pleadings (1)**
10:18
**please (28)**
8:8;23:17;26:17;
28:22;32:1;40:6;
51:21;58:9;70:9;
74:14;81:21;85:25;
91:13,16;103:11,13,
24;110:10;115:20;
118:13;119:8;185:20;
187:5;192:14;197:13;
198:16;226:12;
235:12
**pleasure (1)**
219:7
**plumber (13)**
98:7;119:16;
122:12;173:24;174:1,
3,7,9;209:6;211:5,6,
23;213:4
**plumbers (3)**
52:10,11;209:3
**plumbing (41)**
20:14;42:2,14;
43:10,24;44:14;
45:12;47:1;49:19,22;
50:7,16,18,24;52:12;
55:15,17;56:9,20;
57:9,22;62:20;63:8,
25;64:17;65:25;
119:19,23;120:7;
125:21;127:13;
131:11;132:6;164:21;
171:24;173:15;
175:20;191:20;
228:13,21;229:5
**plus (3)**
177:1,15;178:12
**plywood (3)**
165:11;171:14;
233:8
**pm (6)**
103:15,16;116:6,7,
20;236:12
**PO (1)**
38:20
**pocket (1)**
81:18
**point (12)**
63:10,12;82:12;
85:17;98:6,6,9;
138:24;144:9;149:1;
157:12;214:7
**policies (1)**
216:3
**policy (33)**
54:12;101:4;
142:23;143:5,13,15;
145:7;164:12,14,19;

194:2;197:8;198:6,7,
8,12,13,20,23,25;
199:1,2,4,6,11;215:7,
23;216:11,24;220:19;
230:18;231:12,14
**poly (1)**
229:7
**polybutylene (18)**
29:21;30:2,7;41:7,
14;43:15;44:8,18;
51:1;66:15,17;
228:12,20;229:11,14,
18,22,24
**Ponce (2)**
102:21;103:2
**popped (1)**
34:12
**porch (1)**
203:15
**portions (5)**
145:2;235:22,25;
236:1,3
**position (2)**
22:16;227:5
**positions (1)**
227:4
**possibility (2)**
106:5,22
**postjudgment (2)**
177:3;178:14
**power (6)**
100:11,14,18;
156:3,6,10
**prayers (1)**
218:15
**prejudgment (2)**
177:3;178:14
**Premier (1)**
40:9
**P-R-E-M-I-E-R (2)**
40:3,8
**premium (1)**
216:11
**preparation (2)**
10:5;11:6
**prepared (1)**
137:24
**Present (6)**
2:22;61:1;86:25;
129:2;158:10;186:19
**presented (1)**
144:11
**president (1)**
219:11
**pressure (16)**
43:13;44:3,4,5;
45:3,5,6,6,9,21;221:2,
8,10,21;222:2
**pretty (1)**
225:6
**prevent (1)**
118:17
**preventative (1)**

167:2
**preventing (1)**
114:20
**previous (7)**
19:3;67:14;126:2;
144:1,6;152:23;154:1
**previously (8)**
22:10;90:16;96:1;
107:4;132:1,4;
134:16;154:11
**printed (2)**
101:12;102:3
**prior (10)**
14:11;22:13;47:2;
70:25;89:15;137:1;
141:7;147:1,2;162:22
**privilege (1)**
6:2
**probably (6)**
9:3;27:2;54:16;
57:8;73:8;226:20
**problem (6)**
55:21;115:9;121:9;
127:6;220:5;236:8
**Procedure (1)**
5:10
**process (1)**
203:16
**procure (1)**
27:19
**produce (1)**
10:23
**produced (9)**
10:22,24;33:16;
35:3;42:2;54:10;
130:8;151:22;179:3
**Professional (1)**
104:3
**progress (1)**
225:4
**prompted (7)**
18:5;51:16,24;52:7,
21;57:18;125:16
**pronounce (2)**
77:2;180:21
**proof (1)**
163:17
**property (9)**
22:20,25;23:5,8;
24:5,7;28:12;87:11;
167:2
**propose (1)**
5:13
**Protect (24)**
24:16;35:25;36:1,4,
6,17,18,20;37:7,11,
16,22,23;38:2,8,20,
24;39:2,4,8;43:18;
59:5;141:12,13
**Protection (1)**
24:14
**protects (1)**
37:23

**proud (1)**
219:17
**provide (8)**
28:7;77:15,25;
78:14;145:8;152:9;
173:8;185:12
**provided (4)**
84:7;85:7;94:23;
99:4
**provides (1)**
142:23
**providing (2)**
137:13;138:11
**proxy (1)**
100:20
**public (8)**
102:8;104:22;
105:25;153:23;154:2,
9,12;155:8
**pull (2)**
176:18;187:11
**pun (1)**
166:8
**punitive (2)**
177:2;178:13
**purchase (6)**
23:5,7;193:12,12;
223:15,18
**purchased (5)**
22:20,25;24:7;
216:20;223:20
**purposely (1)**
196:16
**purposes (2)**
5:8,9
**pursuant (1)**
5:11
**push (1)**
115:11
**pushing (1)**
200:2
**put (38)**
7:5;9:17;10:10;
28:20;45:6;73:8;
80:13;81:1;82:19;
83:9;92:4,5;122:7;
124:10,12;128:14;
129:21;132:22;138:5;
140:16;141:13;
151:21;165:10;
171:13;183:14;
187:23;190:13,22;
192:13,15;203:1,7;
205:14;220:19;221:2,
3,11;235:21
**putting (3)**
22:2;86:21;233:7

**Q**

**qualifications (1)**
6:12
**quit (1)**

19:24
**quote/unquote (1)**
59:17

**R**

**rack (1)**
48:15
**raining (3)**
48:25;63:18,22
**RALPH (13)**
2:3;5:13;29:3;
59:21;116:16;120:9;
136:11;162:1;166:9;
174:15;177:7;186:16;
212:24
ralphjvillani@gmailcom (1)
2:10
**ran (2)**
7:6;219:11
**rather (2)**
115:18;209:12
**reach (1)**
99:8
**reached (2)**
99:1;152:1
**read (17)**
6:20;35:10,18;40:6;
43:22;45:19;94:2;
120:17;145:9,10,14;
152:7;154:19;164:25;
165:1;170:3,4
**reading (1)**
72:25
**readings (1)**
85:13
**ready (1)**
11:11
**real (1)**
235:9
**realize (2)**
206:16,20
**really (13)**
53:22;59:17;68:8;
78:15;107:25;114:24;
116:1;169:12;177:17;
196:7;201:1;219:12,
12
**reason (18)**
7:5;8:7;43:2;67:6;
78:20;81:3;98:19;
113:16;150:20;
151:12;185:24;
213:13;220:24;221:1;
226:1,5,18;227:3
**reasonable (3)**
226:1,4,5
**reasons (1)**
98:16
**recall (42)**
21:1,12;32:7;34:16;
39:9;41:14;47:1;63:3;
71:10;73:19;82:21;

83:16;84:4;87:9;
89:12;107:3,8;135:8,
11;137:3,4,12;138:2,
18;139:9;148:12,20,
21,24,24;149:14,16;
155:6,14;156:7;
171:18;206:1,3;
214:8,12;228:14,25
**receipts (1)**
92:2
**receive (11)**
18:22;19:2;71:13;
72:17;73:3;143:19;
158:23;179:14;
193:24;198:20;199:4
**received (20)**
19:9;73:10,12;90:2;
102:2;110:25;143:23;
145:11;147:24;155:4;
160:25;163:15;
164:16;194:19;
196:21;197:6,15;
198:19;224:20;
231:13
**receives (1)**
235:20
**receiving (5)**
18:14;19:15;89:12;
106:8;137:1
**recently (3)**
15:18;39:12;207:15
**Recess (4)**
54:1;103:15;116:6;
166:20
**recognize (1)**
72:11
**recommend (4)**
29:23;43:16;62:25;
229:7
**recommended (4)**
44:7;140:23;195:5,
9
**reconvened (1)**
117:3
**record (21)**
5:6;7:16;9:17,24;
11:22;22:3;26:16;
46:10;54:4;59:19;
73:9;108:23;109:1;
116:9;117:2;121:12;
151:15;166:19,22;
170:4;175:6
**records (5)**
26:10;35:24;57:21;
174:18;190:24
**recover (2)**
55:5;173:4
**recoverable (1)**
136:1
**red (1)**
7:3
**redirect (1)**
31:10

**redo (2)**
18:9,10
**reducing (1)**
43:18
**reference (1)**
117:4
**referencing (2)**
122:16;182:7
**referred (3)**
93:15;163:2,4
**referring (2)**
161:18;168:25
**reflect (3)**
5:6;59:19;117:2
**reflects (1)**
8:20
**refresh (2)**
32:4;111:2
**refrigerator (25)**
32:10,22;35:6,15;
36:16,25;37:24;
123:8,10,13;124:6,8,
10,11,19,23;125:9;
129:13;130:13,18;
132:17,21;140:12;
165:19;168:7
**regard (4)**
69:1;90:18;112:15;
148:17
**regarding (35)**
6:10;7:19;12:11;
13:18;26:10;32:6;
36:24;51:3;69:12;
72:15;76:25;89:11;
100:13;105:19;106:9;
112:7,20,24;137:5;
148:6;149:20,24;
150:4;155:10,12;
164:17;167:1;170:16;
171:2,4;180:10;
185:13;187:4,7;
190:24
**registered (2)**
27:17,18,25;28:2
**registration (1)**
27:22
**regulator (2)**
221:9,11
**reimbursed (2)**
107:23;108:4
**reinspect (2)**
77:14;135:5
**reissue (1)**
198:12
**relationship (1)**
78:6
**relief (1)**
218:15
**relight (1)**
42:15
**relighting (1)**
50:8
**remained (1)**

232:22
**remaining (1)**
    90:11
**remarried (1)**
    15:11
**remediation (5)**
    84:8;182:1,11,12,
    17
**remember (89)**
    14:18;15:19;21:6;
    22:15;31:18;34:5;
    35:21;37:8;41:1,2,4;
    42:23;49:23;55:14;
    60:15;62:16;69:10;
    71:5;7;74:9;76:16;
    82:25;83:1,14;87:20,
    24,25;88:14;92:1,6,
    10,15;94:11;95:5;
    102:17;106:2,8,11,12,
    18,20,21;107:2,11;
    108:14;111:17;112:5;
    113:7,10,13,14,21,23;
    114:13,14,15;118:21;
    128:20;130:3,4;
    137:10,11;138:23;
    139:2,3,6;145:24;
    146:1;155:9;157:5,9;
    158:1;169:21;170:6,
    19;172:22;173:12,24;
    174:2,11;183:4;
    190:22;191:23;197:3;
    198:15,15,22;212:21;
    215:6
**remembered (1)**
    9:15
**REMOTE (1)**
    2:1
**remove (2)**
    85:20;86:2
**removed (2)**
    41:10;86:15
**Renata (3)**
    101:14;102:22,23
**renew (1)**
    197:10
**renewal (1)**
    28:8
**repair (15)**
    30:9;51:1,2;62:19;
    63:3;79:5;83:12;97:7;
    135:24;165:9;169:20;
    170:23;197:25;
    217:16;227:22
**repaired (17)**
    43:16;44:18;55:20;
    63:4;64:1;121:8;
    163:18;165:20,21,23,
    24;167:8,10;168:1;
    197:20;209:12;
    210:15
**repairs (8)**
    24:9;90:25;91:25;
    92:18;167:25;171:11;

191:11;233:7
**repeat (19)**
    23:17;24:23;38:13,
    15;74:14;75:7;81:21,
    23,24;90:20;108:9;
    147:14;151:3;161:25;
    169:24;187:5;201:7;
    207:24;230:20
**rephrase (4)**
    8:9;110:10;111:22;
    192:4
**replace (6)**
    44:8;63:1,6;220:8,
    10;222:1
**replaced (16)**
    30:2;7;41:10,10;
    42:5,10,20,21,22,24;
    43:1;45:20,21;63:2;
    168:6;221:21
**replacement (5)**
    43:17;62:25;63:5;
    217:17;229:8
**replacing (1)**
    30:4
**report (16)**
    51:17;69:2;79:10;
    127:2;129:24;157:15,
    21;158:24;159:23;
    161:11,18;167:3;
    222:24;225:16;
    232:24;233:5
**reported (3)**
    55:23;118:22;
    175:24
**reporter (12)**
    6:12,16;8:14,20;
    9:5;23:22;60:18;
    110:2;189:25;192:14;
    201:6;235:13
**reports (2)**
    186:20;223:8
**represent (4)**
    33:14;54:6,6;175:2
**Representatives (1)**
    172:1
**request (8)**
    38:23;88:18;93:5,6,
    6,8;158:20;173:7
**requested (2)**
    36:20;170:4
**requesting (1)**
    21:22
**required (1)**
    186:21
**requiring (2)**
    164:20;167:1
**rescheduled (1)**
    116:12
**research (2)**
    144:24;145:13
**reserve (2)**
    6:21;235:10
**reserved (2)**

5:14;235:7
**reset (3)**
    115:7,19,21
**reside (2)**
    12:2;16:14
**residing (1)**
    12:18
**respond (1)**
    210:23
**responding (2)**
    8:11;152:16
**response (10)**
    8:20,21;19:4;47:11;
    57:22;130:24;154:8;
    171:6;179:18;228:22
**responses (1)**
    8:17
**responsive (1)**
    47:12
**responsiveness (3)**
    5:16;188:10;195:18
**rest (2)**
    38:16;98:2
**Restoration (1)**
    135:8,11
**restricting (1)**
    198:6
**restrictions (2)**
    198:13;199:6
**result (4)**
    165:22;168:1;
    176:8,11
**retain (1)**
    162:18
**retained (2)**
    162:25;185:11
**retainer (7)**
    104:2;107:6;
    108:17;155:19,23;
    156:2,11
**review (3)**
    10:6,8;137:8
**reviewed (2)**
    10:9;11:3
**rewrite (1)**
    198:8
**RICO (2)**
    177:3;178:13
**rid (1)**
    206:13
**right (196)**
    6:21;8:2;9:11,20;
    10:13;13:17;14:4;
    18:8;22:19;23:3,3,14;
    27:9;28:11;29:7,11;
    31:11;33:22;35:1,7;
    36:2;39:2,3;40:2,18;
    41:21,25;42:7,8;43:8;
    46:24;47:18;48:9;
    52:9;54:22;56:19;
    57:10;61:4,19,21;
    62:24;63:5,16,24;
    64:2,11;65:2,14,21;

66:3,5,10;67:20;71:2;
    72:6,21;74:11;76:13;
    77:8,10;78:25;79:12;
    80:25;83:7;87:14,15;
    88:20;89:4,21;91:3;
    93:18;94:20;95:14;
    97:18;98:5,8,17;99:5;
    100:6,9,24;105:10;
    107:11;108:21,25;
    110:21;111:5;113:21;
    114:4,12,23;116:18;
    117:13;118:8,10;
    119:25;121:10,11,23;
    122:3,4,6,6,8,9;123:1,
    4,9,11,21,23,25,25;
    124:1,5,6,8,15,21;
    125:1,1,3,4,6,24;
    126:5,15,22;127:14;
    128:2;130:11;131:7;
    132:18;133:4,5,6,9,
    10,11,15,17,22;
    134:16;135:23;
    136:18;137:21,23;
    139:16;144:6,7,19;
    146:24;148:4;152:2,
    25;155:1,17;156:18,
    24;157:13;162:13,16;
    163:1,13;164:12;
    165:11;166:2,9;
    171:24;172:4;173:20;
    174:20;175:21;
    177:24;179:9;180:19;
    182:19;183:7,12;
    184:9;185:9;189:9;
    191:13;192:2,7;
    200:11;204:20;210:3;
    211:2;214:2,22;
    215:15;231:1,13;
    233:3;235:5
**right-hand (2)**
    41:25;136:6
**Rodriguez (1)**
    101:24
**Roe (1)**
    179:7
**role (1)**
    155:13
**roles (1)**
    104:25
**room (9)**
    7:6;65:12,13;
    125:12;200:7,8,12,24;
    201:17
**rooms (1)**
    200:9
**Roswell (1)**
    20:5
**rot (3)**
    216:17,18,21
**rotate (3)**
    55:13;80:2;121:5
**rotted (2)**
    91:4;145:1

**RPD (1)**
    27:15
**rude (1)**
    8:19
**Rule (1)**
    186:22
**Rules (1)**
    5:9
**runaround (1)**
    70:20
**running (36)**
    49:5,6;52:22;57:23;
    58:19;61:9;62:11;
    64:22;69:20;111:15;
    116:2;119:14;122:21,
    22;125:15;126:3,24;
    128:5,8,11;131:25;
    140:11;144:17;
    175:16,19;178:8;
    208:5,16,19,22;209:4;
    210:19;211:25;212:3,
    8,9
**rushing (2)**
    55:23;67:8

                    **S**

**Safety (2)**
    187:17;188:14
**Sales (4)**
    42:2;50:7;228:13;
    229:5
**same (37)**
    8:24;27:21;39:18;
    45:22;56:19;57:17;
    59:12;64:13;71:16;
    101:19;118:2;119:1;
    125:19;126:10,12;
    131:10,15;132:3,16;
    134:8;140:13;143:25;
    144:5;154:16;160:10;
    162:6,7;178:11;
    198:23,25;201:7;
    203:19;217:19,24;
    218:6,12;226:7
**Samuel (3)**
    16:2,3,14
**Sandra (3)**
    11:24;12:17;15:13
**S-A-N-D-R-A (1)**
    11:25
**Santos (1)**
    101:14
**Sari (1)**
    2:23
**sat (4)**
    48:19;119:13,13;
    209:1
**Saturday (3)**
    48:7;49:1;56:10
**Savannah (1)**
    27:22
**saw (14)**

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 257 of 265

Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

36:15;48:16,20;
52:1;89:20;118:3,3;
121:3;133:20;134:2,
6;188:1;189:16;
209:14
**saying (19)**
38:5,25;40:2;96:11;
97:14;99:14;110:5,8;
128:12;143:8;153:24;
154:12;176:14;
179:21;197:16;
215:24;223:25;224:3;
232:10
**scared (1)**
81:9
**scent (2)**
214:25;215:3
**schedule (1)**
60:9
**school (5)**
16:19,19,21;17:5;
142:2
**schools (1)**
17:1
**scope (1)**
21:24
**SCOTT (95)**
5:1,2,8;6:22;7:15;
9:25;11:24;12:18;
15:4,5,13;16:2,8;
18:1;22:6;23:18;
24:24;26:23;27:5;
28:7,17,22;29:7;
31:14;33:10,21;34:2;
35:20;45:18;47:15;
50:14;54:4,20;60:1;
65:7;72:8;74:13;75:4,
4;79:20,21;81:20;
88:15;89:7,13;95:24;
103:18;109:2;110:5,
17,23;114:17;115:15;
116:19;117:3,4,10;
120:19;142:5;144:12;
146:19;154:24;
161:12;163:24;
165:25;166:24;170:7;
174:22,25;177:12,22;
179:6;181:6;184:19;
185:23;187:2,12;
188:5;190:4;191:2;
192:2;193:1;198:14,
16;201:10;207:24;
210:1,22;211:5,21;
214:12;216:15;
218:23;228:6;234:6
**Scott's (2)**
115:9;116:11
**scrap (1)**
28:19
**screen (9)**
33:7,20;65:5;72:7;
79:20;103:18,21;
134:17;174:25

**screw (1)**
29:19
**screws (2)**
18:8,8
**second (16)**
54:22;72:5,21;
79:18;83:8;100:7;
121:4;133:2;140:10;
143:7;166:19;176:20;
194:6;210:23;226:12;
236:6
**Secretary (3)**
27:16,16;28:1
**Security (3)**
18:14,25;19:16
**seeing (2)**
25:20;201:11
**seeking (3)**
173:4;176:7,10
**selected (1)**
80:19
**sell (1)**
197:21
**send (10)**
27:14;33:5;77:25;
79:13;148:18;179:21,
23,24;180:6;194:12
**sending (3)**
120:10;162:14;
163:11
**senior (1)**
5:19
**sent (40)**
33:6;49:18;63:25;
71:15;73:4;77:1,1;
80:10,11;87:19;
89:24;93:21;95:20,
22;101:13;119:19;
120:6;121:1;128:25;
135:16;138:1,1,20,21;
145:16;160:14;
162:10,25;163:8;
172:13,21;179:23;
182:2;183:3;196:4;
198:5,11;212:10;
221:24;222:15
**sentence (2)**
94:7;178:11
**separate (4)**
20:9,10;35:7;
123:14
**September (27)**
12:16;30:19;31:1,
16;48:5,9;49:1,13;
56:10;57:18;62:11;
63:17;87:6;111:15;
119:12,20;125:16;
171:20;175:4,15;
180:2;208:3;213:6,7;
228:13,22;229:5
**September/October (1)**
206:5
**Serv (1)**

82:1
**S-E-R-V-E (1)**
39:19
**service (19)**
24:22;25:1;28:8;
34:4;36:25;38:24;
42:3;49:11;50:7;
62:20,25;63:1;104:4;
121:2;130:9;228:13,
21;229:5,6
**Services (4)**
42:14;96:17,17;
107:13
**ServPro (60)**
80:16,19;81:15;
82:2,17,22;83:4,13,
20;84:13,17;85:5,8;
86:2,20;90:10,22;
92:12;94:20;95:14,
15,16,20;96:2,16,21,
23;98:17,18,19;
112:25;137:18,19,21;
138:2,5,15,19;140:17,
18,19;141:21;145:2;
150:4;172:4;173:7,
10;183:14,23;195:4,4,
8,11,16,21;196:2,6,8,
10,13
**set (4)**
141:9,10;200:3;
205:22
**settle (4)**
21:16,19;22:8;
189:4
**settled (2)**
188:21;224:12
**settlement (3)**
21:21;179:10;
180:10
**several (5)**
8:5;144:24;150:24;
151:18;195:11
**shake (1)**
8:17
**shape (1)**
115:24
**share (5)**
33:7,20;72:7;83:10;
103:18
**shared (1)**
133:16
**sharing (1)**
125:9
**sheet (2)**
6:25;171:14
**Sheetrock (3)**
85:20;86:2;90:25
**sheriff (1)**
27:23
**Shop (1)**
203:22
**Shop-Vac (11)**
202:6,8,9,13;

203:23,24,25;204:2,
25;205:4,9
**Shop-Vacs (2)**
202:9,20
**Shortly (3)**
45:11;76:7,8
**show (22)**
50:5;51:20;54:8;
61:12;65:3;72:6;
79:19;83:20;89:5;
120:8,22;130:6;
142:3;155:17;156:19;
157:13;160:12;161:8;
170:14;174:20;181:4;
229:2
**showed (9)**
61:14,17;62:2;
78:17;107:10;133:21;
134:6,8;196:24
**showing (3)**
110:23;136:17;
189:12
**shown (2)**
54:16;196:22
**shows (4)**
55:16;98:13;
143:13;180:4
**shushed (1)**
7:7
**shut (2)**
32:18,19
**sick (3)**
103:6;113:22;114:1
**side (12)**
41:25;67:20;
123:15,18;124:22,24,
25;125:1;132:12;
133:7,11;136:6
**sign (5)**
6:20;101:21,24;
142:20;235:20
**signature (8)**
100:10;101:23;
104:5,7;231:18,18;
235:7,11
**signatures (2)**
102:7;107:5
**signed (11)**
100:5;101:12;
102:3;104:11,15;
108:16;142:20;
155:20;156:9,12,16
**signing (4)**
6:14;107:3,8;156:7
**Silver (1)**
174:12
**single (1)**
33:17
**sink (6)**
98:1;132:17;
133:20,23;134:1,12
**sinking (2)**
164:22;165:3

**sit (6)**
41:13;53:9;63:21;
225:19;227:15;234:6
**sits (2)**
48:15;124:19
**sitting (9)**
39:9;90:16;122:23;
123:9,15,25;171:11;
206:18;233:6
**six (2)**
203:17,18
**sketch (4)**
65:3;121:19;
130:15;131:10
**slept (1)**
114:5
**slow (1)**
228:17
**slowly (2)**
75:6;170:11
**small (1)**
134:18
**smaller (2)**
80:2;204:5
**smell (1)**
214:23
**smelled (4)**
57:5;59:13;64:7;
126:16
**smells (1)**
58:4
**snooped (1)**
61:15
**soak (1)**
202:8
**soaked (1)**
203:4,5,8
**Social (3)**
18:14,25;19:16
**solely (1)**
181:19
**somebody (39)**
33:2,5,6;56:14;
60:9;68:22;69:15,18;
75:23;76:10;77:1,14,
25;79:14;84:9;87:16,
22,23;88:1,22,24;
89:24;97:4;113:18;
129:18;139:3,20;
150:23;152:19;
169:21;170:22;180:6;
184:20;186:18;
197:22;215:6,7,12;
227:6
**somebody's (1)**
209:17
**someone (13)**
69:25;78:2;87:10,
19;88:4;101:15;
152:17;168:21;
169:16;170:5;172:15;
179:25;212:10
**sometime (3)**

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 258 of 265

Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

106:12;174:14;
208:3
**sometimes (3)**
9:1;214:24;215:2
**somewhere (2)**
114:13;172:19
**son (1)**
219:12
**soon (3)**
116:19;221:6,7
**sop (1)**
202:24
**sops (1)**
202:10
**sorry (50)**
15:8;23:20;26:20;
27:20;28:16;30:21;
40:14;53:23;54:17;
56:3;69:23;70:10;
71:6;72:2;75:7;81:13;
90:19;91:14,18;
95:23;102:10,12;
103:4,4;108:20;
114:18;115:23,25;
147:14;151:2;163:23;
164:4;165:25;170:9;
174:18;177:9;180:8;
191:15;196:22;
201:13;207:8,9;
212:20;213:1;215:1;
217:3;219:13;228:1;
235:8;236:2
**sound (9)**
52:22;63:20,22;
64:3,13,22;108:22;
131:25;156:24
**sounded (1)**
48:25
**sounding (1)**
61:21
**sounds (2)**
166:6,6
**sources (1)**
19:20
**space (3)**
67:16,17,19
**span (1)**
213:8
**speak (14)**
8:6;44:12;73:16,17;
74:10;75:6;76:21;
99:21;109:17;111:8,
11;148:8;150:21,21
**speaking (6)**
73:19;76:7,16;84:4;
146:1;148:12
**speaks (1)**
177:1
**specific (2)**
67:1;70:8
**specifically (1)**
173:3
**specified (1)**

100:22
**speculate (1)**
230:5
**spell (6)**
10:3;13:2;40:7;
60:19,20;170:11
**spend (1)**
91:24
**spent (1)**
120:11
**spoke (36)**
11:13;34:22;69:22,
25;73:18,21;74:7,8,
15;75:23;76:10,22;
77:9,11;82:21;94:12,
21;99:22,22;102:24;
112:19;135:3;145:24;
148:1;149:24;150:1,
3,15,24;153:22;180:7,
7,9;207:21;226:14,21
**spoken (1)**
142:24
**spouse (1)**
15:3
**squeegee (5)**
32:13;141:6;
199:23,24;203:20
**squeegeed (4)**
32:20;199:25;
200:1;203:9
**squeegeeing (4)**
200:14,15;203:20,
21
**squeeze (1)**
136:7
**squeezed (2)**
141:6;203:9
**SSDI (1)**
19:9
**stack (2)**
10:23;11:2
**stamped (2)**
34:2;45:18
**stand (1)**
10:1
**standing (1)**
123:24
**stands (2)**
195:22
**standstill (1)**
82:11
**start (1)**
36:3
**started (10)**
7:16;9:20;39:10;
116:14;133:24,25;
134:4,11;147:4;
172:18
**starting (2)**
16:18;114:23
**state (9)**
5:24;17:7,13,14,15,
20;27:17;187:17;

188:15
**statement (5)**
46:12;83:23;
147:15;185:15;198:2
**statements (1)**
84:7
**States (1)**
117:7
**State's (1)**
27:16
**status (4)**
69:6;70:15;106:9,
13
**stay (2)**
77:22;85:7
**stayed (4)**
138:7;205:25;
206:2;224:21
**step (1)**
149:24
**Stephanie (3)**
101:24;102:14,25
**steps (1)**
68:14
**still (33)**
14:4,23;37:12,13;
41:21;56:5;57:13,15,
23;61:9;69:7;82:12;
86:18,25;103:19;
117:11;126:2;128:5,
7;130:19;149:25;
167:10;168:16;
197:20;205:5;210:18;
211:6,7,16,25;212:3,
6;223:7
**stipulate (1)**
6:11
**stipulations (1)**
5:14
**stop (9)**
18:5;64:3;77:8;
83:10;110:6;115:1;
175:19;204:24,24
**stopped (7)**
42:11;43:3;131:22,
25;167:4;171:13;
206:9
**stove (2)**
37:24;124:23
**Street (5)**
2:16;12:5;14:5;
40:7;63:15
**stricken (1)**
6:7
**strike (1)**
222:14
**stuck (2)**
82:10,11
**studs (2)**
85:21;90:25
**stuff (9)**
69:17;71:15;76:13;
82:8;114:11;116:2;

202:25;204:4
**stupid (1)**
146:10
**subfloor (1)**
145:3
**subflooring (1)**
206:17
**subfloors (1)**
159:25
**Subject (1)**
22:5
**submitted (2)**
152:10;186:20
**sue (1)**
20:25
**sued (1)**
21:5
**suggest (2)**
30:1;127:15
**suggested (1)**
127:13
**suing (1)**
176:13
**suit (4)**
21:9;216:2;223:13;
230:18
**Suite (6)**
2:7,17;40:1,3,11,15
**Sun (2)**
18:21;19:4
**supervisor (1)**
70:18
**supply (6)**
55:19;56:13;57:12;
64:2;120:3;121:7
**support (2)**
181:19;184:4
**supposed (5)**
53:2;147:12,21;
233:1,2
**Sure (62)**
6:15,15;8:19;11:15;
13:22;14:1;16:6;
21:14;25:5;28:21;
31:18;32:9,21;35:22,
23;36:11;41:16;
52:19;56:7;59:18;
61:20;68:10;71:14;
72:3;73:18;75:20;
78:15;86:12;87:1;
90:20;92:14;101:11;
103:14;109:9,23;
110:19;113:10;119:2;
138:20;140:8;144:16;
145:23;149:13;153:7,
9;156:14,17;157:8;
159:7;162:20,23;
168:23;171:22;
173:11,17,19;175:13;
180:20,24;183:8;
187:9;227:11
**surgery (2)**
18:7,9

**swim (1)**
98:1
**switch (1)**
93:3
**sworn (1)**
5:3

## T

**tad (1)**
192:22
**Tahresa (2)**
101:17;102:22
**T-A-H-R-E-S-A (1)**
101:17
**talk (26)**
33:18;52:4,5;58:24;
69:14,18;70:12,17;
74:18;75:16;76:23;
96:16;111:14;127:20;
136:24;143:18;
146:10,11;147:2;
153:21;159:15,18;
178:23;226:20,23;
227:1
**talked (41)**
11:12;22:19;39:1;
50:23;62:10;64:5;
77:10;87:13,21;
89:23;90:9;94:10,16;
96:24;97:20;113:15,
16;119:2;128:1;
129:7,7;134:24;
137:21;143:12;
144:20;149:2,22;
150:23;151:16;
152:23;153:13,17;
170:7;171:5;178:1;
179:24;180:6;183:9;
226:25;229:15;235:6
**talking (30)**
31:24;47:20;66:6;
70:25;82:1;85:22;
94:8;96:20;110:6;
113:25;121:1;130:12;
133:2;137:10;140:8;
150:19,23;151:12,13,
14,15;161:24;186:1,
4;191:1,9;192:6;
201:7;210:24;213:23
**tank (5)**
125:25;190:20,23;
202:12;204:1
**tape (1)**
159:8
**taped (1)**
86:7
**technical (1)**
17:1
**technician (4)**
44:13;55:18;
126:12,15
**Technology (1)**

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 259 of 265
Janice Scott v.
The Charter Oak Fire Insurance Company
Part 1 (7-28-21) Part 2 (8-10-21)
Janice Scott
July 28, 2021

166:2
**Teitelbaum (30)**
60:17;61:2,6,12;
67:12,23,25;68:1;
76:18;87:13;88:19;
106:9;128:2,7;
130:22;133:18;134:2,
10,23;136:20,22,24,
25;138:23,25;139:14;
148:15;149:15;
215:19;231:17
**T-E-I-T-E-L-B-A-U-M (2)**
60:19,22
**telephone (3)**
152:24,25;180:15
**teller (1)**
102:23
**telling (7)**
50:21;137:12;
155:6,9;165:9;
195:20;196:25
**tells (1)**
79:13
**temperature (1)**
206:3
**ten (2)**
64:15;204:9
**tendency (1)**
220:14
**tender (1)**
177:5
**ten-minute (4)**
53:21,22,25;103:12
**Tennessee (1)**
40:4
**tentatively (1)**
116:12
**term (1)**
184:12
**terminate (2)**
198:7,12
**test (1)**
233:11
**testified (14)**
5:5;30:18,20,23;
31:1,15;58:7;90:17;
96:1;135:3;154:11;
208:3;228:10,18
**testify (2)**
5:3;185:19
**testifying (1)**
31:9
**testimony (10)**
6:7;58:8;98:10;
110:11;119:7,11;
126:2;154:1;171:21;
211:17
**testing (1)**
232:21
**Thanksgiving (5)**
82:18,20;84:2;
85:12;138:8
**thereafter (2)**

76:7,8
**thinking (2)**
103:4;143:10
**third (2)**
144:10;236:6
**though (3)**
49:24;103:22;189:6
**thought (19)**
32:17;48:22;55:10,
11;61:14;62:3;95:16;
96:1;98:18,21;105:3;
115:10;143:9;146:17;
154:15;185:25;207:9;
232:8;235:2
**Thrash (1)**
117:6
**three (7)**
27:23;109:22;
199:20;208:23;
235:20,24;236:4
**throughout (6)**
44:8;66:17;145:3;
164:23;165:14;
211:16
**tile (1)**
85:21
**Tiller (4)**
91:7,10,11,21
**T-I-L-L-E-R (1)**
91:10
**timeline (1)**
208:2
**timer (1)**
68:6
**times (18)**
8:5;25:19;27:24;
41:13;43:16;44:18;
109:20;157:3;202:15,
17;203:16,18;204:19;
205:11,15,17;208:11,
14
**today (23)**
7:18,22;8:16;10:6;
11:17,19;28:25;
31:14;39:10;41:13;
90:16;98:10;102:13;
114:9;115:16;117:19;
118:13,20;171:11;
192:8;227:15;233:6;
234:6
**together (8)**
10:10;28:20;65:2;
76:15;103:7;116:2;
235:22,25
**toilet (49)**
48:16,19;53:9,10;
61:10,13,18;62:4;
63:19,22;66:5,7,11,
12;67:17,18,21;91:4,
25;119:13;122:19,20,
23;123:2,3,4;125:15;
128:12,13,16;131:5,9,
20;132:6,17,21;133:6,

7,9,16;165:7,7;
171:14;209:1,16;
213:15,16,16;233:8
**told (49)**
26:4;30:6;44:2;
54:6;58:3,16;60:5,5;
74:20;75:10;81:4,7;
82:2;84:9;94:10;96:2,
8;97:2,4;98:12;99:24;
105:24;112:4;127:11;
128:13;129:10;
134:14;135:15;138:9,
12,13;145:15,17,18,
19;146:4,9;147:11,
16;159:19;174:11;
179:25;183:22;
194:11;210:10;212:5;
215:15;221:6,8
**took (15)**
21:11;92:4;100:2;
112:14,18;118:25;
167:2;173:14,18;
202:2,25;226:14,18,
21;228:23
**top (7)**
101:4;185:1;186:5;
193:4,8;231:2;232:4
**Total (25)**
24:14,16;35:25;
36:1,3,6,17,18,20;
37:7,10,16,22,23;
38:1,8,20,24;39:2,4,8;
43:17;59:5;141:12,13
**touch (2)**
70:2;82:8
**toward (1)**
48:17
**towards (1)**
200:15
**towel (2)**
48:15;203:3
**towels (5)**
200:2;202:2,25;
203:12;205:14
**tract (1)**
118:6
**trade (1)**
17:1
**trained (1)**
17:2
**training (1)**
20:14
**transaction (1)**
46:19
**transcribing (1)**
6:13
**transcript (12)**
5:15;33:11;65:8;
72:9;79:22;89:8;
120:20;142:6;174:23;
181:7;187:13;235:20
**traveled (1)**
145:5

**Travelers (95)**
52:1;55:1,10,11;
59:17,23;78:7;80:11;
112:19;134:23;
135:17,21;138:1,10,
11,18;142:11,13,20;
143:1,4,5,6,8,16;
160:9,9;162:15;
164:16;172:16;179:1,
8,9;189:21;193:3,4,9,
13,15,18,20,22,25;
194:3,7,12,12,17,20,
21;195:6,13;196:4,7,
7,13,15;197:7;198:5,
11;207:4,16;212:22,
23;215:4,17;216:2,11,
20;219:20,23;221:15,
23;223:5,7,22,25;
225:16,23,25;227:17,
21;229:23;230:2,5,
11;231:20;232:4,8,10,
25;233:3,14,24;235:2
**Travelers' (1)**
148:18
**Travelers/Charter (1)**
155:6
**travels (1)**
206:21
**trial (3)**
185:16,20;186:19
**tried (4)**
27:14;135:18;
140:2;141:8
**trouble (3)**
120:16;223:16;
225:13
**trucking (1)**
27:21
**true (3)**
6:18;23:1;165:3
**truth (3)**
5:4,4,4
**truthfully (2)**
118:18;192:10
**try (6)**
5:21;9:8;76:12;
100:16;140:1;213:5
**trying (48)**
8:19;11:11;27:9;
35:21;48:13,18;
61:15;70:14;72:23;
73:14;74:5,24;76:14;
88:13,15;95:3;96:19;
97:3;98:2,20;99:6;
102:11,11;103:6;
113:17,17;114:19,24;
115:10,11;131:8;
137:7;140:3;146:11;
152:12,14,18,20;
153:17;177:5;179:13;
180:17;182:25;
188:21;198:21;
201:12;227:6,12

**tub (12)**
55:19;56:14;62:10;
64:2;120:4;121:7;
125:23;133:14;209:7,
12,14;210:15
**tubs (1)**
204:13
**turn (2)**
9:8;209:25
**TV (1)**
170:14
**twice (2)**
204:24;205:14
**two (40)**
19:20;30:10,14;
31:5;39:1,19;57:11;
107:9;109:22;119:7,
12;123:10;124:7,19;
151:1,3;154:1,6;
186:3;200:9;202:16,
17;204:19;205:6;
208:23;213:13,14,19,
22,23;223:8,23;
227:16,22;228:10;
229:16;235:16,22;
236:1,3
**two-page (1)**
196:24
**Tylenol (1)**
115:2
**type (9)**
39:13;130:25;
157:14;179:14;
200:23;228:7;230:3,
10,13

**U**

**Uh-oh (3)**
111:25;166:11,12
**uh-uh (1)**
8:23
**umbrella (5)**
55:1;143:16;193:4;
231:20;232:10
**under (31)**
5:9;7:5;44:22,23;
47:6,8;48:4,22;50:25;
52:24,25;53:5,12,13;
57:6;60:6;91:3,25;
117:11;133:20,22;
134:1;143:16;159:3;
178:10;186:22;194:2;
209:15;212:12,13;
229:25
**underneath (10)**
44:24;45:2;52:14;
55:1;56:15;58:4;
61:20;128:18;134:11;
230:3
**understands (1)**
184:12
**underwriting (3)**

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 260 of 265
Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

54:25;55:12;143:16

**underwrote (1)**
143:14

**United (1)**
117:7

**University (1)**
17:15

**unless (2)**
86:12;181:19

**unloose (1)**
29:19

**up (85)**
5:20;8:17;33:22;
43:3,4;44:24;51:14;
55:8;58:3;62:1;67:16,
19,22;74:14;75:5;
78:17;81:20;82:16;
83:9;85:5,12;91:3;
94:25;101:4;107:6,
25;108:8,19;111:19;
113:2;118:2;120:12;
128:14;129:20;130:2;
138:6,6;140:16;
141:4,5,8,10;142:20,
20;151:21;154:14,16,
18;160:21;169:25;
171:3;175:13;176:18;
177:17;183:18,20;
186:5;187:11;192:13,
15;199:13,14;200:1,2,
3,4,20,21,22;201:20,
22;202:8,10,24;203:1,
8;205:3;206:21,23;
209:15;213:1;219:11;
226:24;230:21;235:9

**upon (3)**
7:20;30:18,24

**urinary (1)**
118:6

**use (12)**
5:15;39:7;51:13;
81:6;140:18,19;
181:18;189:16;190:7,
10;205:1,4

**used (7)**
25:9,11;53:18;90:9;
137:19;190:18;
205:20

**using (8)**
190:1;203:22,23,
24,25;204:24,25;
206:9

**usual (1)**
5:14

**utilized (1)**
159:9

---

## V

**vacuum (1)**
201:20

**vacuumed (1)**
201:22

---

**value (7)**
197:1,2,17,18,20,
23;198:2

**valve (13)**
43:18;44:4,4,5;
45:3,6,6,10,21;62:10;
221:2,21;222:2

**valves (1)**
43:19

**vendor (1)**
135:4

**vendors (4)**
195:5,9,21;196:3

**verbal (1)**
8:16

**versus (4)**
38:24;39:5;117:4;
179:7

**via (2)**
99:19;102:2

**video (1)**
112:1

**view (3)**
41:24;55:13;121:4

**VILLANI (187)**
2:3,5;5:18;6:15,19;
10:22;13:4;17:8,11,
14,16;19:3,6,8,12;
21:22;22:2,2,23;23:17,
20;24:23;25:17;
26:25;27:5,11,20;
28:16,25;30:13,21;
31:3,11,23;35:9,14;
38:13,15;40:6,9,13,
16;47:11;51:19;
53:21;59:14;60:20;
69:23;70:3,6,8;72:22;
74:13;75:4;77:18;
81:20;91:8,12,15;
103:12;106:17;108:8;
110:4,14;111:6;
115:6,15,22;116:17;
120:11;121:12;
124:12;136:5,9,12;
151:1,7,9;154:22,24;
161:23;162:2,11,15,
18;163:2,4,8,23;
164:3;166:5;169:1,5,
24;170:7,10;171:9;
174:17;175:3,6,10;
176:25;177:9,19;
184:10;185:14;
186:11,25;189:11,15,
21,24;190:8;191:2,5,
15;192:13,16,18,21,
25;194:22,25;195:20,
24,25;196:20;198:10;
199:8;201:9;204:11;
207:8,11,12,21,23;
209:10,17,21,23;
211:4,13,18,20;213:1,
2,18;214:1,11;215:10,
14;216:5,8,9,14;

---

217:15,21,25;218:8,
13;220:3,18;222:7,
12;224:9,16,24;226:3,
9;227:10,20,25;
229:12;230:4,20,23,
25;231:3,5;234:3,5,
15;235:3,8,12,24;
236:2,5

**violate (1)**
5:20

**virtually (1)**
8:3

**visits (1)**
26:11

---

## W

**wait (12)**
9:6,8;55:9;72:24;
74:5,23;75:2,13;
101:10;146:6;180:16;
210:22

**waited (4)**
74:20;75:11;146:4;
147:3

**waiting (2)**
69:8;149:25

**waive (1)**
6:12

**walked (2)**
139:18;160:10

**wall (45)**
26:6;48:23;61:22,
22,23;64:24,25;
65:24;66:1,3;67:17,
19;91:5;122:2,5,24;
123:19;124:6,17,18,
22;125:10,11,15,23;
128:15;130:19;131:4,
7,8,19,19,20;132:16,
20,25;133:4,8,12,16;
165:17;168:3,7,10;
213:16

**walls (7)**
51:15;62:1;86:3;
122:2;159:2;206:23;
217:18

**wants (1)**
6:20

**warm (3)**
206:5,6,7

**warping (1)**
159:25

**warranty (20)**
24:9,13,19;25:3,6;
38:20;49:7,8;51:7,13;
52:2;119:18;127:8,8;
129:10,16,25;141:12;
146:17;221:4

**Washer (1)**
37:24

**water (232)**
12:11,15;13:25;

---

20:16;24:21,21,25;
25:1;31:15,22;32:5,8,
13,18,19;34:21;
36:15;37:19;39:8;
40:20,22,23;42:5,9,
11,15,19;43:2,3,5,14,
15,17;45:15;46:24;
48:9,11,17,17,23;
49:4,5,6;50:8,25;51:1,
1,3,8,10,11,14,16,18;
23;58:10,11,14,16,18;
61:9,20;62:11,12,19;
63:18;64:1,3,8,13,22,
23;65:25;66:10;67:9,
10,14;70:14;78:5,17,
21;79:2;80:14;86:21;
87:22;88:20;89:17;
91:9;93:24;97:7,8,15;
111:15;112:22;113:5,
12,19;119:13;120:3;
121:7,8,21;122:19,21,
22;124:4;125:14,22,
25;126:2,24;128:5,8,
10,15;129:11,11,18,
20;130:2,16,25;
131:17,21,22,25;
132:11,11,12;135:8,
10;138:6;140:11;
141:4,8;144:11,25;
145:3,4,6;147:10,20;
160:1;164:23;165:8,
14,22;166:6;167:4,7,
23;168:2,3;172:6;
175:16,19;178:8;
182:2,14;183:3,5,17,
18,20,24;184:15,23;
190:20,23;191:25;
192:1,5;199:14,25;
200:1,1,5,6,15,20,21;
201:21,24,25;202:4,8,
10,12,18,24;203:4,8,
11,21;205:3,16;
206:13,16,16,21;
207:5,6,13,15;208:5,
15,19,22;209:4,7;
210:4,19;211:6,7,16,
25;212:6,8,9;213:22;
224:1;227:16;232:19;
234:22

**water-damaged (1)**
145:2

**way (13)**
6:2,7;9:4,22;93:20;
106:6;110:13;136:18;
146:10;184:14;
190:15;194:24;232:1

**Wednesday (3)**
126:10;161:13;
212:11

**week (11)**
84:2;103:6;109:10;

---

110:14,20;114:1;
126:10;138:7;149:9;
157,7,10

**weekend (9)**
113:23;114:2,3,6,8,
15,19,20;210:8

**weeks (12)**
117:14;118:25;
119:8,12;120:14;
145:7;154:1,6;224:1;
228:10,19;229:16

**welcome (1)**
136:14

**weren't (3)**
83:18;97:23;203:23

**wet (4)**
86:13,18;133:25;
134:5

**what's (22)**
11:22;15:17;44:23;
45:4;47:9;49:9;54:13;
79:14;88:6;91:12;
98:23;116:3;141:6;
150:11;166:13;
168:23;180:14;
200:25;211:13;
215:10,21;216:5

**when's (2)**
25:9;149:19

**whereas (1)**
151:13

**where's (2)**
124:20;201:3

**whole (11)**
5:4;43:15;44:17;
74:24;75:2,5,14;
114:3,5;124:25;138:7

**Who's (4)**
18:20;80:15;
101:14;227:6

**Whose (3)**
101:3,3,7

**wife (2)**
219:13;236:8

**W-I-L-L-E-R (1)**
91:17

**Willie (3)**
91:7,10,17

**W-I-L-L-I-E (1)**
91:18

**within (1)**
213:8

**without (1)**
220:5

**WITNESS (44)**
7:10;17:10,13;19:5,
7;23:19,23;24:25;
26:20;27:3,8;28:23;
30:22;31:8;35:16;
38:14;40:8,11,15;
69:25;70:5,7,10;
72:25;75:8;91:14,17;
102:24;109:4;115:10,

---

20;116:1;151:11;
155:1;163:25;166:11,
13,17;170:9;191:4,6;
192:12;211:1;231:6

**witnessed (1)**
102:7

**witnesses' (1)**
107:5

**wonder (1)**
75:17

**wonderful (1)**
219:10

**wood (5)**
92:4,5;145:1;
200:25;201:1

**Woods (1)**
101:18

**wood-wood (1)**
201:1

**word (3)**
39:19,20;229:19

**words (4)**
39:19;82:1;204:23;
211:18

**work (20)**
17:5;22:14;80:12;
84:20;93:25;94:22;
135:13;142:2;152:22;
153:15;183:22;
195:12,13,15;196:5,7,
9;205:2;214:19;225:5

**worked (1)**
20:11

**working (11)**
18:2,3,6;19:24;
42:12,18;106:14;
188:7,25;189:2,3

**worksheet (1)**
50:2

**worried (1)**
33:16

**worry (2)**
78:24;135:13

**wreck (3)**
140:6,7;197:19

**wrecked (1)**
197:22

**wrecks (1)**
140:5

**write (6)**
69:14;76:2,9;95:7;
197:7;216:2

**writing (1)**
76:6

**written (2)**
106:1,4

**wrong (7)**
26:1;98:11;121:4;
180:8;211:14;215:10;
216:5

**wrote (6)**
75:9;76:5;132:15;
143:15;164:1,2

**wrung (1)**
203:7

**Y**

**y'all (24)**
10:23;15:9;52:7;
59:7,8;73:4;74:18;
76:23;77:9;81:4;
91:24;92:7;99:21;
111:14;129:2;139:19;
146:25;147:6;152:24;
159:18;160:6;165:10;
182:6;200:20

**yard (6)**
50:19;62:22;63:11,
13;190:12;229:9

**year (14)**
16:23;21:20;32:10,
21;36:10,11;38:4;
40:25;42:23;83:19;
106:16;130:5;138:8;
190:22

**years (16)**
12:7,8;14:10,19;
20:12;36:5,7,14;37:8;
66:22,24;145:7;
207:6,14;218:24;
224:2

**yesterday (5)**
120:6;121:1;130:9;
150:1;186:17

**Yolanda (2)**
15:17,21

**Z**

**Zero (2)**
107:14,15

**0**

**0060 (1)**
45:18

**0063 (1)**
34:2

**1**

**1 (34)**
33:10,14,22;36:23;
40:2;41:22;43:10;
50:9;54:9;62:15,18;
93:19,20;99:12,12;
100:10;103:19;
108:18;110:24;130:9;
151:21,25;155:18;
156:19;157:14;
160:13;162:9;163:7,
15;166:25;171:3,8;
230:17,22

**1:00 (2)**
150:2,6

**1:05 (1)**
180:9

**10 (10)**
65:4,7;68:4;117:1;
121:16,19;130:16;
140:10;204:17;
208:11

**10/1/2018 (1)**
55:18

**10:00 (1)**
116:13

**10:05 (1)**
117:1

**100 (3)**
40:3,11,15

**10th (1)**
116:13

**11 (5)**
13:14;70:5;174:21,
22;177:25

**11/12 (1)**
180:9

**11:06 (1)**
54:1

**11:14 (1)**
166:20

**11:16 (1)**
54:1

**11:25 (1)**
166:20

**11th (3)**
69:22;70:1,4

**12 (6)**
13:11,12;20:12;
181:5,6;185:10

**12:23 (1)**
103:15

**12:30 (1)**
103:13

**12:32 (1)**
103:15

**12:51 (1)**
116:6

**12:54 (2)**
116:6;236:12

**12:57 (1)**
116:20

**1232 (1)**
40:1

**12th (4)**
72:13;89:21;
134:22;231:19

**13 (7)**
120:19,23;121:13;
130:6,10;160:19;
229:3

**13th (10)**
74:12,16;143:20;
144:4;145:12;146:3,
25;147:25;148:1;
232:16

**14 (2)**
13:11,11

**14th (1)**
163:9

**15 (6)**
68:4;181:16;
185:10;204:9,17,18

**15- (1)**
205:16

**15,000 (1)**
214:17

**15th (2)**
76:22;77:9

**16 (1)**
62:16

**16th (5)**
42:6,14;157:15,21;
158:24

**17 (3)**
18:10,10;19:17

**17th (3)**
148:9,11,13

**18 (2)**
8:6;180:2

**1-800 (1)**
38:16

**1-800-47 (1)**
38:12

**1-877-444-7750 (1)**
28:4

**18th (6)**
43:14;45:22;46:23;
47:17;50:10;147:25

**19 (2)**
109:12;174:14

**1975 (2)**
15:6;16:24

**1988 (5)**
14:9,11;22:20;23:5;
24:8

**1st (24)**
29:10;47:5,22;
49:17;56:10,23;57:4;
64:1;119:24;121:6,
10,22;122:8;125:22;
132:7,14;133:13;
187:19;210:11,12,14;
211:7,23;213:7

**2**

**2 (6)**
72:7,8;80:1;134:17;
144:8;231:16

**20 (5)**
28:10;180:9;
204:17,18;208:11

**200-and (1)**
176:16

**2012 (1)**
50:25

**2016 (11)**
18:7;34:10,21;37:6;
40:18;62:8;130:11,
16;140:11,21;232:20

**2017 (5)**
18:4,6;19:23;24:3;
39:17

**2018 (65)**
12:16;25:12;26:11;
28:12;29:7;30:20;
31:1,16;42:6,15;
43:14,25;45:23;
46:14,16,23;47:3,17;
48:5,10;49:13;50:11,
18;51:18;56:11,23;
62:11,21;63:9;70:6;
72:13;73:25;74:12,
16;83:3,25;87:6;
89:11,15,21;90:3;
92:11,19;97:18;
106:13;111:16;
114:21;119:12,21,24;
121:6;130:23;133:13;
134:22;135:22;
143:20;144:4,13;
145:12;228:14,22;
229:6;231:19;232:13,
16

**2019 (28)**
80:6;93:14,21;
108:13;109:11;
110:20;111:1;113:15;
114:22;149:10,15;
152:2;156:24;157:7,
11,15,21;158:1,24;
161:10,19;162:11,22;
163:9;164:18;165:3,
15;167:4

**2020 (2)**
175:5;187:19

**2021 (2)**
117:1;151:23

**20-gallon (1)**
205:16

**215-568-2900 (1)**
180:19

**215-985-9177 (1)**
180:23

**229 (1)**
176:21

**22nd (1)**
175:5

**235 (2)**
110:23;156:19

**23rd (1)**
83:25

**250-333 (1)**
2:7

**259 (2)**
103:20;108:18

**25th (1)**
73:24

**26a2B (1)**
186:22

**26th (1)**
74:3

**27,000 (1)**

Case 1:20-cv-04420-TWT    Document 56-3    Filed 10/27/21    Page 262 of 265

Janice Scott v.
The Charter Oak Fire Insurance Company

Part 1 (7-28-21) Part 2 (8-10-21)

Janice Scott
July 28, 2021

176:21
**275 (2)**
  100:9;156:6
**28th (1)**
  118:3
**29th (24)**
  12:16;30:19;31:1,
  16;48:5,10;49:2,12;
  56:11;57:18;62:11;
  63:17;87:6;111:15;
  118:4;119:12,20;
  125:17;171:20;
  175:16;180:2;208:4;
  210:3;213:6
**2nd (18)**
  93:21;99:14;
  108:15;109:8,25;
  110:8,12,17;111:1;
  113:15;152:1;153:8;
  156:24;157:7,11;
  162:11,22;213:7

**3**

**3 (4)**
  99:12;186:8;229:4;
  230:17
**3/4-inch (1)**
  229:7
**30 (1)**
  235:19
**303 (1)**
  2:16
**30303 (1)**
  2:18
**30501 (1)**
  2:8
**30th (6)**
  50:18;63:9;144:13;
  161:10,19;213:7
**31 (1)**
  161:8
**318 (2)**
  23:16,19
**323 (1)**
  162:9
**326 (1)**
  163:6
**327 (2)**
  163:14;171:7
**328 (2)**
  166:25;171:3
**33 (4)**
  14:9,19;218:24,24
**33355 (1)**
  38:21
**34 (1)**
  218:24
**3500 (1)**
  2:17
**37,000 (1)**
  22:9
**37421 (1)**

40:4
**377 (1)**
  160:12
**39 (1)**
  230:23
**396 (1)**
  157:13
**397 (5)**
  54:11;230:17,22,
  25;231:4
**3rd (21)**
  57:4;59:10;61:5;
  64:5;80:6;92:19;
  108:15;109:8,25;
  110:8,12,18;126:11,
  13;127:13,24;153:8;
  212:11,23;213:4,8

**4**

**4 (6)**
  121:13;177:25;
  185:9;187:12,15;
  189:8
**40 (1)**
  16:10
**404-272-5995 (1)**
  91:22
**404-885-6313 (1)**
  2:19
**417 (1)**
  231:3
**42 (1)**
  16:4
**437 (2)**
  33:15;231:4
**44 (2)**
  176:23,24
**46 (1)**
  15:22
**474 (1)**
  38:12
**474-4047 (1)**
  38:17
**4th (6)**
  28:10;60:13;67:13;
  87:14;128:3;130:23

**5**

**5 (9)**
  79:19,21;80:1;
  136:17;189:23,24;
  192:14,19;231:24
**5,000 (6)**
  79:16,18;96:9;97:2,
  4;145:16
**5:00 (6)**
  32:11,14,16;34:17;
  36:16;37:1
**506 (1)**
  19:8
**550247 (1)**

38:21
**58 (3)**
  41:23,24;50:6
**59 (3)**
  43:9;50:8;155:18
**5th (9)**
  64:19;131:1,12;
  132:16;133:14;
  149:22;150:3,12;
  175:20

**6**

**6 (6)**
  89:6,7;90:3;135:20;
  229:4;232:12
**61 (1)**
  62:19
**63 (4)**
  33:25;34:20;36:23;
  50:23
**6th (4)**
  62:20;228:13,22;
  229:6

**7**

**7 (4)**
  142:4,5;230:24;
  232:15
**75 (1)**
  15:21
**770-985-6773 (1)**
  2:9
**7th (3)**
  50:25;149:15,22

**8**

**8 (1)**
  161:21
**8:00 (1)**
  32:15
**8:15 (1)**
  146:3
**821 (1)**
  2:6
**88 (1)**
  218:25
**8th (4)**
  151:23;164:18;
  165:2;167:4

**9**

**9 (1)**
  13:14
**9/29 (1)**
  30:15
**9/5 (1)**
  30:16
**9/6/2018 (1)**
  50:17

**95 (1)**
  15:8
**9th (10)**
  34:10,21;83:3;
  89:11,15;90:3;97:18;
  130:11;135:22;
  232:13

**bfredrics5@outlook.com**

| | |
|---|---|
| **From:** | Janice Scott <mailer@publicadjusteratlantaga.com> |
| **Sent:** | Wednesday, January 2, 2019 10:09 AM |
| **To:** | bfredrics@professional-adjusting-consulting.com |
| **Cc:** | bfredrics5@outlook.com |
| **Subject:** | Public Adjuster Atlanta "Estimate" |

Exhibit 1

From: Janice Scott <scott-janice@comcast.net>
Subject: Estimate

Message:
I need and estimate for my homeowners insurance to compare their estimate to. I have water damage and mold. The amount of money given by insurance is not enough to get the work done and they demand a estimate.

--
This e-mail was sent from a contact form on Public Adjuster Atlanta (https://nam01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fbeta.scxserv.com%2Fpublicadjusteratlantaga_com&amp;data=02%7C01%7C%7C54882162ab40413eea3a08d670c46c9d%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C636820386263537706&amp;sdata=F5CHIAi97XSSQy9nKgYCuw18aJVq%2B3c4HbLymyPlje0%3D&amp;reserved=0)

JScott0001

**TRAVELERS**

The Charter Oak Fire Insurance Company
Po Box 430
Buffalo, NY 14240-0430

Exhibit 2

10/12/2018

**Janice Scott**
**1590 Foote St Ne**
**Atlanta GA 30307**

| | |
|---|---|
| **Insured:** | Janice Scott |
| **Claim Number:** | H9L5871 |
| **Policy Number:** | 0CJP39-982221530-633-1 |
| **Date of Loss:** | 09/29/2018 |
| **Loss Location:** | 1590 Foote St Ne Atlanta GA |

Dear Janice Scott,

I am following up on our recent conversation about your claim. As we discussed, after researching this claim, Travelers Insurance determined that your policy does not cover continuous or repeated seepage or leakage of water. The reasons for this determination are outlined below.

You presented a claim for water damage. We inspected the damages with Janice Scott on 10/04/2018. Our research found there was long term, continuous, or repeated seepage, or leakage of water damage present. This was determined due to the rotting of the wood present in the crawl space under the bathroom area where the leak is present.. Since there is long term water leakage present, your policy does not provide coverage.

As a reference, I have provided the following section of your policy, (Section 1, Perils Insured Against, C. WE DO NOT COVER: 6. Found on pages 7 and 8), which explains that this type of loss is not covered:

Section 1-Perils Insured Against

COVERAGE A DWELLING AND - COVERAGE B
OTHER STRUCTURES
We insure against risks of direct physical loss to
property described in COVERAGE A and B, EXCEPT:

     **C.** WE DO NOT COVER:

           6.CONTINUOUS OR REPEATED SEEPAGE
             OR LEAKAGE OF WATER OR STEAM
             OVER A PERIOD OF TIME, WEEKS,
             MONTHS OR YEARS, FROM WITHIN A
             PLUMBING, DRAINAGE, HEATING, AIR
             CONDITIONING SYSTEM OR AUTOMATIC
             FIRE PROTECTIVE SPRINKLER SYSTEM
             OR FROM WITHIN A HOUSEHOLD APPLIANCE;

This decision is based on the information and documentation we received during our research of

this claim. If you are aware of any new or different information or documentation that might lead us to reconsider our decision, please contact me immediately.

Your policy may have other terms, conditions and exclusions that apply to this claim. We do not waive any rights, including our right to deny coverage, for any other valid reason under the policy or at law.

Please review the Suit Against Us condition of your policy as it contains important information about the period of time in which you may bring legal action.

If you have any questions, please contact me at (470)629-3915 or JTEITELB@travelers.com.

Sincerely,

Jeffrey Teitelbaum
Claim Professional
Direct: (470)629-3915
Office: (800)238-6214 Ext. 629-3915
Fax: (866)680-3951
Email: JTEITELB@travelers.com

P0397